Brendan P. Cullen (CSBN 194057)
cullenb@sullcrom.com
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303-3308
Tel.:  (650) 461-5600
Fax:  (650) 461-5700

***Additional counsel listed on signature page***

*Attorneys for Defendants*
*Goldman, Sachs & Co. and*
*GS Mortgage Securities Corp.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union and of Western Corporate Federal Credit Union, | Case No. CV 11-6521 GW (JEMx) |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GOLDMAN, SACHS & CO. AND GS MORTGAGE SECURITIES CORP.'S MOTION TO DISMISS THE COMPLAINT** |
| Plaintiff, | |
| v. | |
| GOLDMAN, SACHS & CO.; GS MORTGAGE SECURITIES CORP.; and RESIDENTIAL ACCREDIT LOANS, INC., | Complaint filed: August 9, 2011 |
| | Judge: Hon. George Wu |
| | Courtroom: 10 |
| Defendants. | Hearing Date: March 15, 2012 |
| | Hearing Time: 8:30 a.m. |

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................ 1

ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ........................... 4

    A.    The Credit Unions and the Warnings They Received
          Prior to Purchasing the Certificates .................................... 4

    B.    The Certificates and Offering Materials ................................ 6

    C.    The Failure of the Credit Unions ........................................ 8

    D.    NCUA's Claims and Allegations ........................................ 8

ARGUMENT ................................................................................... 9

I.     ALL CLAIMS ARE TIME-BARRED ....................................... 10

    A.    The Statutes of Repose Bar All Securities Act and
          Kansas Blue Sky Law Claims ........................................... 10

          1.    *American Pipe* Tolling Does Not Apply ............................ 11

               a.    NCUA Failed To Plead Adequately
                    *American Pipe* Tolling ........................... 11

               b.    The Class Representatives Do Not Have
                    Standing with Respect to the Credit Unions'
                    Certificates ......................................... 11

               c.    *American Pipe* Tolling Does Not Apply to
                    Statutes of Repose ............................... 12

          2.    The FCUA Does Not Extend the Applicable
               Repose and Limitations Periods ............................. 13

                a.    The "Extender Clause" Does Not Apply to
                    Statutory Claims ................................... 13

               b.    The "Extender Clause" Does Not Apply to
                    Statutes of Repose ............................... 14

    B.    All Claims Are Time-Barred Under the Applicable
          Statutes of Limitations ................................................... 14

          1.    NCUA Fails to Plead Adequately Compliance with
               the Statutes of Limitations ................................... 15

          2.    The Credit Unions Had Inquiry Notice No Later
               Than March 19, 2007 ........................................ 16

# TABLE OF CONTENTS
## (continued)

*Page*

II.   NCUA FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION OF FACT .......................................... 19

    A.    NCUA Fails To Plead An Actionable Misrepresentation Regarding the Underwriting Guidelines of Unaffiliated Originators ....................................................................... 19

    B.    The Offering Documents Accurately Disclosed the Originators' Underwriting Guidelines ............................... 22

    C.    The Average LTV Ratios Were Described Accurately in the Offering Documents and Are Inactionable Statements of Opinion ......................................................................... 23

    D.    The Offering Documents Accurately Disclosed the Credit Enhancements Provided ................................................. 24

III.   NCUA FAILS ADEQUATELY TO PLEAD MATERIALITY ................ 24

CONCLUSION ................................................................................................ 25

-ii-

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Albillo-DeLeon* v. *Gonzales,*
  410 F.3d 1090 (9th Cir. 2005) ........................................................ 12

*Allstate Ins. Co.* v. *Countrywide Fin. Corp.,*
  2011 WL 5067128 (C.D. Cal. Oct. 21, 2011) .................................. 4, 11, 17, 19

*American Pipe & Construction Co.* v. *Utah,*
  414 U.S. 538 (1974) ........................................................ 11, 12

*Ashcroft* v. *Iqbal,*
  129 S. Ct. 1937 (2009) ........................................................ 10, 20

*Bell Atlantic Corp.* v. *Twombly,*
  550 U.S. 544 (2007) ........................................................ 10, 20, 21

*Burnett* v. *Sw. Bell Tel.,*
  151 P.3d 837 (Kan. 2007) ........................................................ 13

*Carver* v. *Workers' Comp. Appeals Bd.,*
  217 Cal. App. 3d 1539 (1990) ........................................................ 13

*Chevron Chem. Co.* v. *Voluntary Purchasing Grp.,*
  659 F.2d 695 (5th Cir. 1981) ........................................................ 13

*Deveny* v. *Entropin, Inc.,*
  139 Cal. App. 4th 408 (2006) ........................................................ 15

*Erickson* v. *Kiddie,*
  1986 WL 544 (N.D. Cal. Feb. 24, 1986) ........................................................ 16

*Footbridge Ltd. Trust* v. *Countrywide Fin. Corp.,*
  770 F. Supp. 2d 618 (S.D.N.Y. 2011) ........................................................ 12

*Footbridge Ltd. Trust* v. *Countrywide Home Loans,*
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ........................................................ 23

*Garcia* v. *Overland Bond,*
  668 N.E.2d 199 (Ill. App. Ct. 1996) ........................................................ 13

-iii-

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

*In re Barclays Bank PLC Sec. Litig.,*
2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ....................................................... 20

*In re Commercial Fin. Servs., Inc.,*
294 B.R. 164 (Bankr. N.D. Okla. 2003) ........................................................ 10

*In re Convergent Techs. Sec. Litig.,*
948 F.2d 507 (9th Cir. 1991) ........................................................................ 19

*In re Deutsche Bank AG Sec. Litig.,*
2011 WL 3664407 (S.D.N.Y. Aug. 19, 2011) ............................................... 24

*In re Gilead Scis. Sec. Litig.,*
536 F.3d 1049 (9th Cir. 2008) ........................................................................ 9

*In re IndyMac Mortg.-Backed Sec. Litig.,*
718 F. Supp. 2d 495 (S.D.N.Y. 2010) ...................................................... 4, 23

*In re IndyMac Mortg.-Backed Sec. Litig.,*
793 F. Supp. 2d 637 (S.D.N.Y. 2011) ........................................................... 12

*In re Infonet Servs. Corp. Sec. Litig.,*
310 F. Supp. 2d 1106 (C.D. Cal. 2003) .................................................. 14, 15

*In re Lehman Bros. Sec. & ERISA Litig.,*
684 F. Supp. 2d 485 (S.D.N.Y. 2010) ............................................................. 4

*In re Lehman Bros. Sec. & ERISA Litig.,*
800 F. Supp. 2d 477 (S.D.N.Y. 2011) ........................................................... 12

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,*
2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ................................................. 4

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,*
2011 WL 4089580 (S.D.N.Y. Sept. 15, 2011) ............................................... 16

*In re Stac Elecs. Sec. Litig.,*
89 F.3d 1399 (9th Cir. 1996) ........................................................................ 14

*Kelly* v. *Primeline Advisory, Inc.,*
889 P.2d 130 (Kan. 1995) ............................................................................. 15

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

*Lampf* v. *Gilbertson,*
    501 U.S. 350 (1991) ........................................ 10

*Landesbank Baden-Württemberg* v. *Goldman, Sachs & Co.,*
    2011 WL 4495034 (S.D.N.Y. Sept. 28, 2011) ................ 21

*McKelvey* v. *Boeing N. Am., Inc.,*
    74 Cal. App. 4th 151 (1999) .............................. 16

*Me. State Ret. Sys.* v. *Countrywide Fin. Corp.,*
    2011 WL 4389689 (C.D. Cal. May 5, 2011) .................. 11

*Me. State Ret. Sys.* v. *Countrywide Fin. Corp.,*
    722 F. Supp. 2d 1157 (C.D. Cal. 2010) .................... 10

*Midstate Horticultural Co.* v. *Pa. R. Co.,*
    320 U.S. 356 (1943) ...................................... 10

*Morton* v. *Mancari,*
    417 U.S. 535 (1974) ...................................... 14

*N.J. Carpenters Health Fund* v. *DLJ Mortg. Capital, Inc.,*
    2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ................. 4

*N.J. Carpenters Health Fund* v. *Novastar Mortg.,*
    2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) ................ 21

*N.J. Carpenters Health Fund* v. *Residential Capital, LLC,*
    2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ................. 4

*Paskowitz* v. *Pac. Capital Bancorp,*
    2009 WL 4911850 (C.D. Cal. Nov. 6, 2009) ................ 24

*P. Stolz Family P'ship L.P.* v. *Daum,*
    355 F.3d 92 (2d Cir. 2004) .............................. 12

*Resolution Trust Corp.* v. *Olson,*
    768 F. Supp. 283 (D. Ariz. 1991) ....................... 14

*Rubke* v. *Capitol Bancorp Ltd.,*
    551 F.3d 1156 (9th Cir. 2009) .......................... 25

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

*Simmons Invs., Inc.* v. *Conversational Computing Corp.*,
  2011 WL 673759 (D. Kan. Feb. 17, 2011) ................... 16

*Sprewell* v. *Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ............................... 9

*Stichting Pensioenfonds ABP* v. *Countrywide Fin. Corp.*,
  2011 WL 3558173 (C.D. Cal. Aug. 9, 2011) ........... 4, 10, 11

*Stone & Webster Eng'g Corp.* v. *Duquesne Light Co.*,
  79 F. Supp. 2d 1 (D. Mass. 2000) ......................... 10

*Toombs* v. *Leone*,
  777 F.2d 465 (9th Cir. 1985) ......................... 15, 16

*Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*,
  692 F. Supp. 2d 387 (S.D.N.Y. 2010) ............... 4, 21, 23

*Xerion Partners I LLC* v. *Resurgence Asset Mgmt.*,
  474 F. Supp. 2d 505 (S.D.N.Y. 2007) ..................... 20

## STATUTES, RULE AND REGULATION

12 U.S.C. § 1787(b)(14) ............................... 13, 14

15 U.S.C. § 77k(a) ....................................... 19

15 U.S.C. § 77l(a)(2) .................................... 19

15 U.S.C. § 77m ................................. 10, 12, 13-14

Cal. Corp. Code § 25401 .................................. 19

Cal. Corp. Code § 25506(b) ........................... 14, 15

Kan. Stat. Ann. § 17-12a509 .................. 10, 14, 15, 19

Fed. R. Civ. P 12(b)(6) ................................... 9

17 C.F.R. § 230.430B ..................................... 10

-vi-

# TABLE OF AUTHORITIES
### (continued)

*Page(s)*

### OTHER AUTHORITIES

Alison Vekshin, *Rise in Nontraditional Mortgages Is Worrying U.S. Lawmakers*, PHILA. INQUIRER, Sept. 21, 2006 .................................................... 5

Allison Pyburn, *2006 HE ABS Vintage:  The Worst Ever?*, ASSET SECURITIZATION REP., Nov. 27, 2006 .................................................... 6

Aparajita Saha-Bubna, *Risky Slice of ABX Index Widens Sharply on Novastar*, DOW JONES NEWSWIRES, Feb. 21, 2007 ............................................ 6

Bob Tedeschi, *When the Truth Goes Begging*, N.Y. TIMES, Aug. 27, 2006 ........... 6

Complaint, *Cedeno* v. *IndyMac Bancorp, Inc.*, No. 06 Civ. 6438 (S.D.N.Y. Aug. 25, 2006) ................................................... 18

Complaint, *Reese* v. *IndyMac Financial*, No. CV 07-1635 (C.D. Cal. Mar. 12, 2007) .................................................... 18

E. Scott Reckard, *Regulator Warns About Nontraditional Mortgages*, L.A. TIMES, Apr. 21, 2006 .......................................................... 6

FDIC Press Release (Mar. 7, 2007) .................................................... 18

FIN. CRIMES ENFORCEMENT NETWORK, OFFICE OF REGULATORY ANALYSIS, DEP'T OF THE TREASURY, MORTGAGE LOAN FRAUD:  AN INDUSTRY ASSESSMENT BASED UPON SUSPICIOUS ACTIVITY REPORT ANALYSIS (Nov. 2006) ......................................................................... 6

Gretchen Morgenson, *Mortgages May Be Messier Than You Think*, N.Y. TIMES, Mar. 4, 2007  .................................................................. 18

Herb Greenberg, *MarketWatch Weekend Investor:  Don't Forget, Higher Reward Comes with a Higher Risk*, WALL ST. J., Feb. 24, 2007 ...................... 6

Joint Press Release, Bd. of Governors of Fed. Reserve Sys. et al., Credit Risk Management Guidance for Home Equity Lending (May 16, 2005) .......... 3

JOSEPH A. ROCCO, MOODY'S INVESTORS SERVICE, EARLY DEFAULTS RISE IN MORTGAGE SECURITIZATIONS 1 (Jan. 18, 2007) ................................................. 6

-vii-

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

Julie Creswell, *Chief Calls Deal a Dream for Wachovia*, N.Y. TIMES,
May 9, 2006 .......................................................................... 5

Letter from NCUA to Credit Unions, *Interagency Guidance on
Nontraditional Mortgage Product Risk* (Oct. 2006) ........................ 5

NCUA's Mem. In Opp'n to Mot. to Dismiss, *NCUA* v. *Siravo*,
No. 10 Civ. 1597 (C.D. Cal. May 12, 2011) .......................... 8, 19, 25

NCUA OFFICE OF INSPECTOR GENERAL, REP. NO. OIG-10-17, MATERIAL
LOSS REVIEW OF U.S. CENTRAL (Oct. 18, 2010) ................... 4, 6, 8, 19

NCUA OFFICE OF INSPECTOR GENERAL, REP. NO. OIG-10-19, MATERIAL
LOSS REVIEW OF WESCORP (Nov. 16, 2010) ........................ 4, 6, 8, 19

NCUA Presentation, *Corporate Credit Unions:  How Did We Get Here*,
*available at* http://www.youtube.com/watch?v=IjvUngJzQYI
(Apr. 12, 2011) ............................................................. 3, 20

*Office of the Comptroller of the Currency Survey Finds Increased Easing of
Commercial, Retail Credit Underwriting Standards*, U.S. FED NEWS ,
Oct. 18, 2006 ..................................................................... 5

*Preserving the American Dream:  Predatory Lending Practices and Home
Foreclosures*, Hearing Before the S. Comm. on Banking, Housing, and
Urban Affairs, 110th Cong. 2 (2007) .................................... 6

Ruth Simon & James Hagerty, *More Borrowers with Risky Loans Are
Falling Behind:  Subprime Mortgages Surged as Housing Market
Soared; Now, Delinquencies Mount*, WALL ST. J., Dec. 5, 2006 ...................... 6

Second Amended Complaint, *NCUA* v. *Siravo*,
No. 10 Civ. 1597 (C.D. Cal. Feb. 22, 2011) .......................... 25

Supervisory Letter from NCUA to Credit Unions, *Increasing Risks in
Mortgage Lending* (Oct. 2005) ....................................... 4, 5

Tentative Ruling, *NCUA* v. *RBS Sec., Inc.*, No. CV 11-5887-GW
(Dec. 19, 2011) ............................. 3-4, 14, 16, 17, 19, 20, 21, 22, 25

-viii-

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

WESCORP, 2008 FINANCIAL ANALYSIS, *available at* http://www.wescorp.org/
content/wescorporg/pdf/financials/analysis_2008.pdf ................................ 7, 17

Defendants Goldman, Sachs & Co. and GS Mortgage Securities Corp. (collectively, "Goldman Sachs") submit this memorandum in support of their motion to dismiss the August 9, 2011 complaint ("Complaint") of the National Credit Union Administration Board ("NCUA").[1]

## PRELIMINARY STATEMENT

Despite warnings in the offering documents, in the media and, most significantly, from NCUA itself about the risks of investing in residential mortgage-backed securities ("RMBS"), the Credit Unions—sophisticated participants in the RMBS market—purchased some $30 billion of RMBS certificates at the height of the housing bubble.[2]  This strategy—which NCUA has itself condemned as "aggressive," "excessive" and "unreasonable"—backfired when the housing and mortgage markets imploded.

Ignoring its own assessment of the cause of the Credit Unions' failure and its own previous warnings to the Credit Unions concerning RMBS investments, NCUA has brought this case and four others like it against various issuers and underwriters of RMBS in which the Credit Unions invested.[3]  In each action, NCUA claims that the issuers and underwriters misled the Credit Unions as to the quality of the securities the Credit Unions purchased.  Here, NCUA asserts claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities

---

[1] NCUA sues in its capacity as liquidating agent for two federally chartered credit unions, U.S. Central Federal Credit Union ("U.S. Central") and Western Corporate Federal Credit Union ("WesCorp" and, collectively with U.S. Central, the "Credit Unions").

[2] An RMBS certificate is a security that entitles its holder to a share of the interest and principal payments from mortgages in a pool that backs the certificate. (Compl. ¶ 25.)  Certificates entitle holders to a pro rata share of the monthly cash flow from the borrowers' payments on the underlying loans and are sold in different classes, or "tranches," of priority.  (*Id.* ¶¶ 40-50.)

[3] *See NCUA* v. *J.P. Morgan Secs.*, No. 11 Civ. 2341 (D. Kan., filed June 20, 2011); *NCUA* v. *RBS Secs.*, No. 11 Civ. 2340 (D. Kan., filed June 20, 2011); *NCUA* v. *RBS Secs.*, No. 11 Civ. 5887 (C.D. Cal., filed July 18, 2011); *NCUA* v. *Wachovia Capital Mkts.*, No. 11 Civ. 2649 (D. Kan., filed Nov. 28, 2011).

Act") and the Blue Sky laws of California and Kansas.  NCUA contends that it is entitled to recoup the Credit Unions' alleged investment losses on AAA- or AA-rated certificates ("Certificates") they purchased in 13 RMBS offerings that closed between March 2006 and June 2007.

The Complaint concedes that the Certificates received investment-grade ratings by independent rating agencies and that the offering documents contained disclosures regarding the liberal loan origination standards and risks inherent in RMBS and the Certificates, including if economic conditions changed. Nonetheless, NCUA contends that the securities were even riskier than described because of the supposed abandonment of underwriting guidelines by loan originators unaffiliated with Goldman Sachs, and alleged deficiencies in disclosures related to loan-to-value ratios (and the appraisals used to calculate those ratios) and credit enhancement measures.  In almost all respects, the Complaint fails to allege facts about the 13 RMBS offerings at issue here. Moreover, the Complaint's post hoc challenge to the offering disclosures based on post-offering delinquencies and ratings downgrades years after the offerings is a classic example of improper hindsight pleading.

The Court should dismiss the Complaint for several reasons:

*First*, the Securities Act and Kansas Blue Sky law claims are time-barred by their respective three-year and five-year statutes of repose, and all of NCUA's claims are time-barred by the applicable statutes of limitations.  At least by mid-March 2007, the Credit Unions had inquiry, if not actual, notice of the claims NCUA has asserted in the Complaint.  As a result, the one-year statute of limitations (Securities Act claims) and two-year statutes of limitations (California and Kansas Blue Sky law claims) expired well before August 19, 2010, when Goldman Sachs agreed to toll the statutes.  (*See infra* at pages 10 to 19.)

*Second*, NCUA has not pled any actionable misstatement or omission. NCUA ignores specific disclosures in the offering documents—and its own

-2-

admonitions—that warned the Credit Unions of the risks about which NCUA now complains.  NCUA relies instead on post-offering loan delinquency rates, alleged losses greater than NCUA "expected," and ratings downgrades long after the offerings in an attempt to manufacture, with perfect hindsight, a misstatement in the offering documents.  This supposed "evidence" of originators' abandonment of underwriting guidelines is more likely explained by the unprecedented economic crisis—as *NCUA itself admitted* before filing this action when it stated that the "losses associated with the private-label mortgage-backed securities that were held by corporate credit unions" were "cause[d]" by "the overall global economic crisis that emerged in 2007."[4]  (*See infra* at pages 19 to 24.)

       *Third*, given the extensive risk disclosures in the offering documents, coupled with the Credit Unions' awareness of those risks when they purchased the Certificates, NCUA has not alleged that the purported misrepresentations in the offering materials were material.  Indeed, NCUA's warnings to the Credit Unions starting in 2005 about the "easing of underwriting standards" and the risks of "[l]imited or no documentation" loans undermine any suggestion of materiality.[5]  (*See infra* at pages 24 to 25.)

       This Court has considered several of these same grounds for dismissal and has indicated that a substantially similar complaint filed by NCUA should be dismissed.  Tentative Ruling, *NCUA* v. *RBS Sec., Inc.*, No. CV 11-5887-GW (Dec.

---

[4] NCUA Presentation, *Corporate Credit Unions:  How Did We Get Here* (Apr. 12, 2011), *available at* http://www.youtube.com/watch?v=IjvUngJzQYI ("NCUA Presentation") (Ex. 14).

[5] Joint Press Release, Bd. of Governors of Fed. Reserve Sys. et al., Credit Risk Management Guidance for Home Equity Lending (May 16, 2005) ("Joint Press Release"), at 1-2 (Ex. 15).

19, 2011) ("*NCUA* v. *RBS*") ("Tentative Ruling").   As explained below, the grounds for dismissal apply with even greater force here.[6]

### ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS

**A.   The Credit Unions and the Warnings They Received Prior to Purchasing the Certificates.**

The Credit Unions were the two largest corporate credit unions in the United States and major participants in the mortgage industry.  By 2008, the Credit Unions owned more than $30 billion of privately issued RMBS.[7]   The Credit Unions also oversaw and provided financial services to member credit unions that originated the very same types of mortgage products, including through the same reduced documentation programs, that are the subject of NCUA's claims here.[8]

NCUA began warning the Credit Unions in May 2005 about the risks associated with the type of loans backing the Credit Unions' RMBS investments:

•   In May 2005, NCUA and other federal regulators issued credit risk management guidelines for home equity loans that warned of "[l]imited or no documentation of a borrower's assets, employment, and income" and "easing of

---

[6] Numerous other courts facing equally deficient claims in similar RMBS actions have dismissed the claims with prejudice.  *See, e.g.*, *Allstate Ins. Co.* v. *Countrywide Fin. Corp.*, 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011); *Stichting Pensioenfonds ABP* v. *Countrywide Fin. Corp.*, 2011 WL 3558173 (C.D. Cal. Aug. 9, 2011); *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010); *N.J. Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010); *N.J. Carpenters Health Fund* v. *DLJ Mortg. Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010).

[7] NCUA OFFICE OF INSPECTOR GENERAL, REP. NO. OIG-10-19, MATERIAL LOSS REVIEW OF WESCORP (Nov. 16, 2010) ("OIG WesCorp Report"), at 16 (Ex. 16); NCUA OIG, REP. NO. OIG-10-17, MATERIAL LOSS REVIEW OF U.S. CENTRAL (Oct. 18, 2010) ("OIG U.S. Central Report"), at 14 (Ex. 17).

[8] *See* Supervisory Letter from NCUA to Credit Unions, *Increasing Risks in Mortgage Lending* (Oct. 2005) ("NCUA Oct. 2005 Letter"), at 8-10 (Ex. 18).

-4-

underwriting standards." (Joint Press Release at 1-2.) The guidelines stressed the need to "closely monitor the quality of loans . . . , includ[ing] post-purchase underwriting reviews." (*Id.* at 4.) The guidelines also alerted the Credit Unions to the potential for the "systematic overvaluation of properties." (*Id.* at 5.)

• In October 2005, in its "Increasing Risks in Mortgage Lending" letter-report, NCUA warned the Credit Unions that "many lenders appear to be loosening their credit standards." (NCUA Oct. 2005 Letter at 8.) NCUA also highlighted recent "changes in underwriting procedures, written or practiced, indicating an increased appetite for credit risk," as well as risks relating to the growing use of interest-only and payment option adjustable rate loans, which could lead to higher default rates. (*Id.* at 3-4, 8-10.)

• In October 2006, NCUA advised the Credit Unions to "'monitor compliance with underwriting standards and exceptions to those standards,'" which were being used to originate higher-risk "'nontraditional loan products'" (like many of the loans that backed the Certificates). (Letter from NCUA to Credit Unions, *Interagency Guidance on Nontraditional Mortgage Product Risk* (Oct. 2006), at 9 (Ex. 19).)

In 2006 and early 2007, media and analyst reports publicized similar issues regarding the growing problems related to originators' underwriting guidelines, including the concerns of regulators about those guidelines.[9] By early 2007, the loosening of underwriting standards was accepted as fact. *See, e.g.,*

---

[9] For example, *The New York Times* reported in May 2006 that regulators were "worried that lenders have lowered underwriting standards," including through the use of alternative and stated documentation loans. Julie Creswell, *Chief Calls Deal a Dream for Wachovia*, N.Y. TIMES, May 9, 2006, at C1 (Ex. 20); *see also, e.g.,* Alison Vekshin, *Rise in Nontraditional Mortgages Is Worrying U.S. Lawmakers*, PHILA. INQUIRER, Sept. 21, 2006, at C4 (Ex. 21) (U.S. senators expressed concern over "lax underwriting standards"); *Office of the Comptroller of the Currency Survey Finds Increased Easing of Commercial, Retail Credit Underwriting Standards*, U.S. FED NEWS (Oct. 18, 2006) (Ex. 22) (OCC reporting on "third consecutive year of eased commercial and retail credit underwriting standards").

*Preserving the American Dream:   Predatory Lending Practices and Home Foreclosures*, *Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 2 (2007) (Ex. 23) ("It is widely recognized today, even within the mortgage industry, that lenders have become too lax in qualifying applicants for subprime loans.").   The media repeatedly reported allegedly improper origination practices,[10] as well as rising rates of mortgage delinquency and foreclosure.[11]

Despite these repeated warnings, including from NCUA itself, the Credit Unions persisted in investing heavily in RMBS.  (*See* OIG WesCorp Report at 16 (RMBS approximately 70% of WesCorp's investment portfolio); OIG U.S. Central Report at 13 (RMBS 63% of U.S. Central's total investment portfolio).)

**B.   The Certificates and Offering Materials.**

Between March 2006 and June 2007, the Credit Unions purchased Certificates totaling approximately $1.17 billion original principal amount in 13 RMBS offerings underwritten by Goldman, Sachs & Co.   (Compl. ¶¶ 8-9.) Although each of the Certificates received investment-grade credit ratings of AAA or AA from independent rating agencies at closing, given the strong housing market at the time (*id.* ¶ 51), the offering materials contained hundreds of pages of

---

[10] *E.g.*, FIN. CRIMES ENFORCEMENT NETWORK, OFFICE OF REGULATORY ANALYSIS, DEP'T OF THE TREASURY, MORTGAGE LOAN FRAUD:  AN INDUSTRY ASSESSMENT BASED UPON SUSPICIOUS ACTIVITY REPORT ANALYSIS (Nov. 2006) (Ex. 24); Bob Tedeschi, *When the Truth Goes Begging*, N.Y. TIMES, Aug. 27, 2006 (Ex. 25); E. Scott Reckard, *Regulator Warns About Nontraditional Mortgages*, L.A. TIMES, Apr. 21, 2006, at C2 (Ex. 26); Ruth Simon & James Hagerty, *More Borrowers with Risky Loans are Falling Behind:  Subprime Mortgages Surged as Housing Market Soared; Now, Delinquencies Mount*, WALL ST. J., Dec. 5, 2006, at A1 (Ex. 27).

[11] *E.g.*, Allison Pyburn, *2006 HE ABS Vintage:  The Worst Ever?*, ASSET SECURITIZATION REP., Nov. 27, 2006 (Ex. 28); JOSEPH A. ROCCO, MOODY'S INVESTORS SERVICE, EARLY DEFAULTS RISE IN MORTGAGE SECURITIZATIONS 1 (Jan. 18, 2007) (Ex. 29); Aparajita Saha-Bubna, *Risky Slice of ABX Index Widens Sharply on Novastar*, DOW JONES NEWSWIRES, Feb. 21, 2007 (Ex. 30); Herb Greenberg, *MarketWatch Weekend Investor:  Don't Forget, Higher Reward Comes with a Higher Risk*, WALL ST. J., Feb. 24, 2007, at B3 (Ex. 31).

-6-

detailed disclosures concerning the loans, the transactions and the risks of investing in RMBS since macro-conditions could change and particularly impact subprime borrowers.  For example, the offering documents disclosed that loan originators frequently made exceptions to stated underwriting "guidelines," which themselves were "less stringent" than those promulgated by Fannie Mae or Freddie Mac,[12] and that loans issued pursuant to these less-stringent guidelines risked "higher rates of delinquencies, defaults and foreclosures than loans underwritten" under the Fannie Mae or Freddie Mac guidelines.[13]  The offering documents also disclosed that originators used a variety of alternative lending programs that limited or eliminated standard disclosure or verification requirements, including with regard to borrowers' income, assets and employment.[14]

Immediately after they purchased each Certificate, the Credit Unions had access to monthly reports on the performance of the loans backing each Certificate, including monthly data concerning the delinquency rates of the loans in each tranche and the amount of losses.[15]  NCUA alleges in the Complaint that those monthly reports reflected "spike[s] in [loan] delinquencies and defaults,"

---

[12] *E.g.*, RALI 2007-QH5 Pro. Supp. at S-11, S-20 (Ex. 12); GSR 2007-OA1 Pro. Supp. at 29-30 (Ex. 6); FFMLT 2006-FF4 Pro. Supp. at S-14 (Ex. 2).  Attached as Appendix A ("App. A") is a compilation of the relevant disclosures contained in the offering documents for the 13 RMBS offerings.

[13] *E.g.*, GPMFT 2006-OH1 Pro. Supp. at S-11 (Ex. 4); RALI 2007-QH5 Pro. Supp. at S-20 (Ex. 12); GSR 2007-OA1 Pro. Supp. at 30 (Ex. 6); *see also* App. A.1.

[14] *E.g.*, GSR 2007-OA1 Pro. Supp. at 30-31 (Ex. 6); ALT 2007-OA4 Pro Supp. at S-35 to S-37 (Ex. 1); *see also* App. A.3.

[15] The monthly reports are available to the general public at www.usbank.com/abs (free registration required).  *See, e.g.*, FFMLT 2006-FF4 Pro. Supp. at S-72 to S-73 (Ex. 2); RALI 2007-QH5 Pro. Supp. at 55-56 (Ex. 12); *see also* App. A.8; WESCORP, 2008 FINANCIAL ANALYSIS, *available at* http://www.wescorp.org/content/wescorp/pdf/financials/analysis_2008.pdf ("WesCorp Financial Analysis"), at 8 (Ex. 32) ("From the inception of a purchase through the entire time of ownership, WesCorp performs multiple due diligence reviews on its investments.").

which "occurred *almost immediately* after" the Credit Unions purchased each Certificate.  (Compl. ¶ 64 & Table 5 (emphasis added).)

### C.   The Failure of the Credit Unions.

Despite the data, reports and statements pointing to the increasing risk of investing in RMBS, including direct warnings from NCUA itself, the Credit Unions invested most of their investment portfolios in RMBS.  The Credit Unions failed when the housing bubble burst, and NCUA placed the Credit Unions into conservatorship on March 20, 2009.  (Compl. ¶ 14.)

In 2010, NCUA's Office of the Inspector General ("OIG") issued two reports on the Credit Unions' failures.  Both reports found that the Credit Unions "should have recognized the risk exposure that [their] significant concentration in [RMBS] represented earlier than 2007" and "should have been more vigilant about investing so heavily in higher risk residential mortgage loans taken out by borrowers with the questionable ability to repay the mortgages."  (OIG WesCorp Report at 25, 34; OIG U.S. Central Report at 4.)  The reports also found that each Credit Union had failed because their management pursued an "unreasonable" and "aggressive" investment strategy in RMBS.  (OIG WesCorp Report at 1; OIG U.S. Central Report at 1.)

Indeed, NCUA has sued WesCorp's management for breaching their fiduciary duties by pursuing that investment strategy and by ignoring known risks, asserting that, "[b]y the summer of 2005," management should have been aware that "the credit quality of the Option ARM MBS loan pools was deteriorating; and [that] a drop in housing demand could result in a decrease in real estate values and credit losses."  (NCUA's Mem. in Opp'n to Mot. to Dismiss at 13, *NCUA* v. *Siravo*, No. 10 Civ. 1597 (C.D. Cal. May 12, 2011) ("NCUA Brief") (Ex. 33).)

### D.   NCUA's Claims and Allegations.

In this action, NCUA challenges the accuracy of disclosures in the offering materials for 13 RMBS offerings between March 2006 and June 2007.

(Compl. ¶¶ 8-9.)   NCUA asserts claims under Sections 11 and 12(a)(2) of the Securities Act and the Blue Sky laws of California and Kansas, seeking unspecified damages and rescission of certain transactions.   In ostensible support, NCUA has cobbled together a set of hindsight theories about what it now asserts must have been inaccuracies in the offering documents.   Relying on backward-looking statistical "studies" and selective citations to recent governmental inquiries into the financial crisis, NCUA alleges that the offering documents:   (1) misstated that the loans that backed the Certificates had been originated in accordance with originators' underwriting guidelines (*id.* ¶¶ 234-83);[16] (2) understated loan-to-value ("LTV") ratios (*id.* ¶¶ 284-90); and (3) based disclosures concerning the extent of credit enhancement on misstatements regarding the quality of the underlying mortgage pool (*id.* ¶¶ 291-98).

Each of these purported misrepresentations is inactionable, refuted by disclosures in the offering documents, or both.

## ARGUMENT

Although courts considering motions to dismiss under Rule 12(b)(6), Fed. R. Civ. P., generally assume the truth of the complaint's allegations and draw all reasonable inferences in plaintiff's favor, the Court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).   The Court also need not accept the truth of allegations that are contradicted by "matters properly subject to judicial notice or by exhibit."  *Sprewell* v. *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).   A motion

---

[16] The Complaint challenges the underwriting practices of eight originators, none of which are or were affiliated with Goldman Sachs:  American Home Mortgage, Countrywide Home Loans ("Countrywide"), First Franklin Financial Corp., Fremont Investment & Loan ("Fremont"), GreenPoint Mortgage Funding, Homecomings Financial ("Homecomings"), IndyMac Bank ("IndyMac"), and Long Beach Mortgage.  (Compl. ¶¶ 106, 117, 142, 153, 159, 165, 170, 192.)

-9-

to dismiss should be granted where the complaint fails to plead specific factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).  "[L]abels and conclusions" and "naked assertions devoid of further factual enhancement" do not suffice. *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009).

## I.  ALL CLAIMS ARE TIME-BARRED.

### A.  The Statutes of Repose Bar All Securities Act and Kansas Blue Sky Law Claims.

Section 13 of the Securities Act provides that all claims brought under Sections 11 and 12(a)(2) may "[i]n no event" be brought more than three years after the security was "bona fide offered to the public" (Section 11 claims) or "after the sale" of the security to plaintiff (Section 12(a)(2) claims).  15 U.S.C. § 77m; 17 C.F.R. § 230.430B; *see Stichting*, 2011 WL 3558173, at *2; *Me. State Ret. Sys.* v. *Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1165 (C.D. Cal. 2010). Under the Kansas Blue Sky law, claims must be brought within five years of the sale of the security.  KAN. STAT. ANN. § 17-12a509(j).

All of the Certificates were "bona fide offered to the public" and allegedly purchased by the Credit Unions on or before June 29, 2007 (*see* Compl. ¶¶ 8-9), more than three years before this action was filed.[17]  Therefore, all Securities Act claims are time-barred.  Further, the sole RMBS that is the subject of the Kansas Blue Sky law claim (FFMLT 2006-FF4) allegedly was purchased by U.S. Central on March 3, 2006 (*id.* ¶¶ 8, 375-83), more than five years before

---

[17]  Although Goldman Sachs entered into a tolling agreement with NCUA in August 2010, courts have held that statutes of repose cannot be tolled through private agreement.  *E.g.*, *Stone & Webster Eng'g Corp.* v. *Duquesne Light Co.*, 79 F. Supp. 2d 1, 3-4, 7-8 & n.9 (D. Mass. 2000); *In re Commercial Fin. Servs., Inc.*, 294 B.R. 164, 172-73 (Bankr. N.D. Okla. 2003); *see Lampf* v. *Gilbertson*, 501 U.S. 350, 363 (1991); *Midstate Horticultural Co.* v. *Pa. R. Co.*, 320 U.S. 356, 358-59 (1943).  In any event, the three-year statute of repose expired before Goldman Sachs entered into the tolling agreement in August 2010.

-10-

1  NCUA filed this action.  Therefore, the Kansas Blue Sky law claim is time-barred

2  by the five-year statute of repose.

3               **1.**    ***American Pipe* Tolling Does Not Apply.**

4           NCUA alleges that, because the Credit Unions were members of

5  putative shareholder classes in various actions allegedly filed between October

6  2006 and June 2007, the filing of those class actions tolled the applicable statutes

7  of limitations and repose under *American Pipe & Construction Co.* v. *Utah*, 414

8  U.S. 538 (1974).  (Compl. ¶ 306.)  This argument fails for several reasons.

9                **a.**    **NCUA Failed To Plead Adequately *American Pipe***

10                      **Tolling.**

11           In order to plead tolling under *American Pipe*, a plaintiff must allege

12  "the grounds for asserting that a [class representative] also purchased the security;

13  the [tranches] of the security that the [class representative] purchased; and the date

14  on which that [class representative] joined the [class action]."  *Stichting*, 2011 WL

15  3558173, at *2.  The Complaint alleges none of this information.

16                **b.**    **The Class Representatives Do Not Have Standing**

17                      **with Respect to the Credit Unions' Certificates.**

18           *American Pipe* tolling applies only to claims concerning securities for

19  which the putative class representative has standing to sue.  *See*, *e.g.*, *Allstate*, 2011

20  WL 5067128, at *10.  To have standing, the class representative must have

21  purchased certificates from the same tranche in the same offering to which the

22  claims relate (*i.e.*, "tranche-based" standing).  *See*, *e.g.*, *id.*; *Me. State Ret. Sys.* v.

23  *Countrywide Fin. Corp.*, 2011 WL 4389689, at *2, *6 (C.D. Cal. May 5, 2011);

24  *Stichting*, 2011 WL 3558173, at *2.  Each tranche is a different security, with a

25  different CUSIP number, based on a different group of assets and carrying a

26  "different level of risk" from the other tranches.  *See*, *e.g.*, *Me. State*, 2011 WL

27  4389689, at *5-6; *see also* Compl. ¶ 40.

28

Here, *none* of the named plaintiffs in the purportedly tolling class actions bought *any* of the Certificates the Credit Unions allegedly purchased. (*See* App. B hereto.)  Because the named plaintiffs in those cases lacked standing to assert any claims as to the Certificates, the statutes of limitations and repose were not tolled under *American Pipe*.

### c. *American Pipe* Tolling Does Not Apply to Statutes of Repose.

Even if the class representatives somehow had standing to assert claims concerning the RMBS at issue here, *American Pipe* tolling applies only to statutes of limitations, not statutes of repose.  Courts have long recognized the distinction between the effect of tolling on statutes of repose and limitations:

> Statutes of limitations bear on the availability of remedies and . . . are subject to . . . tolling. . . .  In contrast, statutes of repose affect the availability of the underlying right:  That right is no longer available on the expiration of the specified period of time. . . .   [T]he legislative bar to subsequent action is absolute.

*P. Stolz Family P'ship L.P.* v. *Daum*, 355 F.3d 92, 102-03 (2d Cir. 2004); *see also Albillo-DeLeon* v. *Gonzales*, 410 F.3d 1090, 1097 & n.5 (9th Cir. 2005).  These decisions are consistent with the plain language of Section 13, which states that "*[i]n no event* shall any such action be brought" after the three-year period.  15 U.S.C. § 77m (emphasis added).  As a result, several courts in recent RMBS actions have refused to permit tolling of statutes of repose under *American Pipe*.[18]

---

[18] *See, e.g., In re Lehman Bros. Sec. & ERISA Litig.*, 800 F. Supp. 2d 477, 482-83 (S.D.N.Y. 2011); *Footbridge Ltd. Trust* v. *Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 620-21, 624-25 (S.D.N.Y. 2011); *In re IndyMac Mortg.-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 642-43 (S.D.N.Y. 2011).

-12-

## 2. The FCUA Does Not Extend the Applicable Repose and Limitations Periods.

NCUA cannot avoid the tolling principles discussed above by contending that its claims were tolled by the "extender clause" of the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1787(b)(14).  (Compl. ¶ 299.)

### a. The "Extender Clause" Does Not Apply to Statutory Claims.

The FCUA extends the limitations period (a) for a *tort* claim, for "the longer of:  (I) the 3-year period beginning on the date the claim accrues; or (II) the period applicable under State law"; and (b) for a *contract* claim, for "the longer of (I) the 6-year period beginning on the date the claim accrues; or (II) the period applicable under State law."   12 U.S.C. § 1787(b)(14)(A)(i)-(ii).   The plain language of the statute therefore makes clear that the "extender clause" applies only to state "contract" and "tort" claims.

NCUA does not assert state contract or tort claims; rather, it asserts federal and state securities claims provided for by statute.  *See Carver* v. *Workers' Comp. Appeals Bd.*, 217 Cal. App. 3d 1539, 1546-47 (1990) (distinguishing "wholly statutory" claims from those "derived from common law" of tort or contract); *Burnett* v. *Sw. Bell Tel.*, 151 P.3d 837, 843 (Kan. 2007) ("A cause of action may be found in tort or contract, or it may be statutorily created. . . .  [T]his court has repeatedly held that a statutory action in this state is *sui generis*—that is, it is neither a contract action nor a tort action, but something entirely its own."); *Chevron Chem. Co.* v. *Voluntary Purchasing Grp.*, 659 F.2d 695, 702 (5th Cir. 1981) (distinguishing common law tort decisions on the basis that the federal statute at issue "created a *sui generis* federal statutory cause of action"); *Garcia* v. *Overland Bond*, 668 N.E.2d 199, 206-07 (Ill. App. Ct. 1996) (distinguishing "statutory right of action created by the legislature" from common law tort claims).

None of NCUA's claims is subject to the extender clause; instead, each is governed by its own separate, specific statute of limitations.  *See* 15 U.S.C.

-13-

§ 77m; Cal. Corp. Code § 25506(b); Kan. Stat. Ann. § 17-12a509(j). Under settled principles of statutory interpretation, these specific statutes govern over the general FCUA's "extender clause." *See Morton* v. *Mancari*, 417 U.S. 535, 550-51 (1974) (a "specific provision applying to a very specific situation" governs over one of "general application" unless there is a "clear intention otherwise").

### b. The "Extender Clause" Does Not Apply to Statutes of Repose.

As this Court indicated in its Tentative Ruling in *NCUA* v. *RBS*, even if the extender clause tolled the applicable statutes of limitations, it still would not apply to the statutes of repose. *See* Tentative Ruling at 14-16. The plain language of the extender clause makes clear that it can apply only to a "statute of limitations." 12 U.S.C. § 1787(b)(14). The extender clause makes no mention of statutes of repose. *See, e.g., Resolution Trust Corp.* v. *Olson*, 768 F. Supp. 283, 285-86 (D. Ariz. 1991) (holding that nearly identical provision of Financial Institutions Reform, Recovery and Enforcement Act applies only to "procedural statutes of limitation and not substantive statutes of repose").

### B. All Claims Are Time-Barred Under the Applicable Statutes of Limitations.

In addition to establishing the three-year period of repose, Section 13 of the Securities Act also requires plaintiffs to file Section 11 and Section 12(a)(2) claims within one year after "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m; *see In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1411 (9th Cir. 1996) (under Section 13, complaint must be filed "within one year of actual notice or inquiry notice"); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1113 (C.D. Cal. 2003) (statute begins "when discovery should have been made by the exercise of reasonable diligence"). Inquiry notice may be "triggered by any financial, legal, or other data, such as public disclosures in the media . . .

-14-

that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of securities." *In re Infonet*, 310 F. Supp. 2d at 1113-14.  The Blue Sky laws of California and Kansas have two-year statutes of limitations, also running from the date the plaintiff has inquiry notice of its claims. CAL. CORP. CODE § 25506(b); KAN. STAT. ANN. § 17-12a509(j); *Deveny* v. *Entropin, Inc.*, 139 Cal. App. 4th 408, 428 (2006); *Kelly* v. *Primeline Advisory, Inc.*, 889 P.2d 130, 137-38 (Kan. 1995).

NCUA does not allege that it or the Credit Unions lacked inquiry notice of the allegations asserted in this action more than two years before August 19, 2010, when Goldman Sachs agreed to toll the statutes of limitations.  Instead, NCUA relies on its contention that the statutes were tolled by the FCUA's "extender clause."  (Compl. ¶¶ 299-300.)  Even if NCUA were correct that the FCUA's "extender clause" applies here, however, the claims were time-barred *before* NCUA became conservator on March 20, 2009, because the Credit Unions had inquiry notice at least two years earlier (by March 19, 2007).[19]

### 1.    NCUA Fails to Plead Adequately Compliance with the Statutes of Limitations.

Section 13 of the Securities Act requires a plaintiff to "affirmatively plead sufficient facts in [the] complaint to demonstrate conformity with the statute of limitations." *Toombs* v. *Leone*, 777 F.2d 465, 468 (9th Cir. 1985).  Plaintiffs must allege the particular time and circumstances of their discovery of the alleged misrepresentations, and may not "rely[] . . . on general public knowledge of

---

[19] NCUA's Blue Sky law claims for Certificates the Credit Unions allegedly purchased after March 19, 2007 are inactionable because by that time there were sufficient "storm warnings to alert a reasonable person to the probability" of misrepresentations, and, as a result, none of the alleged misrepresentations in those offering documents was "material." *In re Infonet*, 310 F. Supp. 2d at 1114; *see also infra* at pages 24 to 25.

-15-

underwriting practices and the other conduct on which the [complaint] is based." *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2011 WL 4089580, at *11 (S.D.N.Y. Sept. 15, 2011); *see Erickson* v. *Kiddie*, 1986 WL 544, at *6 (N.D. Cal. Feb. 24, 1986) (plaintiff "must plead (1) the time and circumstances of discovery of the untrue statement or omission, (2) the reasons why the alleged [misrepresentation] was not discovered sooner, and (3) [its] diligence in making such discovery"); *see also McKelvey* v. *Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 160 (1999); *Simmons Invs., Inc.* v. *Conversational Computing Corp.*, 2011 WL 673759, at *6 (D. Kan. Feb. 17, 2011).

NCUA has not pled the time and circumstances of its discovery of the allegedly misrepresented facts, nor does it describe its attempts (if any) to make such discovery. Instead, NCUA refers to a 2008 Federal Reserve report noting that "deteriorating lending standards" were not readily apparent to investors. (Compl. ¶ 304.)   This allegation is exactly the type of reliance "on general public knowledge of underwriting practices" that fails as a matter of law. *In re Morgan Stanley*, 2011 WL 4089580, at *11; *see also* Tentative Ruling at 16-17 (rejecting identical allegation).   NCUA also conclusorily alleges that it could not have discovered the facts more than one year before it became the Credit Unions' conservator.   (Compl. ¶ 305.)   As demonstrated below, this allegation is contradicted by judicially noticeable facts and other allegations in the Complaint. NCUA's allegation merely parrots the statutory language, and hence fails to meet its burden of pleading compliance. *See Toombs*, 777 F.2d at 468.

### 2.   The Credit Unions Had Inquiry Notice No Later Than March 19, 2007.

For several reasons, the Credit Unions had at least inquiry (and almost certainly actual) notice of the allegations asserted here by March 2007:

*First*, the Complaint itself concedes that the Credit Unions were on inquiry notice well before March 2007.   NCUA has alleged that as the loans

-16-

"began to significantly underperform, . . . [i]t became evident that originators had systematically disregarded their underwriting standards."   (Compl. ¶ 90.) According to NCUA, the loans began to significantly underperform *immediately after each Certificate was purchased*, beginning in March 2006.  (*See id.* ¶¶ 63-64, 82-84 (delinquencies and alleged losses "spik[ed] . . . almost immediately after" each Certificate was purchased).)[20]   NCUA points to these delinquency and loss allegations as evidence of "systematic disregard" for underwriting guidelines.  (*Id.* ¶¶ 64, 84.)   But the basis for that allegation (*i.e.*, the "spikes" in losses and delinquencies), by NCUA's own admission, was available to the Credit Unions as soon as they began purchasing the Certificates in March 2006.  *See Allstate*, 2011 WL 5067128, at *11 ("[Plaintiff] is faced here with a Hobson's choice.  If it is correct in its big-picture argument that systemic abandonment is sufficient to state an RMBS § 10(b) claim, then it was on notice of that claim . . .  If it is wrong, . . . then its claim is insufficient."); *see also* Tentative Ruling at 18 ("[NCUA] unquestionably faces difficulties in asserting that the performance statistics form a large basis for its allegations concerning the systematic disregard of underwriting guidelines while at the same time avoiding a statute of limitations problem.").

            *Second*, beginning in May 2005, *NCUA itself warned* the Credit Unions of the "easing" and "loosening" of underwriting guidelines.  (*See supra* at pages 4 to 6.)  As this Court noted in its Tentative Ruling, "it is often difficult to see a dividing line between" NCUA's abandonment allegations and its warnings to the Credit Unions in 2005 and 2006 of the "relaxation" of guidelines.  Tentative Ruling at 8 n.9.

---

[20] The Credit Unions had access to information and data concerning delinquencies and losses from monthly trustee reports, which included tables detailing the rate and the amount of loan delinquencies and losses in each loan pool.  *See*, *e.g.*, RALI 2007-QH5 Pro. Supp. at 55-56 (Ex. 12); *see also* App. A.8.  WesCorp has admitted that, "[f]rom the inception of a purchase through the entire time of ownership, WesCorp performs multiple due diligence reviews on its investments."  WesCorp Financial Analysis at 8 (Ex. 32).

-17-

*Third*, the same general mortgage loan origination allegations upon which NCUA now bases its claims (*i.e.*, alleged weakening or abandonment of underwriting standards and appraisal bias) were discussed in numerous public sources, including newspaper articles, media reports and governmental publications, before March 2007. (*See supra* at pages 4 to 6.) Myriad lawsuits, news articles and other "storm warnings" referred to many of the originators identified in the Complaint, any of which would have alerted a reasonable person—let alone sophisticated investors like the Credit Unions—to the possibility of misrepresentations. For example:

- On August 25, 2006, borrowers filed a class action lawsuit based on IndyMac's alleged "systematic and continued failure to provide independent and effective appraisals and evaluations." (Complaint at 6, *Cedeno* v. *IndyMac Bancorp, Inc.*, No. 06 Civ. 6438 (S.D.N.Y. Aug. 25, 2006) (Ex. 34).)

- On March 7, 2007, the FDIC announced that it had issued a cease and desist order to Fremont because it allegedly "was operating without effective risk management policies and procedures in place in relation to its subprime mortgage and commercial real estate lending," and that it "had been operating without adequate subprime mortgage loan underwriting criteria." (FDIC Press Release (Mar. 7, 2007) (Ex. 35).)

- In early March 2007, Countrywide reported that 19% of its loans were more than 30 days delinquent and that nearly 3% of its *prime* borrowers were experiencing delinquencies. (Gretchen Morgenson, *Mortgages May Be Messier Than You Think*, N.Y. TIMES, Mar. 4, 2007, at C1 (Ex. 36).)

- On March 12, 2007, shareholders filed a class action in this Court alleging that IndyMac abandoned its underwriting guidelines. (Complaint, *Reese* v. *IndyMac Financial*, No. CV 07-1635 (C.D. Cal. Mar. 12, 2007) (Ex. 37).)

Given these various "storm warnings," it is no surprise that NCUA's OIG concluded that the Credit Unions "should have recognized the risk exposure

-18-

that [their] significant concentration in [RMBS] represented earlier than 2007." (OIG U.S. Central Report at 4; OIG WesCorp Report at 25.)  NCUA itself has said that WesCorp was aware "[b]y the summer of 2005 . . . [that] the credit quality of the Option ARM MBS loan pools was deteriorating; and [that] a drop in housing demand could result in a decrease in real estate values and credit losses."  (NCUA Brief at 13; *see also supra* at page 8.)

NCUA cannot have it both ways.  If these same facts, which existed prior to March 19, 2007, are sufficient to allege an actionable misrepresentation as NCUA contends, then the Credit Unions had inquiry notice of their claims by that time based on those same facts, and those claims are time-barred.  If these same facts are not sufficient to allege an actionable misrepresentation, then the Complaint fails to state a claim.  *See Allstate*, 2011 WL 5067128, at *11; *see also* Tentative Ruling at 20 (NCUA might "save [itself] from a fatal statute of limitations problem" but then "doom its ability to state a claim in the first place").

## II.   NCUA FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION OF FACT.

All of NCUA's claims require NCUA to plead adequately the existence of a material misstatement or omission of material fact.  15 U.S.C. §§ 77k(a), 77l(a)(2); CAL. CORP. CODE § 25401; KAN. STAT. ANN. § 17-12a509. To determine whether they contain actionable misrepresentations, the offering documents must be considered in their entirety, including any cautionary statements. *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

### A.   NCUA Fails To Plead An Actionable Misrepresentation Regarding the Underwriting Guidelines of Unaffiliated Originators.

NCUA alleges with perfect hindsight that, despite the investment-grade ratings at the time of the offerings and the then-robust economy and housing market, the Certificates ultimately experienced losses greater than NCUA "expected," the loan pools were subject to post-offering delinquencies and the

-19-

1  RMBS were downgraded years after the offerings closed.  (Compl. ¶¶ 58-88.)

2  Based on those subsequent events, NCUA contends that the third-party loan

3  originators must have completely abandoned their underwriting guidelines years

4  earlier.  (*Id*.)  NCUA offers no other factual support for these allegations, and its

5  post hoc assertions do not suffice.[21]

6           NCUA's allegations are "not only compatible with" but "more likely

7  explained by" the collapse of the housing market.  *Iqbal*, 129 S. Ct. at 1950.

8  Indeed, NCUA's claims here are contradicted by its prior public acknowledgment

9  that "the losses associated with the private-label mortgage-backed securities that

10 were held by corporate credit unions" were "cause[d]" by "the overall global

11 economic crisis that emerged in 2007."  (NCUA Presentation (Ex. 14).)

12          Strikingly, NCUA does not even try to link its allegations that

13 underwriting guidelines were abandoned to any of the Certificates at issue here (or

14 any of the loans backing them).  Instead, NCUA relies exclusively on a mix of

15 hearsay sources, including press articles, allegations asserted against originators in

16 other lawsuits and testimony at congressional hearings, as ostensible support for its

17 assertions that originators unaffiliated with Goldman Sachs must have abandoned

18 underwriting guidelines with respect to some unspecified number of loans backing

19 these Certificates.  (Compl. ¶¶ 89-221.)[22]  But, as several courts have recognized,

20 _____

21 [21] *See In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *5 (S.D.N.Y. Jan.
   5, 2011) ("A backward-looking assessment of the infirmities of mortgage-related

22 securities, therefore, cannot help plaintiffs' case."); *Xerion Partners I LLC* v.
   *Resurgence Asset Mgmt.*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007) (reliance on

23 subsequent market events to suggest that valuations made months earlier were false
   was improper hindsight pleading); *see also* Tentative Ruling at 4 ("There is a

24 strong argument for the conclusion that reliance on these facts [*i.e.*, post-offering
   performance statistics] to state a claim here is just an example of the conclusory

25 pleading tactic *Twombly* itself expressly rejected.").

26 [22] For example, NCUA relies on the double-hearsay of alleged observations of an
   unidentified credit rating analyst about certain Fremont loans included in an

27 unspecified 2007 RMBS offering.  (Compl. ¶ 154.)  But the only Certificate
   backed by Fremont-originated loans at issue in this case was FHLT 2006-D, a

28 *2006* offering.  (*Id.* ¶¶ 8-9, 153.)

-20-

1   an allegation that an originator did not comply with underwriting guidelines with

2   respect to unidentified loan(s) underlying unidentified security(ies) in no way

3   demonstrates that the offering documents at issue in *this* action misrepresented

4   actually relevant originator practices.[23]

5          In *N.J. Carpenters Health Fund* v. *Novastar Mortg.*, plaintiff asserted

6   a Section 11 claim alleging that loan originators "systematically failed to comply

7   with" and "systematically disregarded" underwriting guidelines and that

8   exceptions to the guidelines were "routinely" granted.  2011 WL 1338195, at *4,

9   *10 (S.D.N.Y. Mar. 31, 2011).  The district court concluded that these allegations

10   were insufficient to state a Section 11 claim because plaintiff "fail[ed] to make

11   allegations specific to the . . . origination practices that relate to the only offering

12   that is relevant."  *Id.* at *11; *accord Landesbank Baden-Württemberg* v. *Goldman,*

13   *Sachs & Co.*, 2011 WL 4495034, at *5 (S.D.N.Y. Sept. 28, 2011) (dismissing

14   fraud claim against Goldman Sachs where plaintiff's allegations were not

15   connected to the securities at issue); *Tsereteli*, 692 F. Supp. 2d at 394 (plaintiff

16   provided no basis to infer that loans referenced in a report cited in the complaint

17   were in any way representative of the loans underlying the securities at issue).

18   Similarly here, NCUA's failure to make allegations about the origination practices

19   specific to the 13 RMBS offerings at issue in this action dooms its claims.

20

---

21   [23]  In this Court's Tentative Ruling, the Court stated that it would "have to

22   determine just how direct a tie to the particular loan pools it would require before a claim of systematic disregard of underwriting guidelines affecting these particular loan pools is plausible."  (Tentative Ruling at 10.)  In this action, the "tie" is, at

23   best, tenuous, and certainly not plausible under *Twombly*.  For instance, in alleging that Homecomings systematically disregarded its underwriting guidelines, NCUA

24   relies almost entirely on a single 2009 article published in the *Portland Tribune* discussing mortgage lending trends that had been observed in the Portland, Oregon

25   market only.  (Compl. ¶ 168.)  Homecomings allegedly originated loans backing six of the 13 RMBS offerings at issue in this action; only 140 of the 10,256

26   mortgage loans that backed those six offerings (*i.e.*, just over 1%) concerned property within the state of Oregon.  *See* RALI 2006-QO6 Pro. Supp. at I-5 (Ex.

27   8); RALI 2006-QO10 Pro. Supp. at I-5 (Ex. 9); RALI 2007-QH2 Pro. Supp. at I-4 (Ex. 10); RALI 2007-QH3 Pro. Supp. at I-4 (Ex. 11); RALI 2007-QH5 Pro. Supp.

28   at I-24 (Ex. 12); RALI 2007-QH6 Pro. Supp. at I-5 (Ex. 13).

-21-

### B. The Offering Documents Accurately Disclosed the Originators' Underwriting Guidelines.

NCUA's "abandonment" theory fails because the offering documents for each of the 13 RMBS offerings made clear that the stated underwriting policies were merely "guidelines," that originators had discretion to deviate from them, and that a "substantial" number of the loans would not comply with those guidelines.[24] The offering documents did not represent that *all* loans would conform to the guidelines; indeed, they expressly disavowed any such representations.[25]   These disclosures refute NCUA's central claim that investors were not told that originators could, and did, make exceptions to their underwriting guidelines.

The offering documents described in detail that many of the loans had been originated pursuant to less stringent alternative loan programs, under which originators issued loans with limited (or no) verification of a borrower's income, assets or employment.[26]   Any reasonable investor understood that the risk of default inherent in any loan was especially acute in—and that unexpected levels of economic distress would especially affect—loans in, for example, GSR 2006-OA1, 88% of which were originated pursuant to reduced-documentation programs.[27]

---

[24] *E.g.*, FHLT 2006-D Pro. Supp. at 41 (Ex. 3); *see also* App. A.2.  In the Tentative Ruling in *NCUA* v. *RBS*, the Court indicated that a disclosure that underwriting guidelines were "generally" followed might not suffice.  Tentative Ruling at 11 n.13.  Here, the disclosures warned that a "substantial portion of the mortgage loans" would not comply with guidelines.  *E.g.*, FHLT 2006-D Pro. Supp. at 41 (Ex. 3); *see also* App. A.2.  While the disclosure in *NCUA* v. *RBS* arguably did not inform investors that many loans would not comply with guidelines, the disclosures in *this* action did precisely that.

[25] *See*, *e.g.*, LBMLT 2006-11 Pro. Supp. at S-40 (Ex. 7) ("There can be no assurance that every mortgage loan owned by the trust was originated in conformity with the applicable underwriting guidelines in all material respects. . . . The application of the Long Beach underwriting guidelines does not imply that each specific criterion was satisfied with respect to every mortgage loan."); *see also* App. A.2.

[26] *See*, *e.g.*, FFMLT 2006-FF4 Pro. Supp. at S-35-S-36 (Ex. 2); *see also* App. A.3.

[27] GSR 2006-OA1 Pro. Supp. at S-B-5 (Ex. 5); *see also* App. A.3.

-22-

Both the offering documents and NCUA itself (in warning the Credit Unions in 2005 and 2006) warned of the risks associated with those types of loans.[28]

### C.   The Average LTV Ratios Were Described Accurately in the Offering Documents and Are Inactionable Statements of Opinion.

NCUA alleges that the LTVs of properties subject to loans underlying the Certificates were the inaccurate results of overvalued appraisals. (Compl. ¶¶ 284-90.)   But the offering documents disclosed the methodology used to determine the LTVs,[29] and NCUA does not allege that the methodology was not followed or that the ratios were miscalculated.   Instead, NCUA asserts that the appraisals resulted from some unspecified "encourage[ment]" by originators of "inflated appraisals." (*Id.* ¶ 290.)   Apart from the absence of any specific factual allegations to support that assertion, NCUA also "does not link this allegation to the [s]ecuritizations at issue," nor does it allege "that any appraiser actually inflated an assessment of property underlying the [m]ortgage [l]oans." *Footbridge Ltd. Trust* v. *Countrywide Home Loans*, 2010 WL 3790810, at *13 (S.D.N.Y. Sept. 28, 2010); *see also In re IndyMac*, 718 F. Supp. 2d at 510.

Even if NCUA could demonstrate that the LTVs in the offering documents were inaccurate, NCUA's claims still must be dismissed because LTVs (and the appraisal values from which they are derived) are statements of opinion and, therefore, not actionable unless Goldman Sachs believed them to be false when it made statements about them.[30]   NCUA does not allege that Goldman Sachs did not believe the appraised values of the properties underlying the Certificates at the time of the offerings, much less present any facts to support such an allegation.

---

[28] *See*, *e.g.*, RALI 2007-QH6 Pro. Supp. at S-19-S-20 (Ex. 13); *see also* App. A.1.

[29] *See*, *e.g.*, FFMLT 2006-FF4 Pro. Supp. at S-31 (Ex. 2); *see also* App. A.4, A.5.

[30] *See In re IndyMac*, 718 F. Supp. 2d at 511; *Tsereteli*, 692 F. Supp. 2d at 393-95.

-23-

### D. The Offering Documents Accurately Disclosed the Credit Enhancements Provided.

NCUA's allegations that Goldman Sachs misstated the credit enhancements described in the offering documents (Compl. ¶¶ 63, 82-84, 291-98) are based entirely on hindsight as to the Certificates' ultimate performance. NCUA alleges no facts showing that the enhancements described in the offering materials were not provided, and the offering documents disclosed that the enhancement measures might not be adequate to cover losses.[31]   Hindsight allegations based on nothing more than the occurrence of disclosed risks are clearly deficient.  *See*, *e.g.*, *In re Deutsche Bank AG Sec. Litig.*, 2011 WL 3664407, at *9 (S.D.N.Y. Aug. 19, 2011).

## III.   NCUA FAILS ADEQUATELY TO PLEAD MATERIALITY.

NCUA has also not alleged facts demonstrating that a "reasonable investor" would have viewed the alleged misrepresentations as "significantly alter[ing] the total mix" of available information, which includes information "in the public domain and facts known or reasonably available." *Paskowitz* v. *Pac. Capital Bancorp*, 2009 WL 4911850, at *6 (C.D. Cal. Nov. 6, 2009).

The offering documents included extensive disclosures that informed the Credit Unions about the risky nature of the underlying loans, including disclosures about the "substantial" number of nonconforming loans and nontraditional loan products.  The Credit Unions were also privy to national press coverage—as well as warnings from NCUA itself beginning in 2005—regarding the trend toward liberal underwriting standards and the risks of RMBS backed by nontraditional loans.  (*See supra* at pages 4 to 6.)  Given the pervasive public reports highlighting underwriting problems, "[i]t is difficult to imagine that [any investor] who was not adequately apprised . . . by . . . existing disclosures would

---

[31] *See*, *e.g.*, RALI 2006-QO6 Pro. Supp. at S-20 (Ex. 8); *see also* App. A.7.

-24-

1  suddenly understand after being exposed to simply one more disclaimer." *Rubke*

2  v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1163-64 (9th Cir. 2009).

3          In its Tentative Ruling in *NCUA* v. *RBS*, the Court indicated that the

4  question of whether defendants' alleged misrepresentations significantly altered

5  the total mix of available information might be a question for the jury.  (Tentative

6  Ruling at 11.)  Here, NCUA itself has answered that question by suing WesCorp

7  management for breaching their fiduciary duties by acquiring an "overwhelming

8  concentration" of RMBS when, "[b]eginning as early as March 2005,"

9  management was "aware that the investment credit spreads for private label MBS

10  had been generally shrinking."  (Second Amended Complaint, *NCUA* v. *Siravo*,

11  No. 10 Civ. 1597 (C.D. Cal. Feb. 22, 2011), ¶ 96 (Ex. 38).)  Tellingly, NCUA

12  asserted in that action that "[b]y the summer of 2005, [management was] aware

13  that:  (1) the "reset shock" experienced by Option ARM loans increases their credit

14  risk; (2) the credit quality of the Option ARM MBS loan pools was deteriorating;

15  and (3) a drop in housing demand could result in a decrease in real estate values

16  and credit losses on existing Option ARM loans."  (NCUA Brief at 13.)

17          In short, the "total mix" of information available to the Credit Unions

18  included extensive risk disclosures in the offering documents, nationwide press

19  coverage of underwriting practices and warnings from NCUA.   One more

20  disclaimer related to already-disclosed risks could not plausibly have affected the

21  total mix of available information. *Rubke*, 551 F.3d at 1163-64.

22                              **CONCLUSION**

23          For the foregoing reasons, Goldman Sachs respectfully requests that

24  the Court dismiss the Complaint with prejudice and grant to Goldman Sachs such

25  other and further relief as the Court deems just and proper.

26

27

28

-25-

Dated:  January 9, 2012

Respectfully submitted,

/s/Brendan P. Cullen
Brendan P. Cullen (CSBN 194057)
cullenb@sullcrom.com
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303-3308
Tel.:  (650) 461-5600
Fax:  (650) 461-5700

Richard H. Klapper (*pro hac vice*)
klapperr@sullcrom.com
Theodore Edelman (*pro hac vice*)
edelmant@sullcrom.com
William B. Monahan (*pro hac vice*)
monahanw@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel.:  (212) 558-4000
Fax:  (212) 558-3588

Theresa A. Buckley (CSBN 259701)
buckleyt@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Tel.:  (310) 712-6600
Fax:  (310) 712-8800

*Attorneys for Defendants Goldman, Sachs & Co. and GS Mortgage Securities Corp.*

-26-