TERRY W. BIRD
twb@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
  NESSIM, DROOKS & LINCENBERG, RHOW P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Fax: (310) 201-2110

GEORGE A. ZELCS
gzelcs@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9760
Fax: (312) 641-9751

Attorneys for Plaintiff National Credit Union
Administration Board
(See Signature Page for Names and Addresses
of Additional Counsel for Plaintiffs)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union and of Western Corporate Federal Credit Union,<br><br>Plaintiff,<br><br>vs.<br><br>GOLDMAN, SACHS & CO., GS MORTGAGE SECURITIES CORP., and RESIDENTIAL ACCREDIT LOANS, INC.,<br><br>Defendants. | Case No.    CV-11-6521 GW(JEMx)<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

i

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ...................................................................1

        Table 1 ..........................................................................................4

        Table 2 ..........................................................................................5

II.   PARTIES AND RELEVANT NON-PARTIES ........................................6

III.  JURISDICTION AND VENUE ............................................................8

IV.  MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION .......................................................................9

        Figure 1 ......................................................................................12

V.   RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ...............12

        Table 3 ........................................................................................13

VI.  U.S. CENTRAL'S AND WESCORP'S PURCHASES ........................15

        Table 4 ........................................................................................16

VII. THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS .......................................................17

    A.   The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards .............18

        Table 5 ........................................................................................20

        Table 6 ........................................................................................24

    B.   The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards ...............................................................24

        Figure 2 ......................................................................................27

ii

C.  The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines ..................................... 34

D.  Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards ........... 34

1.  The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse ................................................................................................ 34

2.  American Home's Systematic Disregard of Underwriting Standards ................................................................. 40

3.  Countrywide Home Loans, Inc.'s Systematic Disregard of Underwriting Standards ................................. 45

4.  First Franklin Financial Corporation's Systematic Disregard of Underwriting Standards ................................. 54

5.  First Magnus Financial Corporation's Systematic Disregard of Underwriting Standards ................................. 60

6.  First National Bank of Arizona's Systematic Disregard of Underwriting Standards ................................. 64

7.  Fremont Investment and Loan's Systematic Disregard of Underwriting Standards ................................. 69

8.  GreenPoint Mortgage Funding Inc.'s Systematic Disregard of Underwriting Standards ................................. 73

9.  Homecomings's Systematic Disregard of Underwriting Standards ................................................................. 79

10.  IndyMac Bank, FSB's Systematic Disregard of Underwriting Standards ................................................................. 86

11.  SCME Mortgage Banker's Systematic Disregard of Underwriting Standards ................................................................. 91

12.  WaMu's and Long Beach Mortgage's Systematic Disregard of Underwriting Standards ................................. 92

iii

E.    Loans That Did Not Meet the Originators' Underwriting Guidelines Were Routinely Collateral for Goldman Sachs-Underwritten RMBS ............................................................106

F.    Additional Evidence Confirms that Defective Loans Were Routinely Packaged into Goldman Sachs's RMBS ................................108

VIII. THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT ........................................................111

A.    Offering Documents Misrepresented Weighted Average Loan-To-Value Ratios ........................................................111

Table 7 ........................................................112

B.    Untrue Statements in the Offering Documents About Owner-Occupancy Ratios ........................................................113

Table 8 ........................................................116

C.    Other Untrue Statements in the Offering Statements ..........................116

Table 9 ........................................................117

D.    Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood To Repay the Mortgage Loan ........................118

E.    Untrue Statements Concerning Reduced Documentation Programs ........................................................140

F.    Untrue Statements Concerning Loan-to-Value Ratios ..........................151

G.    Untrue Statements Concerning Credit Enhancement ..........................158

IX. THE CLAIMS ARE TIMELY ........................................................161

X. NUMEROUS CLAIMS ARE INDEPENDENTLY TIMELY BY VIRTUE OF *AMERICAN PIPE* ........................................................164

XI. CLAIMS FOR RELIEF ........................................................168

FIRST CLAIM FOR RELIEF ........................................................168

Section 11 of the Securities Act of 1933 (Alternative Loan Trust 2007-OA4) ........................................................168

iv

**SECOND AMENDED COMPLAINT**

SECOND CLAIM FOR RELIEF ...................................................................169

    Section 11 of the Securities Act of 1933 (Fremont Home Loan Trust
        2006-D) ..............................................................................................170

THIRD CLAIM FOR RELIEF........................................................................171

    Section 11 of the Securities Act of 1933 (GSR Mortgage Loan Trust
        2006-OA1, GSR Mortgage Loan Trust 2007-OA1, GreenPoint
        Mortgage Funding Trust 2006-OH1).........................................171

FOURTH CLAIM FOR RELIEF.....................................................................172

    Section 11 of the Securities Act of 1933 (First Franklin Mortgage
        Loan Trust 2006-FF4) ....................................................................172

FIFTH CLAIM FOR RELIEF.........................................................................173

    Section 11 of the Securities Act of 1933 (Long Beach Mortgage Loan
        Trust 2006-11) ................................................................................173

SIXTH CLAIM FOR RELIEF.........................................................................174

    Section 11 of the Securities Act of 1933 (RALI Series 2006-QO6
        Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2
        Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5
        Trust, RALI Series 2007-QH6 Trust)..........................................174

SEVENTH CLAIM FOR RELIEF ...................................................................176

    Section 12(a)(2) of the Securities Act of 1933 (Alternative Loan Trust
        2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series
        2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series
        2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series
        2007-QH6 Trust) ...........................................................................176

EIGHTH CLAIM FOR RELIEF ......................................................................178

    Violation of the California Corporate Securities Law of 1968 Cal.
        Corp. Code §§ 25401 and 25501 (Alternative Loan Trust 2007-
        OA4, GreenPoint Mortgage Funding Trust 2006-OH1, GSR
        Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust
        2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-

**SECOND AMENDED COMPLAINT**

QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust) ..............................................178

NINTH CLAIM FOR RELIEF ...................................................................179

Violation of the Kansas Uniform Securities Act Kan. Stat. Ann. § 17-12a509 (First Franklin Mortgage Loan Trust 2006-FF4).....................179

APPENDIX A ...................................................................................... A-1

Table 10 ..................................................................................... A-1

Table 11 ..................................................................................... A-3

APPENDIX B – Examples of False and Misleading Statements................ A-6

vi

**SECOND AMENDED COMPLAINT**

Plaintiff, the National Credit Union Administration Board ("NCUA Board"), brings this action in its capacity as Liquidating Agent of U.S. Central Federal Credit Union ("U.S. Central") and Western Corporate Federal Credit Union ("WesCorp") against Goldman, Sachs & Co. ("Goldman Sachs") as underwriter and seller, and against GS Mortgage Securities Corp., and Residential Accredit Loans, Inc. (collectively, the "Issuer Defendants"), as issuers, of certain residential mortgage-backed securities ("RMBS") purchased by U.S. Central and WesCorp, and alleges as follows in this Second Amended Complaint:[1]

## I.     NATURE OF THE ACTION

1.     This action arises out of the sale of RMBS to U.S. Central and WesCorp where Goldman Sachs acted as underwriter and/or seller of the RMBS.

2.     Virtually all of the RMBS sold to U.S. Central and WesCorp were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.     The Issuer Defendants issued and Goldman Sachs underwrote and sold the RMBS pursuant to registration statements, prospectuses, prospectus supplements, term sheets, free writing prospectuses, and other written materials (collectively, the "Offering Documents").  The Offering Documents contained untrue statements of material fact or omitted to state material facts in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), and the California Corporate Securities Law of 1968 ("California Blue Sky law"), Cal. Corp. Code §§ 25401, 25501 and the Kansas Uniform Securities Act, Kan. Stat. Ann. § 17-12a509 ("Kansas Blue Sky law").

---

[1]     Plaintiff acknowledges and respects the rulings issued by the Court.  Certain claims and allegations are repled herein to preserve such issues for appeal.

**1**

**SECOND AMENDED COMPLAINT**

4.     The NCUA Board expressly disclaims and disavows any allegation in this Complaint that could be construed as alleging fraud.

5.     The Offering Documents described, among other things, the mortgage underwriting standards of the originators (the "Originators") who made the mortgages that were pooled and served as the collateral for the RMBS purchased by U.S. Central and WesCorp.

6.     The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.

7.     The Offering Documents also represented that the loan pools underlying the RMBS had certain characteristics.  These material representations included the weighted average loan-to-value ("LTV") ratio and owner occupancy rates ("OOR").

8.     LTV represents the amount of the loans as a percentage of the value of the mortgaged properties.  A lower LTV number indicated that the loans were less likely to default because the borrower had greater equity, and in the event of default, that the balance of the loans could be recovered by selling the properties.

9.     OOR represents the percentage of borrowers who occupied the mortgaged properties.  A higher OOR number indicated that the loans were less likely to default, as borrowers are much less likely to default on their primary residence than an investment property or vacation home.

10.     In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents.  Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented.  Also, properties were routinely overvalued at the time of origination, rendering the average LTV ratios inaccurate.  And the Offering Documents represented that a significant number of properties were owner-occupied,

**2**

when in fact, they were not.  Indeed, a material percentage of the loans collateralizing the RMBS were all but certain to become delinquent or default shortly after origination.  As a result, the RMBS were destined from inception to perform poorly.

11.     These untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS.  Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

12.     U.S. Central and WesCorp purchased the RMBS listed in Table 1 (*infra*) through initial offerings directly from Goldman Sachs by means of prospectuses or oral communications.  Thus, Goldman Sachs is liable for material untrue statements and omissions of fact under Section 11, Section 12(a)(2), and/or the California and Kansas Blue Sky laws for the RMBS listed in Table 1 (*infra*).

**3**

**Table 1**

| CUSIP[2] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | | WesCorp | 20-Mar-07 | $97,947,000 |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | GS Mortgage Securities Corp. | U.S. Central | 3-Mar-06 | $29,360,000 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $73,547,938 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $59,442,800 |
| 751153AC1 | RALI Series 2006-QO10 Trust | Residential Accredit Loans, Inc. | WesCorp | 14-Dec-06 | $122,963,336 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | Residential Accredit Loans, Inc. | WesCorp | 16-Feb-07 | $19,454,000 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $62,785,038 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $29,673,510 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $20,000,000 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $48,788,000 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $70,102,000 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $84,062,000 |

13.     U.S. Central or WesCorp purchased each RMBS listed in Table 2 (*infra*) pursuant to and traceable to registration statements containing untrue statements of

---

[2]   "CUSIP" stands for "Committee on Uniform Securities Identification Procedures." A CUSIP number is used to identify most securities, including certificates of RMBS.  *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

4

**SECOND AMENDED COMPLAINT**

material fact or that omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  Goldman Sachs was an underwriter for each of the securities listed in Table 2.  Goldman Sachs also acted as seller for the GreenPoint Mortgage Funding Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, and RALI Series 2007-QH5 Trust Certificates listed in Table 2.  Thus, Goldman Sachs is liable for material untrue statements and omissions of fact under Section 11 for the RMBS listed in Table 2 and for material untrue statements and omissions of fact under the California Blue Sky law for the GreenPoint Mortgage Funding Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, and RALI Series 2007-QH5 Certificates.

**Table 2**

| CUSIP | ISSUING ENTITY | SELLER | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|---|
| 35729VAE7 | Fremont Home Loan Trust 2006-D | | | U.S. Central | 25-Oct-06 | $18,000,000 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | | | U.S. Central | 25-Oct-06 | $32,000,000 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | | GS Mortgage Securities Corp. | WesCorp | 5-Feb-07 | $26,708,366 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | Goldman Sachs | GS Mortgage Securities Corp. | WesCorp | 8-Mar-07 | $26,689,604 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | Goldman Sachs | GS Mortgage Securities Corp. | WesCorp | 26-Sep-06 | $61,086,962 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | | GS Mortgage Securities Corp. | WesCorp | 28-Sep-06 | $73,779,370 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | | | U.S. Central | 8-Dec-06 | $57,000,000 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | | Residential Accredit Loans, Inc. | WesCorp | 11-Oct-06 | $49,783,783 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | Goldman Sachs | Residential Accredit Loans, Inc. | WesCorp | 30-May-07 | $115,119,708 |

14.    The RMBS U.S. Central and WesCorp purchased suffered a significant drop in market value.  U.S. Central and WesCorp have suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

5

## II.     PARTIES AND RELEVANT NON-PARTIES

15.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department by 2021 through assessments against all federally-insured credit unions.  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions.  The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  The NCUA is under the management of the NCUA Board.  *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

16.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.  As a corporate credit union, U.S. Central provided investment and financial services to other corporate credit unions.

17.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.  As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

18.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant to the FCU Act, 12 U.S.C. § 1751 *et seq.*  On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into

**6**

**SECOND AMENDED COMPLAINT**

1   involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a), 1787(a)(1)(A) and appointed

2   itself Liquidating Agent.

3        19.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating

4   Agent has succeeded to all rights, titles, powers, and privileges of U.S. Central and

5   WesCorp and of any member, account holder, officer or director of U.S. Central and

6   WesCorp, with respect to U.S. Central and WesCorp and their assets, including the

7   right to bring the claims asserted by them in this action.  As Liquidating Agent, the

8   NCUA Board has all the powers of the members, directors, officers, and committees

9   of U.S. Central and WesCorp and succeeds to all rights, titles, powers, and privileges of

10   U.S. Central and WesCorp.  *See* 12 U.S.C.  § 1787(b)(2)(A).  The NCUA Board may

11   also sue on U.S. Central's and WesCorp's behalf.  *See* 12 U.S.C. §§ 1766(b)(3)(A),

12   1787(b)(2), 1789(a)(2).

13        20.     Prior to being placed into conservatorship and involuntary liquidation,

14   U.S. Central and WesCorp were the two largest corporate credit unions in the United

15   States.

16        21.     Any recoveries from this legal action will reduce the total losses resulting

17   from the failure of U.S. Central and WesCorp.  Losses from U.S. Central and

18   WesCorp's failures must be paid from the NCUSIF or the TCCUSF.  Expenditures

19   from these funds must be repaid through assessments against all federally insured

20   credit unions.  Because of the expenditures resulting from U.S. Central and WesCorp's

21   failures, federally insured credit unions will experience larger assessments, thereby

22   reducing federally insured credit unions' net worth.  Reductions in net worth can

23   adversely affect the dividends that individual members of credit unions receive for the

24   savings on deposit at their credit union.  Reductions in net worth can also make loans

25   for home mortgages and automobile purchases more expensive and difficult to

26   obtain.  Any recoveries from this action will help to reduce the amount of any future

27   assessments on federally insured credit unions throughout the system, reducing the

28

**7**

**SECOND AMENDED COMPLAINT**

negative impact on federally insured credit unions' net worth.  Recoveries from this action will benefit credit unions and their individual members by increasing net worth, resulting in more efficient and lower-cost lending practices.

22.     Defendant Goldman Sachs is a U.S. Securities and Exchange Commission ("SEC") registered broker-dealer and was an underwriter of all the RMBS that are the subject of this Complaint and that are listed in Tables 1 and 2 (*supra*). Goldman Sachs is a New York corporation with its principal place of business in New York.

23.     GS Mortgage Securities Corp. is the depositor and the issuer for the GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, First Franklin Mortgage Loan Trust 2006-FF4, and GreenPoint Mortgage Funding Trust 2006-OH1 offerings.  GS Mortgage Securities Corp. is a Delaware corporation with its principal place of business in New York.

24.     Residential Accredit Loans, Inc. is the depositor and the issuer for the RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, and the RALI Series 2007-QH6 Trust offerings (collectively, "the RALI Series offerings"). Residential Accredit Loans, Inc. is a Delaware corporation with its principal place of business in Minnesota.

## III.   JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil

**8**

actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

26.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), because many of the transactions at issue occurred in San Dimas, California, the headquarters of WesCorp.  This Court has personal jurisdiction over each Defendant because they offered/sold the RMBS at issue in this Complaint to WesCorp in this District; prepared/disseminated the Offering Documents containing untrue statements or omissions of material fact as alleged herein to WesCorp in this District; and/or are residents of/conduct business in this District.

## IV.   MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION

27.     RMBS are asset-backed securities.  A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

28.     Because residential mortgages are the assets collateralizing RMBS, the origination of the mortgages commences the process that leads to the creation of RMBS.  Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.  The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics, including:  the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the amount of the loan compared to the value of the property at issue (the "loan-to-value" or "LTV" ratio), among other things.  Loan underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

**9**

29.     Historically, originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

30.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively "government sponsored enterprises" or "GSEs") began purchasing "conforming loans" or "prime loans"—so-called because they conformed to guidelines set by the GSEs.  The GSEs either sponsored the RMBS issuance (Ginnie Mae) or issued the RMBS themselves after purchasing the conforming loans (Fannie Mae and Freddie Mac).  The GSEs securitized the mortgage loans by grouping mortgages into "loan pools," then repackaging the loan pools into RMBS where investors received the cash flow from the mortgage payments.  The GSEs guarantee the monthly cash flow to investors on the agency RMBS.

31.     More recently, originators, often working with investment banks, began securitizing "non-conforming loans"—loans originated (in theory) according to private guidelines adopted by the originators.  Non-conforming loans are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans.  Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

32.     All of the loans collateralizing the RMBS at issue in this Complaint are private-label mortgage loans.

33.     The issuance of RMBS collateralized by non-conforming loans peaked in 2006.  The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages, to ensuring that the originator could

**10**

process (and obtain fees from) an ever-larger loan volume for distribution as RMBS. This practice is known as "originate-to-distribute" ("OTD").

34.     Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

35.     The depositor transfers the loans to a trust called the "issuing entity."

36.     The issuing entity issues "notes" and/or "certificates," representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

37.     The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

38.     One or more "underwriters"—like Goldman Sachs—then sell the notes or certificates to investors.

39.     A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

40.     Figure 1 (*infra*) depicts a typical securitization process.

**SECOND AMENDED COMPLAINT**

**Figure 1**



41.     Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

42.     RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.

43.     The credit rating for an RMBS reflects an assessment of the

**12**

creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit ratings agencies that assigned credit ratings to the RMBS in this case.

44.     The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

**Table 3**

*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---|---|---|---|
| Aaa | AAA | Prime (Maximum Safety) | INVESTMENT GRADE |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | High Grade, High Quality | |
| A1<br>A2<br>A3 | A+<br>A<br>A- | Upper Medium Grade | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | Medium Grade | |
| Ba2<br>Ba3 | BB<br>BB- | Non-Investment Grade, or Speculative | SPECULATIVE GRADE |
| B1<br>B2<br>B3 | B+<br>B<br>B- | Highly Speculative, or Substantial Risk | |
| Caa2<br>Caa3 | CCC+ | In Poor Standing | |
| Ca | CCC<br>CCC- | Extremely Speculative | |
| C | - | May be in Default | |
| - | D | Default | |

45.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk."  Moody's Investors Services, Inc., *Moody's Rating Symbols & Definitions* at 6 (August 2003), *available at*: http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf.  Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on

the obligation is extremely strong."  Standard & Poor's, *Ratings Definitions*, *available at* http://www.standardandpoors.com/ratings/articles/ en/us/?assetID=1245303711350.

46.     In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as U.S. Central and WesCorp, which are generally limited to buying only securities with the highest credit ratings.  *See, e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities with long-term ratings below AA-); *but see, e.g.*, Removing References to Credit Ratings in Regulations; Proposing Alternatives to the Use of Credit Ratings, 76 Fed. Reg. 11,164 (proposed Mar. 1, 2011) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742) (the NCUA's proposed rule eliminating the use of credit ratings for guidance in investment decisions by credit unions).

47.     While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a triple-A rating on the higher tranches of RMBS.

48.     One form of credit enhancement is "structural subordination."  The tranches, and their risk characteristics relative to each other, are often analogized to a waterfall.  Investors in the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments.  After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

49.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinate tranches first.

50.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

**14**

**SECOND AMENDED COMPLAINT**

51.     Another form of credit enhancement is overcollateralization. Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

52.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.     U.S. CENTRAL'S AND WESCORP'S PURCHASES

53.     U.S. Central and WesCorp purchased only the highest-rated tranches of RMBS.   All but one were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

**15**

**SECOND AMENDED COMPLAINT**

**Table 4**

| | Credit Ratings of RMBS Purchases Original/Recent | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | WesCorp | AAA | Aaa | D 8/30/2012 | C 11/23/2010 |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | U.S. Central | AAA | Aaa | B 9/23/2011 | Caa3 4/6/2010 |
| 35729VAE7 | Fremont Home Loan Trust 2006-D | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 4/29/2010 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | U.S. Central | AA+ | Aa1 | D 2/25/2011 | C 3/17/2009 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | WesCorp | AAA | Aaa | D 4/19/2010 | C 12/9/2010 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | WesCorp | AAA | Aaa | CCC 9/2/2009 | C 12/14/2010 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | D 2/22/2012 | C 12/14/2010 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | D 2/22/2012 | C 12/14/2010 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 3/20/2009 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | WesCorp | AAA | Aaa | CCC 4/15/2010 | C 12/1/2010 |
| 751153AC1 | RALI Series 2006-QO10 Trust | WesCorp | AAA | Aaa | D 3/23/2010 | C 12/1/2010 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | WesCorp | AAA | Aaa | D 6/23/2010 | C 12/1/2010 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | D 9/25/2012 | C 12/1/2010 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | D 5/25/2010 | C 12/1/2010 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | Caa3 12/1/2010 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/1/2010 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | D 12/17/2010 | C 12/1/2010 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | CC 8/11/2011 | C 12/1/2010 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | D 9/24/2010 | C 12/1/2010 |

54. At the time of purchase, U.S. Central and WesCorp were not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS. If U.S. Central and WesCorp had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering

**SECOND AMENDED COMPLAINT**

Documents—U.S. Central and WesCorp would not have purchased the certificates.

55.    The securities' substantial loss of market value has injured U.S. Central, WesCorp and the NCUA Board.

## VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

56.    The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on underlying mortgage loans.

57.    With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is present:

a.    a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section VII.A and Table 5);

b.    actual losses to the underlying mortgage pools within the first 12 months  after the offerings exceeded expected losses (*see infra* Section VII.B and Figure 2);

c.    a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 6 and accompanying allegations); and

d.    downgrades of the RMBS by credit rating agencies from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (*see infra* Section VII.C and *supra* Table 4).

58.    These factors support a finding that the Originators failed to originate the

**17**

mortgages in accordance with the underwriting standards stated in the Offering Documents.

59.     This conclusion is corroborated by reports that the Originators whose mortgage loans collateralize the RMBS at issue in this Complaint abandoned the underwriting standards described in the Offering Documents (*see infra* Section VII.D).

60.     This conclusion is further corroborated by evidence that the RMBS underwritten by Goldman Sachs at issue in this Complaint were collateralized by a substantial number of defective loans that were originated contrary to the stated underwriting standards (*see infra* Sections VII.E-F).

**A.     The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards**

61.     Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

62.     The surge of delinquencies and defaults following the offerings evidence the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

63.     The Offering Documents reported zero or near zero delinquencies and defaults at the time of the offerings (*see infra* Table 5).

64.     The pools of mortgages collateralizing the RMBS experienced delinquency and default rates up to 5.21% within the first three months, up to 14.81% at six months, and up to 34.09% at one year (*see infra* Table 5).

65.     As of September 2012, approximately half (49.3% on average) of the mortgage collateral across all of the RMBS that U.S. Central and WesCorp purchased was in delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which

18

means that the noteholder owns the property after foreclosure  (*see infra* Table 5).

66.    Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint.   The data presented in the last five columns are from the trustee reports (dates and page references as indicated in the parentheticals).   The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by U.S. Central and WesCorp; however, some trustee reports include only the aggregate data.   For RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

**SECOND AMENDED COMPLAINT**

**Table 5**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 (P.S. dated March 28, 2007) | zero (S-67-S-70) | 2.36% (Apr., p.9) | 3.11% (June, p.9) | 5.39% (Sept., p.9) | 16.45% (Mar. 2008, p.7) | 57.88% (Sept. 2012, p.13) |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 (P.S. dated March 27, 2006) | 0.03% were 30-59 days delinquent. Zero were two or more payments delinquent. (S-32) | .42% (Apr., p.11) | 2.5% (June, p.11) | 5.73% (Sept., p.10) | 14.35% (Mar. 2007, p.10) | 51.47% (September 2012, p. 10) |
| 35729VAF4 | Fremont Home Loan Trust 2006-D: Aggregate *Class M1 certificates represent interests in all of the mortgage loans in the trust fund. (3) (P.S. dated November 1, 2006) | Zero more than 30 days delinquent on 10/1/06 (19) | .79% (Dec., p.10) | 5.21% (Feb., p.10) | 12.45% (May, p.10) | 26.17% (Nov., p.10) | 42.73% (Sept. 2012, p.9) |
| | Fremont Home Loan Trust 2006-D: Group 1 | Zero more than 30 days delinquent on 10/1/06 (19) | 1% (Dec., p.12) | 4.42% (Feb., p.12) | 10.19% (May, p.12) | 24.12% (Nov., p.12) | 45.41% (Sept. 2012, p.10) |
| 35729VAE7 | Fremont Home Loan Trust 2006-D: Group 2 *The Class 2-A-4 in Group 2 (3) | Zero more than 30 days delinquent on 10/1/06 (19) | .52% (Dec., p.12) | 1.59% (Feb., p.12) | 4.03% (May, p.12) | 9.84% (Nov., p.12) | 32.33% (Sept. 2012, p.10) |
| | Fremont Home Loan Trust 2006-D: Group 3 | Zero more than 30 days delinquent on 10/1/06 (19) | .78% (Dec., p.13) | 7.23% (Feb., p.13) | 17.55% (May, p.13) | 35.42% (Nov., p.13) | 49.75% (Sept. 2012, p.11) |
| | Fremont Home Loan Trust 2006-D: Group 4 | Zero were more than 30 days delinquent as of 10/1/06. (19) | .51% (Dec., p.13) | 4.86% (Feb., p.13) | 11.47% (May, p.13) | 19.17% (Nov., p.13) | 30.81% (Sept. 2012, p.11) |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 (P.S. dated December 21, 2006) | 0.51% were 30 to 59 days delinquent. (S-44) | 1.05% (Jan., p.9) | 3.48% (Mar., p.9) | 2.55% (Jun., p.9) | 8.36% (Dec., p.9) | 39.15 % (Sept. 2012, p. 9) |
| | GSR Mortgage Loan Trust 2006-OA1: Aggregate (P.S. dated August 23, 2006) | 0.94% were 30 to 59 days delinquent. (S-45) | 1.68% (Sept., p.11) | 2.34% (Nov., p.11) | 3.84% (Feb., p.10) | 10.12% (Aug. 2007, p.9) | 51.14% (Sept. 2012, p.11) |
| | GSR Mortgage Loan Trust 2006-OA1: Group 1 | 0.94% were 30 to 59 days delinquent. (S-45) | 1.59% (Sept., p.12) | 2.38% (Nov., p.12) | 3.39% (Feb., p.11) | 9.41% (Aug. 2007, p.10) | 47.73% (Sept. 2012, p.12) |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1: Group 2 *The Class 2-A-3 in Group 2 (S-13) | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | 1.86% (Sept., p.12) | 2.49% (Nov., p.12) | 4.10% (Feb., p.11) | 10.72% (Aug. 2007, p.10) | 49.84% (Sept. 2012, p.12) |
| | GSR Mortgage Loan Trust 2006-OA1: Group 3 | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | .70% (Sept., p.13) | 1.00% (Nov., p.13) | 3.59% (Feb., p.12) | 8.34% (Aug. 2007, p.11) | 69.56% (Sept. 2012, p.13) |
| | GSR Mortgage Loan Trust 2007-OA1: Aggregate (P.S. dated May 7, 2007) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.58% (May, p.9) | 3.00% (July, p.9) | 5.55% (Oct., p.9) | 12.45% (Apr. 2008, p.10) | 49.33% (Sept. 2012, p. 10) |

**20**

**SECOND AMENDED COMPLAINT**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1: Group 1 *Class 1A-2 in Group 1 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.23% (May, p.10) | 2.67% (July, p.10) | 5.30% (Oct., p.10) | 11.97% (Apr. 2008, p.11) | 46.43% (Sept. 2012, p. 11) |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1: Group 2 *Class 2A-M in Group 2 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.86% (May, p.10) | 3.28% (July, p.10) | 5.76% (Oct., p.10) | 12.85% (Apr. 2008, p.11) | 51.69% (Sept. 2012, p. 11) |
| | Long Beach Mortgage Loan Trust 2006-11: Aggregate (P.S. dated December 11, 2006) | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 3.38% (Mar., p.12) | 12.43% (June, p.12) | 29.89% (Dec., p.12) | 43.45% (Sept. 2012, p.14) |
| | Long Beach Mortgage Loan Trust 2006-11: Group 1 | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 1.8% (Mar., p.13) | 7.65% (June, p.13) | 21.53% (Dec., p.13) | 44.75% (Sept. 2012, p.19) |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11: Group 2 *Class II-A-4 in Group 2 (S-72) | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 4.17% (Mar., p.14) | 14.81% (June, p.14) | 34.09% (Dec., p.14) | 42.55% (Sept. 2012, p.24) |
| 75114NAC8 | RALI Series 2006-QO6 Trust (P.S. dated June 28, 2006) | zero (S-42) | 1.42% (July, p.8) | 1.61% (Sept., p.7) | 2.79% (Dec., p.8) | 6.13% (June, p.8) | 46.13% (Sept. 2012, p. 8) |
| 751153AC1 | RALI Series 2006-QO10 Trust (P.S. dated December 27, 2006) | zero (S-45) | 2.42% (Jan., p.8) | 4.94% (Mar., p.8) | 4.97% (June, p.8) | 13.54% (Dec., p.8) | 44.16 (Sept., 2012 p. 8) |
| 74922JAC2 | RALI Series 2007-QH2 Trust (P.S. dated February 23, 2007) | zero (S-43) | .89% (Mar., p.7) | 3.14% (May, p.7) | 3.09% (Aug., p.7) | 9.32% (Feb. 2008, p.7) | 54.73 (Sept. 2012, p.8) |
| 74922WAC3 74922WAB5 | RALI Series 2007-QH3 Trust (P.S. dated March 28, 2007) | zero (S-45) | .81% (Apr., p.8) | 4.08% (June, p.8) | 2.84% (Sept., p.8) | 10.88% (Mar. 2008, p.7) | 47.81 (Sept. 2012, p. 8) |
| | RALI Series 2007-QH5 Trust: Aggregate (P.S. dated May 29, 2007) | zero (S-51) | 1.55% (June, p.9) | 2.59% (Aug., p.9) | 5.26% (Nov., p.9) | 16.31% (May 2008, p.14) | 51.48% (Sept. 2012, p. 9) |
| 75116EAA075 116EAB8 75116EAC6 | RALI Series 2007-QH5 Trust: Group 1 *Class AI1, AI2, and AI3 in Group 1 (S-12-13) | zero (S-51) | 1.65% (June, p.10) | 2.58% (Aug., p.10) | 5.73% (Nov., p.10) | 16.55% (May 2008, p.12) | 52.58% (Sept. 2012, p. 10) |
| | RALI Series 2007-QH5 Trust: Group 2 | zero (S-51) | 1.32% (June, p.11) | 2.64% (July, p.11) | 4.18% (Nov., p.11) | 15.74% (May 2008, p.13) | 49.06% (Sept. 2012, p. 11) |
| 74922AAB3 74922AAC1 | RALI Series 2007-QH6 Trust (P.S. dated June 27, 2007) | zero (S-45) | 1.10% (July, p.8) | 2.84% (Sept., p.8) | 5.57% (Dec., p.7) | 15.81% (June 2008, p.10) | 50.25 (Sept. 2012, p. 8) |

67.     This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by U.S. Central and WesCorp, was later

21

**SECOND AMENDED COMPLAINT**

discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

68.     The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."   Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

69.     A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to "[d]eteriorating lending standards" and posits that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

70.     In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy.  *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").   The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy."  *Id.* at 2.

71.     The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the investors, while obscuring critical information concerning the actual nature of the risk.  The FSOC Risk Retention Report stated:

**SECOND AMENDED COMPLAINT**

The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between borrower and lender. The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk. By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower. As a result, originators and securitizers that do not retain risk can, at least in the short run, maximize their own returns by lowering loan underwriting standards in ways that investors may have difficulty detecting. The originate-to-distribute model, as it was conducted, exacerbated this weakness by compensating originators and securitizers based on volume, rather than on quality.

*Id.* at 3.

72.     Indeed, originators that wrote a high percentage of their loans for distribution were more likely to disregard underwriting standards, resulting in poorly performing mortgages, in contrast to originators that originated and then held most of their loans.

73.     High OTD originators profited from mortgage origination fees without bearing the risks of borrower default or insufficient collateral in the event of default. Divorced from these risks, high OTD originators were incentivized to push loan quantity over quality.

74.     Table 6 (*infra*) shows the percentage of loans originated for distribution relative to all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in this Complaint with high OTD percentages. The data was obtained from the Home Mortgage Disclosure Act database.

23

**SECOND AMENDED COMPLAINT**

**Table 6**

| Originator Name | OTD % 2005 | OTD % 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| First Franklin Financial Corporation | | | 98.7 |
| First Magnus Financial Corp. | 100 | 100 | |
| First National Bank Arizona | 88.0 | 79.9 | 89.4 |
| Fremont Investment & Loan | 91.2 | 85.2 | 94.0 |
| GreenPoint Mortgage Funding Inc. | 89.0 | 87.1 | 95.6 |
| Homecomings Financial, LLC | 97.4 | 97.9 | 99.9 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Long Beach Mortgage | | 80.2 | |
| Quicken Loans | 89.5 | 86.7 | 91.3 |
| SCME Mortgage Bankers Inc. | 100 | 90.9 | |
| SunTrust Mortgage, Inc. | 62.6 | 71.1 | 74.4 |

**B.    The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

75.    The actual defaults in the mortgage pools underlying the RMBS U.S. Central and WesCorp purchased exceeded expected defaults so quickly and by so wide a margin that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

76.    Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted.  The running total of this cumulative default balance is referred to as the "gross loss."

77.    When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss.  The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

24

**SECOND AMENDED COMPLAINT**

78.    "Actual loss" is the economic loss the mortgage pool experiences in fact. So "actual gross loss" is the actual cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the actual cumulative realized loss on defaulted loans after foreclosure.

79.    At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities. So "expected gross loss" is the expected cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the expected cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

80.    Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  CE/ENL = RF).  Thus, the rating factor expresses how many times the expected net loss is covered by credit enhancement.  A "triple-A" rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected net loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

81.    Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for

25

the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5.  The following equation illustrates: $25,000,000/5 = $5,000,000.

82.   Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss (EGL = ENL/(1 − ERR)).

83.   A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph.  Figure 2 (*infra*) is a series of such line graphs.  Figure 2 illustrates the actual gross loss (again, actual defaults) for the pools backing the RMBS purchased by U.S. Central and WesCorp experienced in the first 12 months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

84.   The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a resource for asset-backed securities related data.  The expected gross losses were calculated by "grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

85.   As the graphs show, the actual gross losses (the solid lines) far exceeded the expected gross losses (the dotted lines) for the period analyzed.  That means that the actual balance of defaulted loans in the first 12 months following issuance far exceeded the expected balance of defaulted loans based on historical performance.

26

**SECOND AMENDED COMPLAINT**

### Figure 2

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2007-OA4 | 40782 | 1 | $ - | $ 1,721,048 |
| Alternative Loan Trust 2007-OA4 | 40782 | 2 | $ - | $ 1,879,815 |
| Alternative Loan Trust 2007-OA4 | 40782 | 3 | $ - | $ 2,052,895 |
| Alternative Loan Trust 2007-OA4 | 40782 | 4 | $ 5,552,496 | $ 2,241,515 |
| Alternative Loan Trust 2007-OA4 | 40782 | 5 | $ 8,256,396 | $ 2,446,993 |
| Alternative Loan Trust 2007-OA4 | 40782 | 6 | $ 9,843,413 | $ 2,670,748 |
| Alternative Loan Trust 2007-OA4 | 40782 | 7 | $ 11,117,391 | $ 2,914,296 |
| Alternative Loan Trust 2007-OA4 | 40782 | 8 | $ 11,443,511 | $ 3,179,264 |
| Alternative Loan Trust 2007-OA4 | 40782 | 9 | $ 13,077,444 | $ 3,467,385 |
| Alternative Loan Trust 2007-OA4 | 40782 | 10 | $ 16,955,124 | $ 3,780,506 |
| Alternative Loan Trust 2007-OA4 | 40782 | 11 | $ 18,593,680 | $ 4,120,586 |
| Alternative Loan Trust 2007-OA4 | 40782 | 12 | $ 21,253,642 | $ 4,489,703 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 1 | $ 299,800 | $ 7,015,627 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 2 | $ 1,860,071 | $ 7,662,819 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 3 | $ 3,294,072 | $ 8,368,358 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 4 | $ 11,208,529 | $ 9,137,241 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 5 | $ 15,952,584 | $ 9,974,848 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 6 | $ 26,732,902 | $ 10,886,953 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 7 | $ 41,253,367 | $ 11,879,747 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 8 | $ 41,421,650 | $ 12,959,853 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 9 | $ 44,920,449 | $ 14,134,341 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 10 | $ 53,575,411 | $ 15,410,736 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 11 | $ 65,836,028 | $ 16,797,031 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 12 | $ 69,896,152 | $ 18,301,685 |



27

**SECOND AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Fremont Home Loan Trust 2006-D | 39741 | 1 | $           - | $        8,287,486 |
| Fremont Home Loan Trust 2006-D | 39741 | 2 | $     3,753,135 | $        9,052,007 |
| Fremont Home Loan Trust 2006-D | 39741 | 3 | $     6,212,973 | $        9,885,452 |
| Fremont Home Loan Trust 2006-D | 39741 | 4 | $   20,765,954 | $      10,793,726 |
| Fremont Home Loan Trust 2006-D | 39741 | 5 | $   36,520,130 | $      11,783,182 |
| Fremont Home Loan Trust 2006-D | 39741 | 6 | $   58,203,553 | $      12,860,642 |
| Fremont Home Loan Trust 2006-D | 39741 | 7 | $   81,810,437 | $      14,033,419 |
| Fremont Home Loan Trust 2006-D | 39741 | 8 | $ 107,497,063 | $      15,309,337 |
| Fremont Home Loan Trust 2006-D | 39741 | 9 | $ 118,828,404 | $      16,696,747 |
| Fremont Home Loan Trust 2006-D | 39741 | 10 | $ 122,788,975 | $      18,204,539 |
| Fremont Home Loan Trust 2006-D | 39741 | 11 | $ 120,044,997 | $      19,842,154 |
| Fremont Home Loan Trust 2006-D | 39741 | 12 | $ 118,165,126 | $      21,619,586 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 1 | $           - | $        802,726 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 2 | $           - | $        876,777 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 3 | $           - | $        957,505 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 4 | $           - | $      1,045,480 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 5 | $     1,066,439 | $      1,141,319 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 6 | $     2,202,733 | $      1,245,681 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 7 | $     1,999,286 | $      1,359,277 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 8 | $     3,557,154 | $      1,482,862 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 9 | $     3,344,056 | $      1,617,247 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 10 | $     3,721,155 | $      1,763,291 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 11 | $     5,959,259 | $      1,921,911 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 12 | $     7,845,777 | $      2,094,073 |

**28**

**SECOND AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 1 | $ - | $ 5,494,102 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 2 | $ - | $ 6,000,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 3 | $ - | $ 6,553,457 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 4 | $ 1,358,347 | $ 7,155,588 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 5 | $ 4,282,540 | $ 7,811,537 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 6 | $ 6,429,963 | $ 8,525,828 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 7 | $ 8,637,375 | $ 9,303,308 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 8 | $ 12,644,175 | $ 10,149,165 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 9 | $ 14,733,906 | $ 11,068,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 10 | $ 18,092,798 | $ 12,068,508 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 11 | $ 25,912,308 | $ 13,154,148 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 12 | $ 35,241,988 | $ 14,332,479 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 1 | $ - | $ 2,096,434 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 2 | $ 138,000 | $ 2,289,830 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 3 | $ 548,083 | $ 2,500,662 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 4 | $ 1,970,334 | $ 2,730,422 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 5 | $ 2,555,411 | $ 2,980,719 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 6 | $ 5,789,933 | $ 3,253,277 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 7 | $ 8,674,548 | $ 3,549,947 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 8 | $ 10,980,315 | $ 3,872,708 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 9 | $ 15,810,760 | $ 4,223,673 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 10 | $ 17,540,976 | $ 4,605,090 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 11 | $ 21,894,799 | $ 5,019,347 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 12 | $ 27,470,029 | $ 5,468,973 |



29

**SECOND AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 1 | $ - | $ 6,553,966 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 2 | $ - | $ 7,158,570 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 3 | $ 890,051 | $ 7,817,680 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 4 | $ 8,357,534 | $ 8,535,968 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 5 | $ 12,840,288 | $ 9,318,456 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 6 | $ 32,937,163 | $ 10,170,540 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 7 | $ 47,453,779 | $ 11,098,004 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 8 | $ 77,814,855 | $ 12,107,034 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 9 | $ 111,775,253 | $ 13,204,235 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 10 | $ 146,284,958 | $ 14,396,637 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 11 | $ 170,179,730 | $ 15,691,707 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 12 | $ 184,780,135 | $ 17,097,348 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QO6 Trust | 38111 | 1 | $ - | $ 2,048,115 |
| RALI Series 2006-QO6 Trust | 38111 | 2 | $ - | $ 2,237,054 |
| RALI Series 2006-QO6 Trust | 38111 | 3 | $ - | $ 2,443,026 |
| RALI Series 2006-QO6 Trust | 38111 | 4 | $ 282,856 | $ 2,667,491 |
| RALI Series 2006-QO6 Trust | 38111 | 5 | $ 1,873,291 | $ 2,912,019 |
| RALI Series 2006-QO6 Trust | 38111 | 6 | $ 4,017,608 | $ 3,178,295 |
| RALI Series 2006-QO6 Trust | 38111 | 7 | $ 6,135,151 | $ 3,468,128 |
| RALI Series 2006-QO6 Trust | 38111 | 8 | $ 8,393,609 | $ 3,783,450 |
| RALI Series 2006-QO6 Trust | 38111 | 9 | $ 9,394,454 | $ 4,126,325 |
| RALI Series 2006-QO6 Trust | 38111 | 10 | $ 9,244,872 | $ 4,498,951 |
| RALI Series 2006-QO6 Trust | 38111 | 11 | $ 11,623,527 | $ 4,903,661 |
| RALI Series 2006-QO6 Trust | 38111 | 12 | $ 14,913,305 | $ 5,342,924 |



**30**

**SECOND AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QO10 Trust | 40250 | 1 | $ - | $ 1,895,544 |
| RALI Series 2006-QO10 Trust | 40250 | 2 | $ - | $ 2,070,408 |
| RALI Series 2006-QO10 Trust | 40250 | 3 | $ 157,654 | $ 2,261,037 |
| RALI Series 2006-QO10 Trust | 40250 | 4 | $ 397,104 | $ 2,468,780 |
| RALI Series 2006-QO10 Trust | 40250 | 5 | $ 1,774,851 | $ 2,695,092 |
| RALI Series 2006-QO10 Trust | 40250 | 6 | $ 4,416,022 | $ 2,941,533 |
| RALI Series 2006-QO10 Trust | 40250 | 7 | $ 5,707,788 | $ 3,209,775 |
| RALI Series 2006-QO10 Trust | 40250 | 8 | $ 7,455,454 | $ 3,501,607 |
| RALI Series 2006-QO10 Trust | 40250 | 9 | $ 12,901,438 | $ 3,818,941 |
| RALI Series 2006-QO10 Trust | 40250 | 10 | $ 14,654,350 | $ 4,163,808 |
| RALI Series 2006-QO10 Trust | 40250 | 11 | $ 19,022,850 | $ 4,538,370 |
| RALI Series 2006-QO10 Trust | 40250 | 12 | $ 18,742,305 | $ 4,944,911 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH2 Trust | 40843 | 1 | $ - | $ 469,637 |
| RALI Series 2007-QH2 Trust | 40843 | 2 | $ - | $ 512,961 |
| RALI Series 2007-QH2 Trust | 40843 | 3 | $ - | $ 560,191 |
| RALI Series 2007-QH2 Trust | 40843 | 4 | $ - | $ 611,661 |
| RALI Series 2007-QH2 Trust | 40843 | 5 | $ 1,242,652 | $ 667,732 |
| RALI Series 2007-QH2 Trust | 40843 | 6 | $ 1,246,124 | $ 728,790 |
| RALI Series 2007-QH2 Trust | 40843 | 7 | $ 1,592,534 | $ 795,249 |
| RALI Series 2007-QH2 Trust | 40843 | 8 | $ 1,936,176 | $ 867,553 |
| RALI Series 2007-QH2 Trust | 40843 | 9 | $ 4,191,926 | $ 946,175 |
| RALI Series 2007-QH2 Trust | 40843 | 10 | $ 5,000,625 | $ 1,031,619 |
| RALI Series 2007-QH2 Trust | 40843 | 11 | $ 6,300,968 | $ 1,124,419 |
| RALI Series 2007-QH2 Trust | 40843 | 12 | $ 8,182,211 | $ 1,225,143 |



**31**

**SECOND AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH3 Trust | 40800 | 1 | $ - | $ 457,831 |
| RALI Series 2007-QH3 Trust | 40800 | 2 | $ - | $ 500,066 |
| RALI Series 2007-QH3 Trust | 40800 | 3 | $ - | $ 546,109 |
| RALI Series 2007-QH3 Trust | 40800 | 4 | $ - | $ 596,285 |
| RALI Series 2007-QH3 Trust | 40800 | 5 | $ - | $ 650,946 |
| RALI Series 2007-QH3 Trust | 40800 | 6 | $ 192,738 | $ 710,469 |
| RALI Series 2007-QH3 Trust | 40800 | 7 | $ 1,331,462 | $ 775,258 |
| RALI Series 2007-QH3 Trust | 40800 | 8 | $ 3,556,839 | $ 845,744 |
| RALI Series 2007-QH3 Trust | 40800 | 9 | $ 4,617,339 | $ 922,390 |
| RALI Series 2007-QH3 Trust | 40800 | 10 | $ 4,628,201 | $ 1,005,686 |
| RALI Series 2007-QH3 Trust | 40800 | 11 | $ 8,532,214 | $ 1,096,154 |
| RALI Series 2007-QH3 Trust | 40800 | 12 | $ 13,454,920 | $ 1,194,346 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH5 Trust | 41380 | 1 | $ - | $ 733,221 |
| RALI Series 2007-QH5 Trust | 41380 | 2 | $ - | $ 800,861 |
| RALI Series 2007-QH5 Trust | 41380 | 3 | $ - | $ 874,599 |
| RALI Series 2007-QH5 Trust | 41380 | 4 | $ 303,402 | $ 954,957 |
| RALI Series 2007-QH5 Trust | 41380 | 5 | $ 304,095 | $ 1,042,497 |
| RALI Series 2007-QH5 Trust | 41380 | 6 | $ 551,599 | $ 1,137,824 |
| RALI Series 2007-QH5 Trust | 41380 | 7 | $ 3,713,937 | $ 1,241,583 |
| RALI Series 2007-QH5 Trust | 41380 | 8 | $ 5,481,623 | $ 1,354,468 |
| RALI Series 2007-QH5 Trust | 41380 | 9 | $ 11,203,237 | $ 1,477,217 |
| RALI Series 2007-QH5 Trust | 41380 | 10 | $ 18,346,412 | $ 1,610,616 |
| RALI Series 2007-QH5 Trust | 41380 | 11 | $ 17,414,436 | $ 1,755,501 |
| RALI Series 2007-QH5 Trust | 41380 | 12 | $ 20,855,638 | $ 1,912,756 |



32

**SECOND AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH6 Trust | 41979 | 1 | $                      - | $            917,466.16 |
| RALI Series 2007-QH6 Trust | 41979 | 2 | $                      - | $         1,002,102.50 |
| RALI Series 2007-QH6 Trust | 41979 | 3 | $                      - | $         1,094,369.02 |
| RALI Series 2007-QH6 Trust | 41979 | 4 | $                      - | $         1,194,919.49 |
| RALI Series 2007-QH6 Trust | 41979 | 5 | $                      - | $         1,304,457.20 |
| RALI Series 2007-QH6 Trust | 41979 | 6 | $         1,463,785.37 | $         1,423,737.41 |
| RALI Series 2007-QH6 Trust | 41979 | 7 | $         4,291,610.29 | $         1,553,569.73 |
| RALI Series 2007-QH6 Trust | 41979 | 8 | $       10,720,429.00 | $         1,694,820.25 |
| RALI Series 2007-QH6 Trust | 41979 | 9 | $       17,886,574.54 | $         1,848,413.43 |
| RALI Series 2007-QH6 Trust | 41979 | 10 | $       18,896,190.65 | $         2,015,333.56 |
| RALI Series 2007-QH6 Trust | 41979 | 11 | $       24,666,980.73 | $         2,196,625.78 |
| RALI Series 2007-QH6 Trust | 41979 | 12 | $       27,779,856.42 | $         2,393,396.45 |



86.    As clearly shown in Figure 2 (*supra*), actual losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the RALI 2007-QH3 Trust offering, actual losses at month 12 exceeded $13 million, or more than 10 times the expected losses of approximately $1.19 million (*see supra* Figure 2).

87.    This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

88.    Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement has failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

**SECOND AMENDED COMPLAINT**

**C.    The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines**

89.    Virtually all of the RMBS U.S. Central and WesCorp purchased were rated triple-A at issuance.

90.    Moody's and S&P have since downgraded the RMBS U.S. Central and WesCorp purchased to well below investment grade (*see supra* Table 4).

91.    A rating downgrade is material.  The total collapse in the credit ratings of the RMBS  U.S. Central and WesCorp purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these securities were impaired from the outset.

**D.    Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards**

92.    Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

**1.    The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse**

93.    Mortgage originators experienced unprecedented success during the mortgage boom.  Yet, their success was illusory.  As the loans they originated began to significantly underperform, the demand for their products subsided.   It became evident that originators had systematically disregarded their underwriting standards.

94.    The Office of the Comptroller of the Currency (the "OCC"), an office within the Treasury Department, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst

**34**

**SECOND AMENDED COMPLAINT**

Ten in the Worst Ten' Report").  In this report, the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance.  The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

95.     Recent government reports and investigations and newspaper reports have uncovered the extent of the pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis.   Using Washington Mutual Bank ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets.   The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans.   These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011) ("PSI Wall Street Report").

**SECOND AMENDED COMPLAINT**

96. Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy. *See* FIN. CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

97. The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics" during the housing and financial crisis. "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id.* at xxii. The FCIC found that the current economic crisis had its genesis in the housing boom:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id.* at xvi.

98. During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii. Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards. . . ." *Id.*

**SECOND AMENDED COMPLAINT**

99.   In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

100.   Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

101.   In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

102.   Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker

**37**

SECOND AMENDED COMPLAINT

credit histories.  To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay.  In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators.  Notably, the incentive structures sometimes often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain.  Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process.  However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

103.   Investment banks securitized loans that were not originated in accordance with underwriting guidelines and failed to disclose this fact in RMBS offering documents. As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.  Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

104.   The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put U.S. Central and

38

WesCorp at a severe disadvantage.  The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS.  The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

105.   Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived.  The FSOC found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan.  This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully.  Some research indicates that securitization was associated with lower quality loans in the financial crisis.  For instance, one study found that subprime borrowers with credit scores just

**39**

**SECOND AMENDED COMPLAINT**

above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold.  By lowering underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

*Id.* at 11 (footnote omitted).

106.   The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans. . . ."  *Id.*

107.   In sum, the disregard of underwriting standards was pervasive across originators.  The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials.  The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

108.   As discussed below, facts have recently come to light that show many of the Originators that contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

## 2. American Home's Systematic Disregard of Underwriting Standards

109.   American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated and serviced by its

**40**

subsidiaries.  It was the parent of American Home Mortgage Holdings, Inc., which in turn was the parent of American Home Mortgage Corp., a retail lender of mortgage loans.   Collectively, these entities are referred to herein as "American Home." American Home originated or contributed a material portion of the loans in the mortgage pool underlying the GSR Mortgage Loan Trust 2006-OA1 offering.  *See infra* Table 9.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

110.   Edmund Andrews, an economics reporter for the New York Times, recounted his own experience using American Home as a lender.   According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home.  The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed.   Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife.  Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage.  Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.   One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were "Alt-A" customers, and we

**41**

SECOND AMENDED COMPLAINT

usually paid slightly higher rates for the privilege of concealing our financial weaknesses.

I thought I knew a lot about go-go mortgages.  I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages.  I had interviewed people with very modest incomes who had taken out big loans.  Yet for all that, I was stunned at how much money people were willing to throw at me.

[The American Home loan officer] called back the next morning.  "Your credit scores are almost perfect," he said happily.  "Based on your income, you can qualify for a mortgage of about $500,000."

What about my alimony and child-support obligations?  No need to mention them.  What would happen when they saw the automatic withholdings in my paycheck?  No need to show them.  If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it.  His job was to make it happen.

"I am here to enable dreams," he explained to me long afterward.  [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence.  "Who am I to tell you that you shouldn't do what you want to do?  I am here to sell money and to help you do what you want to do.  At the end of the day, it's your signature on the mortgage—not mine."

**42**

**SECOND AMENDED COMPLAINT**

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.

111.   The American Home loan officer steered Andrews to a stated-income loan so that he would not have to produce paychecks or tax returns that would reveal his alimony and child support obligations.  The loan officer wanted to limit disclosure of Andrews's alimony and child support payments when an existing mortgage showed up under Andrews's name.  Although his ex-wife was solely responsible for that mortgage under the terms of the couple's separation agreement, the only way Andrews could explain that fact would be to produce the agreement, which would also reveal his alimony and child support obligations.  According to Andrews:

> [The American Home loan officer] didn't get flustered.  If Plan A didn't work, he would simply move down another step on the ladder of credibility.  Instead of "stating" my income without documenting it, I would take out a "no ratio" mortgage and not state my income at all.  For the price of a slightly higher interest rate, American Home would verify my assets, but that was it.  Because I wasn't stating my income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too much debt.  I could have had four other mortgages, and it wouldn't have mattered.  American Home was practically begging me to take the money.

*Id.*

112.   American Home ultimately approved Andrews's application.  Not surprisingly, Andrews was unable to afford his monthly mortgage payments.

113.   American Home's lack of adherence to underwriting guidelines was set forth in detail in a 165-page amended class action complaint filed June 4, 2008, in *In re American Home Mortgage Sec Litig*, No. 07-md-1898 (TCP) (E.D.N.Y.).  Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from more than 33

confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness.  *See* Am. Class Action Compl., *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

114.  According to the American Home ACC, former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied.  *See id.* at 43.

115.  The American Home ACC cited to witnesses who were former American Home employees.  These witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud.  *See id.*

116.  Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans.  When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions.  Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval.  *See id.* at 44.

117.  A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations.  *See id.*

118.  The parties settled the litigation on January 14, 2010, for $37.25 million.

119.  American Home's lax lending practices landed it in the 2008 "Worst Ten in the Worst Ten" Report.  American Home came in 8th in Las Vegas, Nevada, and

**44**

9th in both Detroit, Michigan, and Miami, Florida.  *See* 2008 "Worst Ten in the Worst Ten" Report.  When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3. Countrywide Home Loans, Inc.'s Systematic Disregard of Underwriting Standards

120.   Countrywide Home Loans, Inc. ("Countrywide") was one of the largest originators of residential mortgages in the United States during the time period at issue in this Complaint.  Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2006-OA1, and GSR Mortgage Loan Trust 2007-OA1 offerings. *See infra* Table 9.   Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

121.   In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis."  Press Release, Comm. on

45

Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

122.  On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income."  Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. Times, May 9, 2008 at C1.

123.  In a television special titled, "If You Had a Pulse, We Gave You a Loan," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders.  "We told them the income that you are giving us will not be verified.  The asset that you are stating will not be verified."

> He said they joked about it:  "If you had a pulse, we gave you a loan.  If you fog the mirror, give you a loan."

> But it turned out to be no laughing matter for Partow.  Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes.  On April 20, 2007, he pleaded guilty to two counts of

46

**SECOND AMENDED COMPLAINT**

wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials.  "It's impossible they didn't know."

…

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated.  "I don't buy the rogue.  I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray.  He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path.  It was not just the matter of stated income loans, said Feinberg.  Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

124.   On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the

47

others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.  *See* Compl. for Violations of the Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4, 2009).  Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010.  *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

125.   Internal Countrywide e-mails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines.  For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines."  E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT).  Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."  *Id.* (internal quotation marks omitted).

126.   Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."  E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

**SECOND AMENDED COMPLAINT**

127.   To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

128.   In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.  In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."  E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets at Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic]
> It's not only subordinated to the first, but the first is subprime.   In
> addition, the [FICOs] are below 600, below 500 and some below
> 400 . . . .   With real estate values coming down . . . the product will
> become increasingly worse.  There has [sic] to be major changes in this
> program, including substantial increases in the minimum [FICO].

*Id.*

129.   Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos Garcia, former CFO of Countrywide

**49**

Financial and Jim Furash, former President of Countrywide Bank (June 1, 2006 10:38 PM PST).

130.   An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.   *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

131.   Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."   E-mail from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15 AM PDT).   Yet such loans were securitized and passed on to unsuspecting investors such as U.S. Central and WesCorp.

132.   With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank."   E-mail from Angelo Mozilo Countrywide to Carlos Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST).   In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans.   Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."   *Id.*

133.   In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product.   This is the most

**50**

dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."  E-mail from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST).

134.  Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors.  In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed.  He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." E-mail from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).  Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines."  *Id.*  Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions.  I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . .  [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry. . . .

*Id.*

135.  Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.  E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian

**51**

**SECOND AMENDED COMPLAINT**

1  Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM
2  PDT).

3       136.  In February 2007, nearly a year after pressing for a reduction in the
4  overuse of exceptions and as Countrywide claimed to be tightening lending standards,
5  Countrywide executives found that exceptions continued to be used at an unacceptably
6  high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered
7  purely optics with little change in overall execution unless these exceptions can be
8  contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark
9  Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM
10  PST).

11       137.  John McMurray, a former Countrywide managing director, expressed his
12  opinion in a September 2007 e-mail that "the exception process has never worked
13  properly".  E-mail from John McMurray, Managing Director, to Jess Lederman,
14  Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

15       138.  Countrywide conceded that the poor performance of loans it originated
16  was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed
17  that its high combined loan-to-value ratio ("CLTV") stated income loans were
18  performing worse than those of its competitors.  After reviewing many of the loans
19  that went bad, a Countrywide executive stated that "in most cases [poor performance
20  was] due to poor underwriting related to reserves and verification of assets to support
21  reasonable income."  E-mail from Russ Smith, Countrywide to Andrew Gissinger,
22  Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

23       139.  On October 6, 2008, 39 states announced that Countrywide agreed to
24  pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and
25  investigations regarding Countrywide's deceptive lending practices.

26       140.  On July 1, 2008, NBC Nightly News aired the story of a former
27  Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he

28  52

1  was fired for questioning his supervisors about Countrywide's poor underwriting
2  practices.

3      141.    According to Zachary, Countrywide pressured employees to approve
4  unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to get
5  one more deal done.  It doesn't matter how you get there [i.e., how the employee
6  closes the deal] . . . ."  NBC Nightly News, Countrywide Whistleblower Reports "Liar
7  Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News").  Zachary also stated that the
8  practices were not the work of a few bad apples, but rather:  "It comes down, I think
9  from the very top that you get a loan done at any cost."  *Id.*

10     142.    Zachary also told of a pattern of:  1) inflating home appraisals so buyers
11  could borrow enough to cover closing costs, but leaving the borrower owing more
12  than the house was truly worth; 2) employees steering borrowers who did not qualify
13  for a conventional loan into riskier mortgages requiring little or no documentation,
14  knowing they could not afford it; and 3) employees coaching borrowers to overstate
15  their income in order to qualify for loans.

16     143.    NBC News interviewed six other former Countrywide employees from
17  different parts of the country, who confirmed Zachary's description of Countrywide's
18  corrupt culture and practices.   Some said that Countrywide employees falsified
19  documents intended to verify borrowers' debt and income to clear loans.  NBC News
20  quoted a former loan officer:  "'I've seen supervisors stand over employees' shoulders
21  and watch them . . . change incomes and things like that to make the loan work.'"  July
22  1, 2008 NBC Nightly News.

23     144.    Not surprisingly, Countrywide's default rates reflected its approach to
24  underwriting.  *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide appeared
25  on the top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in
26  Sacramento, California; 9th in Stockton, California and Riverside, California; and 10th
27  in Bakersfield, California and Miami, Florida.  When the OCC issued its updated 2009
28

53

"Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 4.   First Franklin Financial Corporation's Systematic Disregard of Underwriting Standards

145. First Franklin Financial Corporation ("First Franklin") originated or contributed a material portion of the loans in the mortgage pool underlying the First Franklin Mortgage Loan Trust 2006-FF4 offering. *See infra* Table 9. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

146. First Franklin faces a suit that alleges it systematically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS. *See* Corrected Am. Compl. For Rescission and Damages, *Federal Home Loan Bank of Chicago v. Banc of America*, No. 10-ch-45033 (Ill. Cir. Ct. filed Apr. 8, 2011) ("FHLB Chicago Am. Compl.").

147. Statements from confidential witnesses in the FHLB Chicago Am. Complaint represented that First Franklin originated mortgage loans in violation of its underwriting standards.

SECOND AMENDED COMPLAINT

148.    According to a confidential witness who was an underwriter at a First Franklin branch in Georgia from March 2004 to November 2007, account executives at First Franklin were making "$100,000 a month in commissions," which was based off of the number and dollar amount of loans approved.  Due to this incentive structure, account executives would often pressure underwriters to approve loans that should not have been approved.  The executives would simply override the underwriter's decision so that, according to this confidential witness, "Nine out of ten times, the loan went through."  *Id.* ¶¶ 387-88.

149.    That same confidential witness explained that First Franklin used contract appraisers who inflated property values.  "The[r]e were homes with busted out windows and the meter boxes [] missing" that appraised for $300,000.  He also knew that many fake W-2s had been attached to loan applications because the tax withholdings did not match the income.  Further, he knew that mortgage brokers who referred loan applications to First Franklin were "whiting out or faxing over" the actual numbers and writing in new numbers so that the loans would work.  *Id.* ¶¶ 400, 402.

150.    Another confidential witness was an underwriter and account executive at a First Franklin branch in Ohio from 2000 until 2007.  Account executives were responsible for maintaining relationships with mortgage brokers that referred loan applications to the originating banks.  This confidential witness stated that "account executives paid processors cash under the table to help them get loans closed," and went on to describe how one loan processor was caught manipulating the loan documents in order to close more loans.  *Id.* ¶ 389.

151.    One confidential witness, who was an underwriter at a First Franklin Branch in Washington from 2005 until November 2007, described how the systematic disregard for underwriting guidelines grew worse after First Franklin purchased OwnIt Mortgage, and OwnIt employees began working with the confidential witness.  She

stated that OwnIt employees "were used to approving anything.  They'd say, 'If we don't approve it, somebody else will.  So why lose the money?'"  This witness's manager was a former OwnIt employee who would often override her employees' decisions to decline loans in order to meet performance goals.  The witness also noted that First Franklin employees manipulated applications so that they would be approved.  *See id.* ¶¶ 390, 406.

152.   The confidential witness who worked at the Ohio branch represented that there was enormous pressure from management to close loans at any cost.  "[P]eople were working until 8 p.m. on Saturdays and Sundays" in order to close the loans, stated the witness.  As a result, "a lot of loans slipped through.  People were tired of being beat up.  With the rush of loans, stuff could have been overlooked.  Maybe the conditions didn't exactly meet the guidelines."  During the last few days of the month, a drove of employees would go to the branch manager "begging for exceptions to close their loans."  The witness recalls one instance where the branch manager came out of his office and yelled: "Oh f*** it! Just close the f***ing loans."  *Id.* ¶ 395.

153.   Another confidential witness, who was, among other things, an account executive and underwriter at a First Franklin Branch in Utah from 1996 until 2008, noted that account executives would often approach branch managers about overturning an underwriter's decision to reject a loan and said that "some loans were approved that were not compliant with guidelines."  *Id.* ¶ 396.

154.   That same confidential witness also encountered the "blatant fraud" first hand.  She recalled a $500,000 loan application for a home that was supposed to be owner occupied even though the same borrower had purchased a $1,000,000 home in the same neighborhood a month earlier and also claimed that it would be owner occupied.  Although the underwriter was successful in blocking that particular application, her manager was mad at her for catching it.  Other similar loans were

**SECOND AMENDED COMPLAINT**

approved.  *See id.* ¶ 404.

155.   When First Franklin began downsizing its mortgage operation in late 2007, it ordered all of its remaining underwriters to assist in loss mitigation.  The confidential witness from the Utah branch was one of them.  She reported that the loss mitigation group was tasked with reviewing the quality of a number of First Franklin's loans: she reported that among the loans she reviewed, fifty percent were not compliant with First Franklin's guidelines, citing problems such as inflated appraisal values, insufficient employment verification, and disqualifying credit scores.  *See id.* ¶ 398.

156.   According to another confidential witness, who was an underwriter at a First Franklin branch in Florida from 1999 until 2007, loan document manipulation at First Franklin grew to disconcerting levels.  The witness stated that "a lot of fraudulent loans were going through.  There was tons of fraud going on."  *Id.* ¶ 401.

157.   FHLB's complaint survived the defendants' motion to dismiss, with the court stating "the Bank has provided evidentiary facts, such as testimony, AVM analysis of appraisal values, delinquency and foreclosure rates, and pleadings from other civil actions involving the defendants, which demonstrate the strength of the Bank's case" that the originators systematically disregarded their underwriting standards.   Order, *FHLB*, No. 10-45033 (Ill. Cir. Ct. Sept. 19, 2012) ("FHLB Ill. Order").

158.   Statements from confidential witnesses in a lawsuit brought by American International Group ("AIG") against Bank of America provide further evidence of First Franklin's systematic disregard of its underwriting guidelines.  *See* Compl., *Am. Int'l Grp. v. Bank of Am. Corp.*, No. 652199/2011 (N.Y. Sup. Ct., N.Y. Cnty. filed Aug. 8, 2011), *removed to* No. 11-cv-10549 (C.D. Cal.).

159.   In that suit, a former First Franklin underwriter from 2005 to 2007, said First Franklin's lending practices were "basically criminal."   Underwriters were

required to depart from underwriting guidelines in ways "that we did not agree with, but had to do" in order to keep their jobs.  That former employee also divulged that managers would call appraisers directly "if they didn't get exactly what they wanted" and would request re-appraisal until a satisfactory number was returned.  When she and another employee "spoke out" about these practices, they were fired.  *Id.* ¶ 301.

160.   Another former senior underwriter at First Franklin until 2005, said her manager would override her decisions not to fund problematic loans, believing that the defects would not be discovered since First Franklin only audited 5% of its loans.  She recalled several instances when she rejected unreasonable stated income loans only to be overturned by her managers.  One such instance involved a cocktail waitress who claimed to make $5,000 per month while working at the equivalent of an IHOP.  *See id.* ¶ 302.

161.   That same senior underwriter revealed that her manager would routinely "sign off" on appraisals that used "crazy" comparable properties that were over a mile away.  The manager would also pick appraisers who he knew would give favorable appraisals:  "He would pick the appraiser who would do what he wanted . . . he'd say, 'don't use that guy, use this guy.'"  The manager even instructed the senior underwriter to change appraisals and to omit key details about properties.  *Id.* ¶ 303.

162.   That same senior underwriter further explained how First Franklin's bonus structure motivated the behavior she witnessed.  She received a $50 bonus for every approved loan, ultimately bringing in $150,000 a year even though her base salary was $55,000.  *See id.*

163.   Another First Franklin underwriter corroborated the problems caused by First Franklin's bonus structure.  She claimed some of her fellow underwriters "would approve anything" in order to be paid more.  She explained that the bonus structure was not based on loans *reviewed* but only on loans *approved*.  Even if an underwriter

**SECOND AMENDED COMPLAINT**

resisted the temptation to approve a faulty loan, his or her manager would redirect the loan application to someone else who would "sign behind your back." *Id.* ¶ 304.

164.   First Franklin has also been sued by Ambac Assurance Corporation, a company that provided monoline insurance, a form of credit enhancement for certain certificates in a RMBS.  After paying hundreds of millions of dollars to certificate holders as a result of the many defaults and delinquencies on First Franklin-originated loans, Ambac reviewed 1,750 First Franklin loans.  It found that 94% had material defects, including:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property;
- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;
- Inflated appraisals; and
- Pervasive violations of the loan originator's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with debt-to-income and loan-to-value ratios above the allowed maximums, or (iii) with relationships to the applicable originator or other non-arm's-length relationships.

Compl., *Ambac Assurance Corp. v. First Franklin Fin. Corp.*, ¶¶ 82-83, 651217/2012 (N.Y. Sup. Ct. filed Apr. 16, 2012).

165.   As shown by statements from former employees and a forensic analysis of a monoline insurer, First Franklin's actual mortgage underwriting practices deviated widely from its stated guidelines.  This systematic disregard of underwriting standards led to toxic loans being bundled into securities and sold to investors who did not

**SECOND AMENDED COMPLAINT**

know, and could not have known, about the true nature of the loans backing their securities.

### 5. First Magnus Financial Corporation's Systematic Disregard of Underwriting Standards

166.   First Magnus Financial Corporation ("First Magnus") originated or contributed a material portion of the loans in the mortgage pool underlying the RALI Series 2006-QO6, RALI Series 2006-QO10, the RALI Series 2007-QH2, the RALI Series 2007-QH3, the RALI Series 2007-QH5, and the RALI Series 2007-QH6 offerings. *See infra* Table 9.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

167.   A September 9th, 2007 article in the Arizona Daily Times reported:

The data suggest that First Magnus contributed to the nationwide proliferation of subprime and limited-documentation, "Alt-A," loans, which led to this year's mortgage crisis and in turn brought about the company's collapse [sic] Aug. 16. At least 550 Tucsonans lost their jobs in the failure, as did about 5,000 employees outside this area, and Tucson lost its biggest locally based, nationwide company. …

"We jokingly called them 'liar loans,'" said Anita Luciano, a former First Magnus underwriting manager in Houston.  "A borrower can state their income and state their assets—and you approve their loans."

…

"There were people getting into houses where no way under the normal lending practices could they get a loan," said Beryl Poole, a former First Magnus underwriting manager in Fort Lauderdale, Fla.

*Poole said it wasn't uncommon for some First Magnus employees in her office to intentionally overstate incomes or assets on Alt-A applications to qualify.*

"I had many people say that to me, 'Just change the income. It's OK. We've always done that,'" she said. "I was very, very afraid of the misrepresentation that was there."

…

"We are all guilty of pushing crazy stated and NO DOC loans that were time bombs ready to go off and kill the borrower but leave the house standing," First Magnus Mid-Atlantic Regional Manager Raymond H. Fraser Jr. said in an Aug. 3 e-mail, forwarded by a former First Magnus employee. "The market is now realizing that we and others should have been a little suspect of some of these products we all sold and loved."

Jack Gillum & Christie Smythe, *First Magnus Made Many Risky Loans in Arizona*, Arizona Daily Star (Sept. 9, 2007) (emphasis added), *available at* http://azstarnet.com/business/article_c3b73c08-beef-57aa-b056-fac952a52e51.html.

168.    The Illinois Department of Financial of Professional Regulation Division of Banking investigated First Magnus and found significant inconsistencies in certain of its loan originator files from July 2006, including:

a)    Falsified employment and income information. No file contained any income tax returns, pay stubs or W-2 forms for any borrower

**61**

despite the fact that all the loans were structured as a first loan for 80% loan to value ("LTV") and a second loan at 20% LTV, thus resulting in a total loan of 100% LTV.  In the file for Unit 1201, the Verification of Employment came from a different company than the one stated by the borrower on the [loan application];

b)      Buyers of multiple units stated th[at] each one would be their principal residence.  In some cases, ownership of multiple units was not disclosed on the [loan application] or elsewhere;

c)      The use of fraudulent and inflated appraisals to support the sale prices and loan amounts.  Some of these units were used as comparables for the appraisals of later units, thus perpetuating the inflated values and creating a closed circuit of comparables which were used to aid and abet the aforementioned flipping scheme.

State of Illinois, Dept. of Financial and Professional Regulation: Division of Banking, *In Matter of First Magnus Fin. Corp.*, at 2, No. 2007-34 (Aug. 7, 2007).

169.   Another article in the Arizona Daily News concerning First Magnus revealed the details of audits performed by the U.S. Department of Housing and Urban Development and the Arizona Department of Financial Institutions:

In the months leading up to the meltdown, the 10-year-old company was writing $2.5 billion a month in home loans—three times the business it was doing just five years ago.  First Magnus was setting new internal records for loan volume, opening dozens of new branches and hiring 300 new employees.

…

Spot audits done in 2005 and 2006 by the U.S. Department of Housing and Urban Development and the Arizona Department of Financial Institutions revealed several problems with First Magnus loans:

**SECOND AMENDED COMPLAINT**

- A Scottsdale branch manager made "false promises and misrepresentations" that "resulted in 10 fraudulent loan transactions," an Arizona Department of Financial Institutions report said.

- A loan was approved with false employment verification, pay stubs and tax forms.

- A loan was approved with a false lease form for a borrower's previous residence.

- Three loans were approved with overstated income and high debt-to-income ratios.

- A refinance loan was approved without information about debt carried by the borrower's spouse.

- "Insufficient justifications" were used in some loan approvals, including one case in which the borrower was listed as a "minimal user of credit." He had six accounts, and four had gone into collection.

Becky Pallack, *First Magnus: Boom to Bust in Three Weeks*, Arizona Daily Star (Aug. 19, 2007), *available at* http://www.eller.arizona.edu/docs/press/2007/08/ ArizonaDailyStar_First_Magnus_Boom_to_bust_in_three_weeks_Aug19_2007.pdf.

170.   In 2007, Lehman Brothers and other banks requested that First Magnus repurchase $100 million of non-performing loans which First Magnus had sold to the banks.  This drove First Magnus into Chapter 11 Bankruptcy.  Josh Brodesky, *Suit Says First Magnus Officers Fueled Crisis; Their Reply: "Absurd"*, Arizona Daily Star A1 (Feb. 28, 2009),   *available   at*   http://azstarnet.com/article_169e26ed-3c23-5ff7-8e2c-b765b02f8da6.html.

**63**

**SECOND AMENDED COMPLAINT**

171.   The bankruptcy trustee subsequently filed suit against former First Magnus directors and officers.   The trustee alleged that First Magnus employees "would overstate incomes or assets to qualify potential borrowers."   *Id.*

172.   The trustee's complaint also detailed First Magnus's compensation structure.   Starting in January 2005, approximately 60-65% of the loans that First Magnus originated were referred by mortgage brokers.   First Magnus paid these brokers a fee for approved loans, creating an incentive for brokers to falsify information in the loan applications and for underwriters to ignore underwriting guidelines.   *See* Compl. in Adversary No. 09-211, *In re First Magnus Fin. Corp.*, ¶ 88, No. 07-1578 (D. Ariz. Bankr. filed Feb. 26, 2009).

173.   After a lengthy battle, the trustee settled its claims against First Magnus's directors and officers on confidential terms.   *See* Josh Brodesky, *First Magnus Saga's End Shouldn't Surprise You*, Arizona Daily Star (Apr. 10, 2011), *available at* http://azstarnet.com/news/local/josh-brodesky-first-magnus-saga-s-end-shouldn-t-surprise/article_b3e3d446-e111-51d7-8303-c4316de15dfa.html.

### 6.   First National Bank of Arizona's Systematic Disregard of Underwriting Standards

174.   First National Bank of Arizona ("FNB Arizona") was a large subprime mortgage lender.   It originated or contributed a material portion of the loans in the mortgage pool underlying the RALI Series 2006-QO6, RALI Series 2006-QO10, RALI Series 2007-QH2, RALI Series 2007-QH3, RALI Series 2007-QH5, and RALI Series 2007-QH6 offerings.   *See infra* Table 9.   Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.   In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would

**64**

have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

175. FNB Arizona, First National Bank of Nevada ("FNB Nevada"), and First Heritage Bank were controlled by First National Bank Holding Company ("FNB Holding"), collectively ("FNB Group"). All were under common management. *See* Department of the Treasury, Office of the Inspector General, *Audit Report: Safety and Soundness: Material Loss Review of First National Bank of Nevada and First Heritage Bank, National Association* at 4 (Feb. 27, 2009) ("FNB Arizona OIG Report"), *available at* http://www.treasury.gov/about/organizational-structure/ig/Documents/ oig09033.pdf; David Enrich and Damian Paletta, *Failed Lender Played Regulatory Angles*, Wall St. J. (Oct. 3, 2008), *available at* http://online.wsj.com/article/ SB122298993937000343.html.

176. FNB Arizona ran the FNB Group's residential mortgage lending operation. *See* FNB Arizona OIG Report at 4.

177. The amount of mortgage loans originated by FNB Arizona grew from $1.5 billion in 2001 to $7 billion in 2006. *See* Enrich and Paletta, *Failed Lender Played Regulatory Angles*. FNB Arizona was an OTD lender; in 2006, $6.9 billion of its loans were packaged into RMBS. *See* FNB Arizona OIG Report at 5.

178. A series of investigations by the Treasury Department's Office of the Comptroller of Currency ("OCC") detail how FNB Arizona achieved its rapid growth by pervasively disregarding its underwriting guidelines.

179. In 2004, the OCC inspected FNB Arizona and determined that it needed better "[p]rocedures to reduce underwriting exceptions" and better "[p]olicies and internal controls over the use of appraisers." FNB Arizona OIG Report at 44.

180. A 2005 OCC investigation found that "[c]redit underwriting and administration need improvement. The quickness of loan production has had priority over quality. Issues include loan appraisal violations (repeat issue) and inadequate

65

practices over standby letters of credit."  It recommended FNB Arizona "develop and implement procedures and accountability that are effective in reducing the high level of underwriting exceptions (repeat issue)" and reduce the number of employee and vendor errors in loan origination.  It also cited FNB Arizona for two regulatory violations—failing to appraise properties prior to closing and failing to use independent appraisers. *Id.* at 44-46.

181.  A 2006 investigation found that FNB Arizona still had not implemented "effective procedures and processes to reduce the level and number of underwriting exceptions."  The OCC also noted that appraisers' reports were often missing or incomplete. *Id.* at 47

182.  In 2007, FNB Arizona's liquidity problems prompted the OCC to initiate an informal enforcement action.  It cited several matters requiring the direct attention of the bank's board, including internal loan review that lacked independence due to executive management influence, understaffed internal loan review, staffing levels and expertise that were not commensurate with the complexities of the bank's operations, and (yet again) the need to reduce underwriting exceptions. *See id.* at 48-50.

183.  FNB Arizona's underwriting practices became so poor that in 2007 it was unable to sell $683 million of residential mortgages to securitizers.  It was also forced to repurchase a number of its poorly underwritten mortgages.  This contributed to a liquidity crisis for the entire FNB Group. *See id.* at 2, 6.

184.  On June 30, 2008 FNB Arizona merged into FNB Nevada.  Shortly thereafter, the OCC closed FNB Nevada and appointed the FDIC as its receiver. Press Release, *OCC Closes First National Bank of Nevada and Appoints FDIC Receiver* (July 25, 2008), *available at* http://www.occ.gov/news-issuances/news-releases/2008/nr-occ-2008-87.html.

185.  In its capacity as receiver for FNB Nevada, the FDIC sued the former directors and officers of the FNB Group.  Compl., *FDIC v. Dorris*, No. 11-1652 (D.

66

Ariz. filed Aug. 23, 2011).   The FDIC alleged the same pervasive disregard of underwriting guidelines described above.  *See id.* ¶¶ 38-42.

186.   That complaint detailed how the bank's compensation structure was tied to the volume of loans originated, creating an incentive for bank employees to disregard the underwriting guidelines.  *See id.* ¶ 30.  FNB Arizona also used many mortgage brokers who had the same volume-based incentive to disregard underwriting guidelines and to inflate appraisals.  *See id.* ¶¶ 33-34

187.   The suit settled less than two months after it was filed.  Final Judgment Order, *FDIC v. Dorris*, Doc. 15., No 11-1652 (D. Ariz. Oct. 13, 2011).

188.   Evidence uncovered in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-10446 (D. Mass. filed Oct. 1, 2012) further highlights FNB Arizona's disregard of its underwriting guidelines.  There, the Court allowed the Plumber's Union to engage in limited discovery, which uncovered four pertinent pieces of evidence:

> (1)    "[T]hree 'representative' no-document loans that [FNB Nevada] originated.   In each of these 'No Doc' loans, the borrower's income was either unknown or unverified, or inadequate to make payments on the underlying mortgage, or if not, the borrower's debt to income ratio (DTI) belied any realistic probability that the borrower could keep up with mortgage payments over the life of the loan."
>
> (2)    "[T]he declaration of Susan Wright, who underwrote loans at [FNB Nevada] in 2006 and 2007 and generally corroborates the Complaint's allegations about [FNB Nevada]'s underwriting practices."  "Wright describes [FNB Nevada]'s business model as trying to 'make as many loans as possible and then sell them as quickly as possible' and explains that their underwriting practices

**67**

instructed underwriters to remove income and asset information already in the possession of [FNB Nevada] from 'No Doc' loans. She states that [FNB Nevada] regularly made loans to borrowers whom '[FNB Nevada] knowingly qualified on the basis of what appeared to be obviously false information [and] [FNB Nevada] did not appear to reasonably expect that the borrowers would be able to repay these loans.'"

(3)   "[S]everal emails generated by [FNB Nevada] employees, including Mortgage Division President Pat Lamb; Vice President of Risk Management Renea Aderhold; 'SVP Ops/Communication Manager' Beth Rothmuller; Senior Vice President Lisa Sleeper; and Senior Vice President and Risk Officer Eric Meschen, which collectively paint a picture of a devil-may-care underwriting culture."

(4)   "[T]he expert report of Ira Holt, an accountant who performed a forensic analysis of 408 of the Trusts' loans using the [FNB Nevada] guidelines that were in place when they were originated. Holt found that 108 (26.5%) had material defects that violated even [FNB Nevada]'s slack underwriting standards."   "According to Holt, he was unable to 're-underwrite' some of the 408 loans because of the lack of documentation, as well as the 'scrubbing' of the applicant's disqualifying data by [FNB Nevada].   According to plaintiffs, the number of loans in the sample with material defects may be considerably higher than Holt's estimates."

*Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 08-10446-RGS, 2012 WL 4480735, at *3 & nn. 6, 8 (D. Mass. Oct. 1, 2012).

**SECOND AMENDED COMPLAINT**

189.   The Court held allegations based on that evidence were sufficient to survive a motion to dismiss.  *See id.* at *3 ("[D]efendants' efforts to impugn plaintiffs' evidence is largely factual in nature and better fitted to a summary judgment motion than the relaxed pleading standard that attaches to a Rule 12(b)(6) motion.").

190.   Lehman Brothers has also sued FNB Arizona for selling mortgages containing misrepresentations about borrowers' finances, employment, and the nature of the property.  That case settled for an undisclosed amount.  *See* Philip Shiskin, *Bankers Escape Big Penalties in FDIC Failed Bank Case* (Feb. 23, 2012), *available at* http://www.reuters.com/article/2012/02/23/us-bankers-fdic-idUSTRE81M1UH20120223; Compl., *Lehman Mortg. Trust Mortg. v. First Nat'l Bank of Nev.*, Nos. CV2006-018929 (AZ Super. Ct., Maricopa Cnty. filed Dec. 12, 2006).

### 7.   Fremont Investment and Loan's Systematic Disregard of Underwriting Standards

191.   Fremont Investment and Loan ("Fremont") originated or contributed a material portion of the loans in the mortgage pool underlying the Fremont Home Loan Trust 2006-D Offering.  *See infra* Table 9.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

192.   Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a lender "'known for poor quality loans.'"  Opening Statement of Sen. Carl Levin, Chairman, Permanent S. Comm. on Investigations, Hearing on *Wall Street and the Financial Crisis: The Role of Credit Rating Agencies* (Apr. 23, 2010).  Senator Levin

**69**

**SECOND AMENDED COMPLAINT**

recounted how an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, *a subprime lender known for loans with high rates of delinquency*.   On January 24, 2007, an analyst wrote seeking advice from two senior analysts:  "I have a Goldman deal with subprime Fremont collateral. *Since Fremont collateral has been performing not so good, is there anything special I should be aware of*?"  One analyst responded:  "*No, we don't treat their collateral any differently*."  The other asked:  "are the FICO scores current?"  "Yup," came the reply.  Then "You are good to go."  In other words, *the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry.*  In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages.  By October, both companies began downgrading the CDO.  Today all five AAA tranches have been downgraded to junk status.

*Id.* (emphasis added).

193.   Fremont was subject to a cease and desist order from the Federal Deposit Insurance Corporation ("FDIC") in 2007.  A July 1, 2008 article in the BCD News reported:

> Ever since the FDIC slapped Fremont Investment & Loan with a cease and desist order in March 2007, a Chapter 11 filing seemed likely.
>
> . . .
>
> When the subprime mortgage market collapsed, Fremont Investment &

**70**

**SECOND AMENDED COMPLAINT**

Loan, once one of the top 10 subprime mortgage originators, found itself mired in financial disaster.  To make matters worse, it also faced scrutiny from the FDIC, and was the subject of numerous lawsuits alleging that Fremont engaged in deceptive practices in connection with its origination and servicing of residential mortgage[s]…

In March 2007, the company exited the residential subprime loan business in light of an FDIC cease and desist order.  The FDIC determined, among other things, that Fremont had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default.

*Former Subprime Lender's Parent Throws in the Towel*, 50 BCD NEWS & COMMENT, July 1, 2008.

194.   In July 2009, The New Yorker reported that Sheila Bair, Chairman of the FDIC, initiated the first federal government action against Fremont in 2007 that culminated in the cease and desist order to Fremont:

In March, 2007, she initiated the first government action against a subprime lender, instructing Fremont Investment & Loan, a California bank, to cease operations.  Fremont was among the worst of the subprime offenders, using all the now familiar practices:  targeting people with bad credit, *ignoring traditional standards for underwriting home loans*, paying third-party brokers handsomely to bring in gullible customers, and then infecting the larger financial system by selling off the hazardous loans.  "We ordered them out of the business," she said. "And they weren't happy about it."

Ryan Lizza, *The Contrarian; Sheila Bair and the White House financial debate*, NEW YORKER,

**SECOND AMENDED COMPLAINT**

July 6, 2009, at 30 (emphasis added).

195.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc., which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.

Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, MYRTLE BEACH SUN-NEWS, Jan. 13, 2011, at A.

196.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee.  *See* 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions:  2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

**SECOND AMENDED COMPLAINT**

### 8. GreenPoint Mortgage Funding Inc.'s Systematic Disregard of Underwriting Standards

197. GreenPoint Mortgage Funding Inc. ("GreenPoint") originated or contributed a material portion of the loans in the mortgage pool underlying the GreenPoint Mortgage Funding Trust 2006-OH1 offering. *See infra* Table 9. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

198. GreenPoint, based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007.

199. According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector." Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

200. When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

1    Many Alt-A loans go to borrowers with credit scores higher than
2    subprime and lower than prime, and carried lower interest rates than
3    subprime mortgages.
4
5    So-called no-doc or stated-income loans, for which borrowers didn't
6    have to furnish pay stubs or tax returns to document their earnings, were
7    offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to
8    small business owners who might have found it difficult to verify their
9    salaries.
10   . . .
11   "To grow, the market had to embrace more borrowers, and the obvious
12   way to do that was to move down the credit scale," said Guy Cecala,
13   publisher of Inside Mortgage Finance.  "Once the door was opened, it
14   was abused."
15   . . .
16   Almost all stated-income loans exaggerated the borrower's actual income
17   by 5 percent or more, and more than half increased the amount by more
18   than 50 percent, according to a study cited by Mortgage Asset Research
19   Institute in its 2006 report to the Washington-based Mortgage Bankers
20   Association.

21   Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*,
22   BLOOMBERG, Sept. 12, 2008, *available at* http://www.bloomberg.com/apps/news?
23   pid=newsarchive&sid=arb3xM3SHBVk.

24       201.    U.S. Bank, the indenture trustee of GreenPoint Mortgage Funding
25   Trust 2006-HE1, sued GreenPoint in order to force GreenPoint to repurchase the
26   loans that GreenPoint had contributed to the RMBS.  U.S. Bank alleged that
27   GreenPoint "pervasive[ly] fail[ed] to follow its underwriting guidelines during the

**74**

**SECOND AMENDED COMPLAINT**

origination of the Loans." *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, No. 600352/09, 2010 WL 841367, at *7 (N.Y. Sup. Ct. Mar. 3, 2010); *see also* Compl., *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, 2009 WL 6084150, ¶ 35 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers' income, assets, employment, intent to occupy the property, inflated appraisal values, and violations of GreenPoint's underwriting guidelines regarding credit scores, debt-to-income ratios, and loan-to-value ratios).

202.   U.S. Bank based its allegations on its forensic analysis of GreenPoint-originated loans.  Of 1,030 randomly sampled loans, U.S. Bank found that 93% were in violation of GreenPoint's underwriting guidelines.  *See id.* at *7 n.4.  Its complaint survived a motion to dismiss.  *See id.* at *8.

203.   Syncora Guarantee, a monoline insurer, sued JP Morgan as successor to Bear Stearns in connection with an RMBS underwritten by Bear Stearns and exclusively collateralized by GreenPoint-originated loans.  After sustaining large losses due to the poor performance of GreenPoint loans, Syncora hired an independent consultant to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected without regard to payment status.  Over 92% of the 1,431 loans contained misrepresentations, and over 85% of the randomly selected 400 loans contained misrepresentations.  The misrepresentations uncovered include:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and,

**SECOND AMENDED COMPLAINT**

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

See Compl., *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, ¶¶ 7, 181-82, No. 651566/2011 (N.Y. Sup. Ct. filed June 6, 2011). Syncora's suit against JP Morgan survived a combined motion to dismiss and motion for summary judgment. *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

204. GreenPoint's own employees have corroborated the findings of U.S. Bank and Syncora. A confidential witness in the *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.*, confirmed that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines. This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007. *See* Compl., *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Secs., Inc.*, ¶ 265, No. 49D051010PL045071 (Ind. Sup. Ct., Marion Cnty. filed Oct. 15, 2010) ("FHLB Indianapolis").

205. According to that confidential witness, sales staff and managers at GreenPoint Mortgage received bonuses based on the number of loans closed. As she

76

said, "sales had tremendous authority" at GreenPoint Mortgage, and "[t]hey were in business to make more money. They would try to find any way to close a loan." *Id.* ¶ 266.

206. Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes that she believed should not have been approved. She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment." When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers, and the regional operations manager overrode her decisions. *Id.* ¶ 267.

207. More often than not, the confidential witness believed that her managers overrode her denials due to the incentives that they received based upon loan volume. As she said, "They were making the decision because they had to hit certain sales numbers." She was aware of such targets because of comments made in operations meetings about the company needing to meet certain goals. *Id.* ¶ 268.

208. The *FHLB Indianapolis* suit survived a motion to dismiss, with the Court holding, "the plaintiff has, indeed, stated a claim upon which relief can be granted on the issue of underwriting guidelines." *Fed. Home Loan Bank of Indianapolics v. Bank of Am. Mortg. Secs., Inc.*, No. 49D051010PL045071, 2012 WL 2844690 (Ind. Sup. Ct., Marion Cnty. July 3, 2012).

209. In *Allstate Bank v. J.P. Morgan Case, N.A.*, Allstate, an RMBS investor, sued J.P. Morgan, the RMBS underwriter, for misrepresentations. Allstate's complaint relied on several confidential witnesses. One confidential witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only 10% of the loans it originated for fraud. He thought this was a "mistake" because the fraud and misrepresentation uncovered in the 10% sample indicated that many more loans likely contained fraud. But the remaining 90% of the

**SECOND AMENDED COMPLAINT**

loans were not reviewed.  Am. Compl., *Allstate Bank v. JP Morgan Chase, N.A.*, ¶ 485, No. 11-1869 (S.D.N.Y. filed May 10, 2012).

210.   That confidential witness also stated that sales personnel ran GreenPoint, and senior management was comprised of people from sales who were incentivized to push the volume of mortgage loans, not adherence to the underwriting guidelines or due diligence.  Managers' bonuses were tied to production volume, and they were not penalized if loans were later found to be fraudulent or if the borrower defaulted on the first payment.   He stated that GreenPoint's management deliberately overlooked misrepresentations from mortgage loan brokers, particularly if the broker brought in a high volume of loans.  Problem brokers were rarely suspended, and even when they were, there was never a review of the loans they originated that were already in the pipeline. *Id.* ¶ 486.

211.   Another confidential witness was a Wholesale Account Manager at GreenPoint from 2004 to 2006.  That confidential witness stated that GreenPoint employees understood that if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund the mortgage loan.  The majority of the loan products originated in the confidential witness's office were stated income-stated asset loans and pay-option ARMs.  Despite the risk inherent in these products, the sales force "never learned of negative loan performance" and their compensation was in no way tied to loan performance. *Id.* ¶ 487.

212.   Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 and witness supervised five Underwriters and three Conditions Specialists.  That confidential witness stated that GreenPoint management authorized exceptions to loan underwriting guidelines in order to approve applications, even when there were no compensating factors justifying the exceptions.   The confidential witness was aware that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud was

78

found.  According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint.  *Id.* at ¶ 488.

213.  *Allstate's* complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any realistic degree of control.  Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.  *Id.* ¶ 490.

214.  This was problematic because mortgage brokers were known to commit fraud in order to get loan applications approved by originators.  As one former mortgage wholesaler put it, "I'd walk into mortgage shops and see brokers openly cutting and pasting income documents and pay stubs, getting out the Wite-Out and changing Social Security numbers."  Mara Der Hovanesian, *Sex, Lies, and Subprime Mortgages*, Bloomberg Businessweek (Nov. 12, 2008), *available at* http://www.businessweek.com/stories/2008-11-12/sex-lies-and-subprime-mortgages.

215.  GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report.  GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  *See* 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 9. Homecomings's Systematic Disregard of Underwriting Standards

216.  Homecomings Financial, LLC f/k/a Homecomings Financial Network, Inc. ("Homecomings") originated or contributed a material portion of the loans in the mortgage pool underlying each RALI Series offering at issue and is a wholly-owned

subsidiary of the sponsor of those offerings, Residential Funding Co., LLC f/k/a Residential Funding Corp. ("RFC").  *See infra* Table 9.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

217.   Following the purchase of the certificates in the RALI Series Offerings by WesCorp, public disclosures revealed that Homecomings systematically disregarded its underwriting guidelines in favor of riskier, fee-driven mortgage lending practices including subprime, Alt-A and option-ARM loans, and engaged in predatory lending.

218.   The Federal Trade Commission opened an investigation into Homecomings mortgage lending and underwriting practices, closing the investigation in January 2009, after Homecomings ceased mortgage loan origination.  *See* Letter from Peggy L. Twohig, Associate Dir., Div. of Fin. Practices, Bur. of Consumer Protection, Federal Trade Commission, to Andrew Sandler, Skadden, Arps (counsel for Homecomings) (Jan. 22, 2009).

219.   In March 2009, the Portland Tribune reported that Homecomings lending practices allowed for the origination of shaky loans that precipitated a wave of foreclosures.  The article reported:

> "In order to keep your market share, you had to be more aggressive," said Tim Boyd, who sold subprime loans in the Portland area for six years and then Alt A loans for seven years for Homecomings Financial.

**SECOND AMENDED COMPLAINT**

"The main focus was doing Alt A because that's where the money was," said Boyd, who left the industry.  A loan officer arranging a $300,000 Option ARM loan could collect $10,500 in fees, he said.

Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs.  Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.

"The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, [Bill Ridge, owner of Ridge Mortgage Services] said.  "I had Wachovia march through there; I had GMAC."

. . . .

He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.

"They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.'"

Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble.  "It made me sick," he said.

Steve Law, *Shaky Loans May Spur New Foreclosure Wave, Unraveling 'Alt A' Mortgages Could Keep Portland Housing Market Dismal*, PORTLAND TRIB., Mar. 5, 2009.

220.   The Offering Documents in the RALI Series Offerings indicate that the underlying pools of mortgages were primarily comprised of "payment-option, hybrid adjustable-rate mortgage loans" ("Option ARMs") and/or Alt-A loans.

**81**

**SECOND AMENDED COMPLAINT**

221.   Homecomings' origination practices are also at issue in the *Federal Home Loan Bank of Chicago v. Banc of America Securities, LLC* action in state court in Illinois. There, the Federal Home Loan Bank of Chicago ("FHLB Chicago") alleges that Homecomings systemically disregarded its underwriting guidelines when originating mortgages that were subsequently collateralized RMBS.   *See* FHLB Chicago Am. Compl.

222.   Statements from confidential witnesses in the FHLB Chicago Complaint represented that Homecomings originated mortgage loans in violation of its stated underwriting standards.

223.   According to two confidential witnesses in the FHLB Chicago Complaint, the first who was a Homecomings underwriter from January 2006 until December 2006 and the second who was a Homecomings underwriter from May 2005 until October 2007, Homecomings made loans to borrowers who clearly could not make the monthly payments, approved high-risk low-doc or no-documentation loans, approved exceptions with no reasonable compensating factors, and widely abandoned underwriting practices.  *See id.* ¶ 447.

224. Those two confidential witnesses described the two different automatic underwriting systems that Homecomings employed to underwrite loans: (1) Desktop Underwriter, and (2) Assetwise.   According to the second confidential witness, Homecomings' employees purposefully chose to use Desktop Underwriter for subprime loan applications from low-income applicants because it approved loans with a higher debt-to-income ratio than Assetwise would approve.  *See id.* ¶ 450.

225.   The first confidential witness described how the Assetwise program required an employee to simply enter in a borrower's information and the program would yield its findings.   The confidential witness explained that "one of [her] problems was that [a loan application] would fit inside the guidelines, but if you read between the lines, you could see that the borrower was not going to be able to make

**82**

the payments." When the confidential witness raised these pressing concerns to her supervisor, she received unambiguous directions: "It fits, you do the loan. We're going to do this deal." *Id.* ¶ 451.

226. The second confidential witness reported that no matter which automated underwriting system employees chose to use, nearly all of the loan applications were approved. Once the loan application was approved by the automated underwriting system, the underwriters could not reverse the approval. *See id.* ¶ 452.

227. The first confidential witness described how mortgage brokers would appeal loans initially denied until Homecomings supervisors signed off on the loans. The second confidential witness said loan officers were instructed to search for compensating factors that would enable them to approve the loan despite the presence of "red flags." *Id.* ¶¶ 453-54.

228. The FHLB complaint survived the defendants' motion to dismiss. FHLB Ill. Order.

229. Homecomings' underwriting practices are implicated in three lawsuits filed by MBIA, Inc. MBIA provided monoline insurance, a form of credit enhancement, for RMBS containing Homecomings-originated loans. In its suits, MBIA alleges misrepresentations regarding the quality of the loans underlying the RMBS that it insured. Except for one, the RMBS in MBIA's suits were issued in 2006 and 2007. *See* Compl., *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (MN Ct., Hennepin Cnty. filed Sept. 17, 2012) ("*MBIA v. Ally* Compl."); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct. filed Apr. 1, 2010) ("*MBIA v. GMAC* Compl."); Compl., *MBIA Ins. Corp. v. Residential Funding Co.*, No. 603552/2008 (N.Y. Sup. Ct. filed Dec. 4, 2008) ("*MBIA v. RFC* Compl.").

230. The defendants in those suits include Ally Financial, Inc., RFC, and GMAC Mortgage, LLC ("GMAC Mortgage"). RFC, GMAC Mortgage, and

**83**

1    Homecomings were all subsidiaries of GMAC Mortgage Group, LLC, which is now a

2    subsidiary of Ally Financial.  *See* Ally Financial, Inc., Form 10-K, Ex. 21 (2011);

3    GMAC LLC, Form 10-K, Ex. 21 (2006).

4        231.   RFC and GMAC Mortgage sponsored the RMBS that MBIA insured.

5    RFC also sponsored each of the RALI Series RMBS at issue in this suit.

6        232.   Homecomings originated many of the loans underlying the RMBS at

7    issue in MBIA's suits.  *See also MBIA v. Ally* Compl. ¶¶ 5, 25 (alleging Homecomings

8    originated many of the loans in RMBS sponsored by RFC and GMAC Mortgage).

9        233.   After sustaining large losses, MBIA conducted forensic analyses of

10   several thousand loans underlying the RMBS sponsored by RFC and GMAC, many of

11   which were originated by Homecomings.  MBIA found material misrepresentations in

12   over 89% of those loans from GMAC-sponsored RMBS and over 93% of those loans

13   from RFC-sponsored RMBS.  The material misrepresentations included, among other

14   things, routine disregard of underwriting guidelines, debt-to-income and combined

15   loan-to-value ratios that exceeded the amounts allowed in the underwriting guidelines,

16   failure to verify employment as required by underwriting guidelines, and improper

17   reliance on the Assetwise program.  *See MBIA v. Ally* Compl. ¶¶ 76-83; *MBIA v.*

18   *GMAC* Compl. ¶¶ 70-79; *MBIA v. RFC* Compl. ¶¶ 42-48.

19       234.   Representative examples of the misrepresentations MBIA uncovered

20   include (1) a loan that had a debt-to-income ("DTI") ratio of 65.56% and a CLTV

21   ratio of 125.68% when the underwriting guidelines imposed a maximum DTI ratio of

22   50% and a maximum CLTV ratio of 100%, and (2) a loan for a borrower with a stated

23   income of $3700 per month and a CLTV of 94.2% when the underwriting guidelines

24   required an income of $4000 per month and a CLTV not exceeding 80%.  *See MBIA v.*

25   *GMAC* Compl. ¶ 78; *MBIA v. RFC* Compl. ¶ 47.

26       235.   All three of MBIA's suits are still pending.  Two have survived motions

27   to dismiss.  *See MBIA v. GMAC*, 914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010); *MBIA v.*

28                                  **84**

1   *RFC*, Order, No. 603552/08 (N.Y. Sup. Ct. Dec. 22, 2009). There have been no

2   rulings in the recently filed *MBIA v. Ally* suit.

3       236. A confidential witness, who was an account executive at Homecomings

4   from August 2001 to September 2008, corroborated the allegations in the *MBIA*

5   complaints regarding improper use of Assetwise. As a subsidiary of RFC,

6   Homecomings used Assetwise in its mortgage origination. According to the

7   confidential witness, Homecomings employees would "game" Assetwise. Assetwise

8   was programmed to make "automated exceptions" that were purportedly within the

9   RFC and Homecomings underwriting guidelines. Homecomings did not monitor

10   what information a loan officer could input in Assetwise, and Assetwise required only

11   a limited amount of information to process and approve a loan. If possible, loan

12   officers would sometimes not submit detrimental information to Assetwise in order to

13   gain approval for a loan that would not have been approved if all known information

14   had been input into Assetwise.

15       237. The confidential witness also stated that Homecomings' employees

16   would run the same loan through Assetwise several times, making a slight adjustment

17   to the loan application each time until Assetwise approved the loan. This was possible

18   because Homecomings did not place limits on the number of times a loan application

19   could be submitted to Assetwise, and the software itself had no internal limits on the

20   number of times a loan application could be submitted.

21       238. The confidential witness also corroborated the statements made by the

22   confidential witnesses in the FHLB Chicago Complaint, stating that the lack of

23   following underwriting guidelines at Homecomings was much more severe than what

24   was related in the FHLB Chicago Complaint. The confidential witness sometimes

25   processed as many as 130 to 200 loans per month and received pervasive pressure to

26   get loans approved.

27       239. RFC is also the defendant in several other cases brought by the Financial

28

Guaranty Insurance Company ("FGIC"), alleging material misrepresentations in the offering documents concerning the characteristics of the mortgages underlying the securities at issue. *See* Compl., *Fin. Guar. Ins. Co. v. Residential Funding Co*, No. 653304/2011 (N.Y. Sup. Ct. filed Nov. 29, 2011). *See also* Nos. 653493/2011, 653621/2011, 653622/2011, 653623/2011, 653303/2011 (related FGIC cases). The complaints allege that Homecomings originated and serviced many of the deficient loans underlying the securities at issue in the FGIC complaints, and that disregard of underwriting standards at Homecomings directly led to the losses incurred by FGIC.

240. As shown by statements from confidential witnesses, former employees in the FHLB Chicago Complaint, and MBIA's forensic analyses of Homecomings' loans, Homecomings' actual mortgage underwriting practices deviated widely from its stated guidelines. This systematic disregard of underwriting standards led to toxic loans being bundled into securities and sold to investors who did not know, and could not have known, about the true nature of the loans backing their securities.

### 10.   IndyMac Bank, FSB's Systematic Disregard of Underwriting Standards

241. IndyMac Bank, FSB ("IndyMac") originated or contributed a material portion of the loans in the mortgage pool underlying the GSR Mortgage Loan Trust 2006-OA1 Offering. *See infra* Table 9. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

242. On July 11, 2008, just four months after IndyMac filed its 2007 Annual

**SECOND AMENDED COMPLAINT**

Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history.  IndyMac filed for bankruptcy on July 31, 2008.

243.   On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

244.   According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were … associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2. The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories.  Appraisals obtained by IndyMac on underlying collateral were often questionable as well."  *Id.*

245.   IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id.* at 11, 21.  The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment."  *Id.* at 11.

246.   IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable.  *Id.* at 2-3.

247.   IndyMac's "risk from its loan products. . .was not sufficiently offset by

**87**

1  other underwriting parameters, primarily higher FICO scores and lower LTV ratios."

2  *Id.* at 31.

3      248.   Unprepared for the downturn in the mortgage market and the sharp

4  decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing]

5  $10.7 billion of loans it could not sell in the secondary market." *Id.* at 3.  This proved

6  to be a weight it could not bear, and IndyMac ultimately failed. *See id.*

7      249.   In June 2008, the Center for Responsible Lending ("CRL") published a

8  report entitled *IndyMac: What Went Wrong?  How an 'Alt-A' Leader Fueled its Growth with*

9  *Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL Report"), *available at*

10  http://www.responsiblelending.org/mortgage-lending/research-

11  analysis/indymac_what_went_wrong.pdf.  The CRL Report detailed the results of the

12  CRL's investigation into IndyMac's lending practices.   CRL based its report on

13  interviews with former IndyMac employees and reviewed numerous lawsuits filed

14  against IndyMac.   The CRL Report summarized the results of its investigation as

15  follows:

16      IndyMac's story offers a body of evidence that discredits the notion that

17      the mortgage crisis was caused by rogue brokers or by borrowers who

18      lied to bankroll the purchase of bigger homes or investment properties.

19      CRL's investigation indicates many of the problems at IndyMac were

20      spawned by top-down pressures that valued short-term growth over

21      protecting borrowers and shareholders' interests over the long haul.

22  CRL Report at 1.

23      250.   CRL reported that its investigation "uncovered substantial evidence that

24  [IndyMac] engaged in unsound and abusive lending during the mortgage boom,

25  routinely making loans without regard to borrowers' ability to repay [the mortgage

26  loans]." *Id.* at 2.

27      251.   The CRL Report stated that "IndyMac pushed through loans with fudged

28  **88**

**SECOND AMENDED COMPLAINT**

or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id.*

252. The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id.* at 3.

253. Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id.* at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans' – in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

254. The CRL also found evidence that: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple: "Find a way to make this work."

*Id.* at 9 (footnote omitted).

**SECOND AMENDED COMPLAINT**

255.   Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated:  "I would reject a loan and the insanity would begin.  It would go to upper management and the next thing you know it's going to closing."  *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors."  *Id.* at 8.

256.   Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time.  *See id.* at 9.  According to Montilla:

> "I would tell them:  'If you want to approve this, let another underwriter
> do it, I won't touch it – I'm not putting my name on it,'" Montilla says.
> "There were some loans that were just blatantly overstated. . . .  Some of
> these loans are very questionable.  They're not going to perform."

*Id.* at 10.

257.   Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process.  *See id.* at 14.

258.   On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral.  *See* Compl. ¶ 6, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF (C.D. Cal. filed July 2, 2010).  This case is set for trial in September 2012.

259.   IndyMac currently faces a class action lawsuit alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS.  *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y.

filed May 14, 2009).  On June 21, 2010, the class action suit survived a motion to dismiss.

260.  Like loan purchasers, insurers of RMBS also typically require the insured party to repurchase loans suffering Early Payment Default in order to protect themselves against fraud and poor underwriting.

261.  MBIA filed a breach of contract claim against IndyMac (with the FDIC representing IndyMac as conservator and receiver) in May 2009, claiming that IndyMac made contractual misrepresentations concerning its adherence to its underwriting standards in processing mortgage loan applications.  *See* Compl., *MBIA Ins. Corp. v. IndyMac Bank, FSB*, No. 1:09-cv-01011-CKK (D.D.C. filed May 29, 2009).  A motion to dismiss is pending.

262.  IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities.  As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst Ten" Report.  IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.  *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

## 11.  SCME Mortgage Banker's Systematic Disregard of Underwriting Standards

263.  SCME Mortgage Bankers Inc. originated or contributed a material portion of the loans in the mortgage pool underlying the RALI Series 2006-QO6, RALI Series 2006-QO10, RALI Series 2007-QH2, RALI Series 2007-QH3, RALI Series 2007-QH5, and RALI Series 2007-QH6 offerings.  *See infra* Table 9. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor

would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

264.   SCME had one of the largest originate-to-distribute percentages in the nation.   In 2006, half of all mortgage lenders sold barely any of their loans for securitization (4%).   The next quartile of mortgage lenders packaged less than 68% of their loans into RMBS.   SCME was near the top of the final quartile, with nearly 91% of its loans being packaged into RMBS.

265.   SCME's   originate-to-distribute   business   model   created   perverse incentives for its employees and management.   The company profited according to the volume of loans it originated with no regard for their quality.   It offloaded the high risk of default for poorly underwritten loans onto unsuspecting third parties.

266.   Because of this incentive structure, SCME originated numerous loans that did not meet its own stated underwriting guidelines.   These faulty loans were packaged into RMBS that were ultimately purchased by WesCorp and U.S. Central.

## 12.   WaMu's and Long Beach Mortgage's Systematic Disregard of Underwriting Standards

267.   WaMu affiliate Long Beach Mortgage ("Long Beach") originated or contributed a material portion of the loans in the mortgage pool underlying Long Beach Mortgage Loan Trust 2006-11 Offering.   *See infra* Table 9.   Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.   In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these

92

offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

268. WaMu was a Seattle-based bank that rapidly grew from a regional to a national mortgage lender during the period from 1991 to 2006. At over $300 billion in total assets, WaMu was at one time the largest institution regulated by the Office of Thrift Supervision ("OTS"). On September 25, 2008, however, federal regulators closed WaMu when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of WaMu's problems led to a run on the thrift by depositors. Federal regulators facilitated the sale of WaMu to J.P. Morgan Chase & Co., in September 2008.

269. In April 2010, the Treasury OIG, issued a report titled "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG Report"), discussing the reasons for WaMu's meteoric rise and consequent collapse. The WaMu OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending strategy that included liberal underwriting standards and inadequate risk controls." WaMu OIG Report at 2. The report elaborated on how WaMu adopted this new strategy to compete with Countrywide and maximize profits:

> In 2005, WaMu management made a decision to shift its business strategy away from originating traditional fixed-rate and conforming single family residential loans, towards riskier nontraditional loan products and subprime loans. WaMu pursued the new strategy in anticipation of increased earnings and to compete with Countrywide…
>
> . . . .
>
> WaMu estimated in 2006 that its internal profit margin from subprime loans could be more than 10 times the amount for a government-backed

93

loan product and more than 7 times the amount for a fixed-rate loan product.

*Id.* at 8 (footnote omitted).

270. As previously noted in this Complaint, the PSI issued its report on the causes of the economic crisis. The PSI Wall Street Report used WaMu as its case study into lending practices of the mortgage industry during the housing bubble. Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

(1) High Risk Lending Strategy. [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices. WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans. WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) Polluting the Financial System.  WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans.  At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation.  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when their High Risk Lending Strategy placed the bank in financial jeopardy.

PSI Wall Street Report at 50-51.

271.   In particular, the PSI Wall Street Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its subsidiary, Long Beach.  WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated by Long Beach.  The review found that the "top five priority issues" were as follows:

"Appraisal deficiencies that could impact value and were not addressed[;]

**95**

**SECOND AMENDED COMPLAINT**

Material misrepresentations relating to credit evaluation were
confirmed[;]

Legal documents were missing or contained errors or discrepancies[;]
Credit evaluation or loan decision errors[; and]

Required credit documentation was insufficient or missing from the file."
*Id.* at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory
Gunderson (Dec. 11, 2006 9:21 AM PST)).

272.   Pushing "Option ARMs" was a major part of WaMu's new "high risk"
lending strategy.  In a bipartisan memorandum from Senators Carl Levin and Tom
Coburn to the Members of the PSI, dated April 13, 2010, Option ARMs are labeled
WaMu's "flagship" product.  Senate Exhibit 1.a, at 3.  The WaMu OIG Report
describes the inherently dangerous nature of WaMu's Option ARMs:

WaMu's Option ARMs provided borrowers with the choice to pay their
monthly mortgages in amounts equal to monthly principal and interest,
interest-only, or a minimum monthly payment.  Borrowers selected the
minimum monthly payment option for 56 percent of the Option ARM
portfolio in 2005.

The minimum monthly payment was based on an introductory rate, also
known as a teaser rate, which was significantly below the market interest
rate and was usually in place for only 1 month.  After the introductory
rate expired, the minimum monthly payment feature introduced two
significant risks to WaMu's portfolio:  payment shock and negative
amortization.   WaMu projected that, on average, payment shock
increased monthly mortgage amounts by 60 percent.  At the end of 2007,

84 percent of the total value of Option ARMs on WaMu's financial statements was negatively amortizing.

WaMu OIG Report at 9.

273.    The WaMu OIG Report notes that "Option ARMs represented as much as half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47 percent, of the home loans on WaMu's balance sheet at the end of 2007." *Id.*

274.    The OIG also notes that WaMu's "new strategy included underwriting subprime loans, home equity loans, and home equity lines of credit to high-risk borrowers.  In line with that strategy, WaMu purchased and originated subprime loans, which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home loan portfolio." *Id.* at 10.

275.    WaMu's careless underwriting practices rendered these already high risk loan products even more risky.  *See id.*  The WaMu OIG Report stated that the OTS and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and loan underwriting, weaknesses in management and "inadequate internal controls." *Id.* at 3-4.  Those concerns included "questions about the reasonableness of stated incomes contained in loan documents, numerous underwriting exceptions, miscalculations of loan-to-value ratios, and missing or inadequate documentation." *Hearing on Wall Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S. Homeland Sec. and Governmental Affairs Comm., Permanent Subcomm. on Investigations*, 111th Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General, Dep't of the Treasury) ("Thorson Statement").

276.    WaMu management began to notice the pattern of "first payment default" ("FPD") for loans its Long Beach subsidiary originated.  In June 2007, WaMu closed Long Beach as a separate entity and placed its subprime lending operations in a new division called "Wholesale Specialty Lending."

277.    In late 2007, WaMu performed an internal review to determine whether

97

its plans to address its poor underwriting practices were effective.  The review focused on 187 loans that experienced FPD, originated from November 2006 to March 2007.  As an initial matter, the review found:

> The overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk.  Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors.

PSI High Risk Home Loans Hearing, Senate Ex. 21, "WaMu Corporate Credit Review: Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

278.  Specifically, the WaMu internal review reported the following findings regarding the 187 FPD loans:

- (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files were reviewed by Risk Mitigation for fraud.  Risk Mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as "highly suspect."  This issue is a repeat finding with CCR.

- (High) Weak credit risk infrastructure impacting credit quality.  Credit weakness and underwriting deficiencies is a repeat finding with CCR.  It was also identified as a repeat finding and Criticism in the OTS Asset Quality memo 3 issued May 17, 2007.  Internal Audit in their August 20, 2007 Loan Origination & Underwriting report identified it as a repeat issue.  Findings from the CCR FPD review in relation to credit quality:

  o 132 of the 187 loans sampled were identified with red flags that were not addressed by the business unit

**98**

      ○ 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income

      ○ 87 files (47%) exceeded program parameters in place at the time of approval

      ○ 133 (71%) had credit evaluation or loan decision errors present

      ○ 25 (13%) had the title report issues that were not addressed

      ○ 28 (14%) had income calculation errors and 35 (19%) had income documentation errors

      ○ 58 (31%) had appraisal discrepancies that raised concerns that the value was not supported

*Id.* at 3.

279.   An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008, observes the systematic nature of the problem:  "[T]he review defines an origination culture focused more heavily on production volume rather than quality. An example of this was a finding that production personnel were allowed to participate in aspects of the income, employment, or asset verification process, a clear conflict of interest. . . .  Prior OTS examinations have raised similar issues including the need to implement incentive compensation programs to place greater emphasis on loan quality."  PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum from D. Schneider, President Home Loans, to A. Hedger, OTS Examiner and B. Franklin, OTS EIC at 1 (June 19, 2008).

280.   A WaMu Significant Incident Notification, Date Incident Reported – 04/01/2008, Loss Type - Mortgage Loan, stated:

One Sales Associate admitted that during that crunch time some of the Associates would 'manufacture' assets statements from previous loan docs and submit them to the [Loan Fulfillment Center ('LFC')].  She said

**99**

**SECOND AMENDED COMPLAINT**

the pressure was tremendous from the LFC to get them the docs since the loan had already funded and pressure from the Loan Consultants to get the loans funded.

PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification (SIN)" at 1 (Apr. 1, 2008).

281.  A New York Times article described WaMu's underwriting practices as follows: "On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending." Peter S. Goodman & Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans*, N.Y. TIMES, Dec. 27, 2008 at A1.

282.  Sherri Zaback, a former underwriter at a WaMu branch in San Diego, California, stated that "[m]ost of the loans she . . . handled merely required borrowers to provide an address and Social Security number, and to state their income and assets." *Id.* On one occasion, Zaback asked a loan officer for verification of a potential borrower's assets.  The officer sent her a letter from a bank showing a balance of about $150,000 in the borrower's account.  Zaback called the bank to confirm and was told the balance was only $5,000.  The loan officer yelled at her, Ms. Zaback recalled.  "She said, 'We don't call the bank to verify.'" *Id.*

283.  Zaback also recalled that the sheer volume of loans precluded WaMu employees from adhering to underwriting standards.  According to Zaback, she would typically spend a maximum of 35 minutes per file:  "'Just spit it out and get it done. That's what they wanted us to do.  Garbage in, and garbage out.'" *Id.*  Another WaMu agent in Irvine, California told the New York Times that she "coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy." *Id.*

284.  WaMu's underwriting also critically failed with respect to appraisals as well.  An accurate appraisal of a property's market value is crucial to the underwriting

**SECOND AMENDED COMPLAINT**

1  process as the property provides collateral for the loan in case of default.

2  WaMu's review of appraisals establishing the value of single family homes

3  did not always follow standard residential appraisal methods because

4  WaMu allowed a homeowner's estimate of the value of the home to be

5  included on the form sent from WaMu to third-party appraisers, thereby

6  biasing the appraiser's evaluation.

7  WaMu OIG Report at 11.

8  285.   The New York Times reported, "WaMu pressured appraisers to provide

9  inflated property values that made loans appear less risky, enabling Wall Street to

10  bundle them more easily for sale to investors."  Goodman & Morgenson, *Saying Yes,*

11  *WaMu Built Empire on Shaky Loans* at A1.  The article quoted the founder of one

12  appraisal company that did business with WaMu until 2007 as saying, "'It was the Wild

13  West,'. . . .  'If you were alive, they would give you a loan.  Actually, I think if you

14  were dead, they would still give you a loan.'"  *Id.*  (quoting Steven Knoble, founder

15  Mitchell, Maxwell & Jackson).

16  286.   Nor did WaMu adequately monitor third-party brokers (non-employees)

17  who originated most of WaMu's loans.  As Eric Thorson explained before the PSI:

18  In addition to originating retail loans with its own employees, WaMu

19  began originating and purchasing wholesale loans through a network of

20  brokers and correspondents.   From 2003 to 2007, wholesale loan

21  channels represented 48 to 70 percent of WaMu's total single family

22  residential loan production.   WaMu saw the financial incentive to use

23  wholesale loan channels for production as significant.  According to an

24  April 2006 internal presentation to the WaMu Board, it cost WaMu about

25  66 percent less to close a wholesale loan ($1,809 per loan) than it did to

26  close a retail loan ($5,273).   So while WaMu profitability increased

27

28

**101**

1    through the use of third-party originators, it had far less oversight and

2    control over the quality of the originations.

Thorson Statement at 5.  According to the WaMu OIG Report, WaMu had only 14 employees monitoring the actions of 34,000 third-party brokers.  *See* WaMu OIG Report at 11.  This lack of oversight led to WaMu "identif[ying] fraud losses attributable to third-party brokers of $51 million for subprime loans and $27 million for prime loans" in 2007.  *Id.*

287.  Federal regulators also noted that "WaMu acquired 11 institutions and merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . . information technology systems, risk controls, and policies and procedures" from its acquisitions and institute "a single enterprise-wide risk management system." Thorson Statement at 5.  An integrated risk management system was critically important in light of WaMu's high-risk lending strategy.  *See id.*

288.  Based on interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers, Goodman and Morgenson of the New York Times noted the "relentless pressure to churn out loans" "while disregarding borrowers' incomes and assets" that came from WaMu's top executives.  Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.  According to Dana Zweibel, a former financial representative at a WaMu branch in Tampa, Florida, even if she doubted whether a borrower could repay the loan, she was told by WaMu management that it was not her concern:  her concern was "'just to write the loan.'" *Id.*  Said Zweibel, "'[i]t was a disgrace'. . . .  'We were giving loans to people that never should have had loans.'"  *Id.*

289.  In November 2008, the New York Times, quoting Keysha Cooper, a Senior Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the quality of the loans; it was about the numbers'. . . .  'They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans

did you guys close and fund?'" Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. TIMES, Nov. 1, 2008. According to the article, "[i]n February 2007 . . . the pressure became intense. WaMu executives told employees they were not making enough loans and had to get their numbers up. . . ." Cooper concluded, "'I swear 60 percent of the loans I approved I was made to.' . . . 'If I could get everyone's name, I would write them apology letters.'" *Id.*

290. WaMu inflated salaries of baby sitters and mariachi singers to the six-figure range. Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file. The New York Times reported:

> As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.
>
> Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows. The borrower was claiming a six-figure income and an unusual profession: mariachi singer.
>
> Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.
>
> "I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.
>
> . . .

**103**

**SECOND AMENDED COMPLAINT**

1      At WaMu, getting the job done meant lending money to nearly anyone

2      who asked for it — the force behind the bank's meteoric rise and its

3      precipitous collapse this year in the biggest bank failure in American

4      history.

5      . . .

6      Interviews with two dozen former employees, mortgage brokers, real

7      estate agents and appraisers reveal the relentless pressure to churn out

8      loans that produced such results.

9   Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.

10      291.  Long Beach, a WaMu affiliate, specialized in the riskiest of loans—

11 subprime mortgages.  Internal WaMu documents reveal a well-documented pattern of

12 underwriting deficiencies at Long Beach.  A memorandum to the Washington Mutual,

13 Inc. and WaMu Board of Directors' Audit Committees, dated April 17, 2006, re:  *Long*

14 *Beach Mortgage Company -Repurchase Reserve Root Cause Analysis* states:  "[Long Beach]

15 experienced a dramatic increase in EPDs[] during the third quarter of 2005. . . .

16 [R]elaxed credit guidelines, breakdowns in manual underwriting processes, and

17 inexperienced subprime personnel . . . coupled with a push to increase loan volume

18 and the lack of an automated fraud monitoring tool, exacerbated the deterioration in

19 loan quality."  Senate Exhibit 10 at 1-2.

20      292.  A WaMu Audit Report titled *Long Beach Mortgage Loan Origination &*

21 *Underwriting*, dated August 20, 2007, states:  "[T]he overall system of risk management

22 and internal controls has deficiencies related to multiple, critical origination and

23 underwriting processes. . . .  These deficiencies require immediate effective corrective

24 action to limit continued exposure to losses."  Senate Exhibit 19 at 2.   In its

25 "Executive Summary" section, this Audit Report states:

26      In response to challenges resulting from the softening housing market,

27      rising   interest   rates,   tightening   capital   markets,   poor   portfolio

28 **104**

performance and underwriting deficiencies, [Long Beach] continually refines their processes and guidelines.  While management has been responsive to these challenges by identifying and implementing corrective actions, actual underwriting practices have not been consistent to achieve the desired levels of improvement.  Continued patterns of loans being underwritten outside of established underwriting and documentation guidelines have been previously identified.

*Id.* at 2.  It also identifies the following as the number one high rated "repeat issue" to correct:  "Underwriting guidelines established to mitigate the risk of unsound underwriting decisions are not always followed and the decisioning methodology is not always fully documented."  *Id.* at 8.  The number two "repeat issue" was identified as "[p]olicies and procedures defined to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed."  *Id.* at 10.  An e-mail from a WaMu executive describes the Long Beach audit report as "the ultimate in bayonetting the wounded, if not the dead."  Senate Exhibit 20 at 1.

293.  In a WaMu internal report titled "[Long Beach] Post Mortem – Early Findings Read Out," dated November 1, 2005, the authors note the following "common theme" surfacing:  "Underwriting guidelines are not consistently followed and conditions are not consistently or effectively met."  Senate Exhibit 9 at 1.  The report goes on to note that 60% of First Payment Default cases could have been prevented "had current policy, procedures and guidelines been better executed."  *Id.* at 2.

294.  In Gretchen Morgenson's July 9, 2010, article titled *Mortgage Investors Turn to State Courts for Relief*, Morgenson of The New York Times reported on a lawsuit filed by Cambridge Place Investment Management, an investment management firm that lost over a billion dollars in RMBS it bought for clients, against 15 banks, for abetting fraud.  The complaint alleges that management at Long Beach directed underwriters to

105

1   "'approve, approve, approve'" and highlights the "anything-goes" lending practices at

2   Long Beach:

3         One Long Beach program made loans to self-employed borrowers based

4         on three letters of reference from past employers.  A former worker said

5         some letters amounted to "So-and-so cuts my lawn and does a good job,"

6         adding that the company made no attempt to verify the information, the

7         complaint stated.

8       295.   The OTS also reported concerns with subprime underwriting practices

9   by Long Beach from 2006 to 2007.  *See* Thorson Statement at 9-10.

10       296.   As a result of its systematic disregard of underwriting standards, Long

11   Beach also appeared in the 2008 "Worst Ten in the Worst Ten" Report.  In fact, Long

12   Beach was in the top five in every city other than Las Vegas, Nevada (1st in Stockton,

13   California, Sacramento, California, Denver, Colorado, and Memphis, Tennessee; 2nd

14   in Bakersfield, California and Detroit, Michigan; 3rd in Cleveland, Ohio and Miami,

15   Florida; and 4th in Riverside, California).  *See* 2008 "Worst Ten in the Worst Ten"

16   Report.  Long Beach again ranked near the top in nearly every city in the 2009 "Worst

17   Ten in the Worst Ten" Report (1st in Stockton-Lodi, California, Merced, California,

18   and Vallejo-Fairfield-Napa, California; 5th in Fort Pierce-Port St. Lucie, Florida; and

19   6th in Riverside-San Bernardino, California).  *See* 2009 "Worst Ten in the Worst Ten"

20   Report.

21       **E.**    **Loans That Did Not Meet the Originators' Underwriting**

22           **Guidelines Were Routinely Collateral for Goldman Sachs-**

23           **Underwritten RMBS**

24       297.   A February 2010 report from J.P. Morgan noted that "[t]he outstanding

25   balance of [private-label] mortgages grew from roughly $600 billion at the end of 2003

26   to $2.2 trillion at its peak in 2007."  Gary J. Madich et al, *Non-Agency Mortgage-Backed*

27   *Securities:  Managing Opportunities and Risks*, J.P. Morgan Asset Management at 2 (Feb.

28                               **106**

---

**SECOND AMENDED COMPLAINT**

2010), *available at* http://www.jpmorganinstitutional.com/cm/BlobServer/Non-Agency_Mortgage-Backed_Securities.pdf?blobkey=id&blobwhere=1321487765101&blobheader=application%2Fpdf&blobcol=urldata&blobtable=MungoBlobs&isAMIA=yes.  While unknown to reasonable investors at that time, it now is apparent that this massive expansion in the origination of loans over a short period of time was accomplished by ignoring underwriting standards.  The J.P. Morgan report also noted that home prices rose, requiring larger loans:  "[private-label] mortgage providers initially met this need for larger loans while maintaining stringent qualifications.    However, investment banks were willing to buy lower quality mortgages and bundle them for issuance into new and innovative forms of Asset Backed Securities (ABS) and Collateralized Debt Obligations (CDOs)." *Id.*

298.   During the FCIC investigation referenced above (*supra* at Section VII.D.1), Clayton Holdings provided evidence about the originators' pervasive disregard of their stated underwriting guidelines.  Clayton was the leading provider of due diligence services for RMBS offerings during the relevant time period.  This gave Clayton "a unique inside view of the underwriting standards that originators were actually applying." FCIC Report at 166.

299.   Banks routinely hired Clayton to inspect the mortgage loans that the banks securitized into RMBS.  Clayton would determine whether the loans complied with the originators' stated underwriting guidelines, and prepare a report of its findings for the bank.  *See* FCIC Testimony of Vicki Beal, Senior Vice President of Clayton Holdings (Sept. 23, 2010), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Beal.pdf.

300.   From January 1, 2006 through June 30, 2007, Clayton reviewed 911,039 loans.  Only 54% of those met the originators' underwriting guidelines.  Clayton's former President and CEO, Keith Johnson, testified that the "54% says there [was] a quality control issue in the [originators]."  FCIC Report at 166; Audiotape of FCIC

**SECOND AMENDED COMPLAINT**

Interview with Keith Johnson, former President of Clayton ("Johnson FCIC Interview") (Sept. 2, 2010) ("Even if the guideline was bad, [the loans] didn't adhere to the guideline . . . .  To me in hindsight, [the data] just said there was a . . . fundamental breakdown."), *available at* http://fcic.law.stanford.edu/interviews/view/220.  Another 18% of the loans failed the underwriting guidelines but were deemed to have adequate compensating factors.  That left a large number – 28% – that did not meet the underwriting guidelines and had no compensating factors.  *See* All Clayton Trending Reports, 1st Quarter 2006 – 2nd Quarter 2007, at 1 (2007), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf ("All Clayton Trending Report").

301.  Clayton confirmed that the RMBS sold by Goldman Sachs from the beginning of 2006 through the middle of 2007—which includes all of the RMBS listed in Tables 1 and 2 of this Complaint—contained a substantial number of loans that were not originated in conformity with underwriting guidelines.

302.  As revealed during the FCIC investigation in 2010, Clayton routinely found large numbers of loans that were not properly originated under the applicable underwriting guidelines.  Despite identifying these defectively originated loans, Clayton stated that they often were included into the RMBS that was being sold to investors.  According to the statistics maintained by Clayton, a large number of the loans that Clayton found did not meet underwriting guidelines and did not have adequate compensating factors nonetheless were included into RMBS.  Specifically, Clayton found that 29% of such loans were included in RMBS underwritten by Goldman Sachs.  *See* FCIC Report at 167; All Clayton Trending Report at 1.

**F.    Additional Evidence Confirms that Defective Loans Were Routinely Packaged into Goldman Sachs's RMBS**

303.  Clayton officials offered an explanation for why so many defective loans were packaged into RMBS.  When asked what caused the financial crisis, one pointed

to the banks belief that they had no liability for loans' compliance with underwriting guidelines: "When it came to the underwriting [guidelines] . . . and [securitizers] could perhaps distribute that risk quickly, then that wasn't as high on their priorities." Johnson FCIC Interview.

304.   During the course of the FCIC investigation, Clayton also explained that the practice of putting rejected loans into RMBS was particularly prevalent among banks, such as Goldman Sachs, that extended warehouse lines of credit to originators. Warehouse lending is a short-term revolving line of credit provided to an originator to fund the closing of mortgages.  Clayton's former president stated "I think our data would show that, you know, we saw bigger exceptions to any client that had warehouse lines." *Id.* This was so because if the investment bank forced an originator to take back too many defective loans, the originator would go bankrupt and default on the warehouse line of credit.  On the other hand, the bank could waive the loan into the RMBS pool, and thereby pass the risk of default onto the RMBS investors. As Johnson explained:  "if Bob was originating for me as the client and I had a warehouse line to you, I think what happened is a conflict of interest.  That if I put back loans to you, Bob and you don't have the financial capability to honor those, then I'm kind of caught; right? [. . .] I'm going to take a loss on the warehouse line." *Id.*

305.   Goldman Sachs provided warehouse lines of credit to several originators at issue in this suit, including Long Beach, Fremont, and Countrywide.  Because of those warehouse lines of credit, Goldman Sachs had an incentive to accept loans that did not meet the applicable underwriting guidelines.  *See* FCIC Report at 142.

306.   A number of loan originators had an express policy of attempting to sell loans that had already been rejected.  Because only a small percentage of the pools were reviewed by a due diligence firm like Clayton (or its chief competitor, Bohan), there was a very strong likelihood that those defective loans would enter the pool on the second or third attempt.  Clayton referred to this practice as the "three strikes,

**109**

you're out rule."  Transcript, FCIC Hearing, *The Financial Crisis at the Community Level—Sacramento, CA* at 178 (Sept. 23, 2010) (testimony of D. Keith Johnson, former President of Clayton), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-transcript.pdf.

307.   The FCIC Report also concluded that banks like Goldman Sachs that securitized RMBS "were reluctant to review or reject loans in greater numbers because doing so would endanger their relationship with originators."  FCIC Report at 166 ("[Clayton's former CEO] concluded that his clients often waived in loans to preserve their business relationship with the loan originator—a high number of rejections might lead the originator to sell the loans to a competitor."); Paul Muolo and Matthew Padilla, *Chain of Blame* 228 (2010) ("There were two reasons the [Wall] Street firms reviewed only a small sample of the loans they were buying . . . .  The most important reason was the relationship with the lender.  'The lower the sample you requested [of the lender], the more likely it was that you'd win the bid.'").

308.   Like Clayton, Bohan confirmed that Goldman Sachs did little to weed out bad loans from its RMBS.  Bohan loan evaluators explained that their supervisors overrode the bulk of their challenges to specific loans on behalf of Goldman Sachs, and "cleared half-million-dollar loans to a gardener, a housekeeper and a hairdresser." According to the evaluators, the loan reviews were mostly for appearances because Goldman Sachs planned to quickly securitize the loans and pass any future liabilities on to investors—playing "hot potato," trying to pass the risks before they got burned. As one of them explained, "There was nobody involved in this who didn't know what was going on, no matter what they say … We all knew."  Greg Gordon, *Why Did Goldman Stop Scrutinizing Loans It Bought?*, McClatchy Newspapers (Nov. 1, 2009), *available at* http://www.mcclatchydc.com/2009/11/01/77788/why-did-goldman-stop-scrutinizing.html.

**110**

**SECOND AMENDED COMPLAINT**

# VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

309.   The Offering Documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  Examples of false and misleading statements are included in this section and Appendix B.[3]

310.   For purposes of Section 11 liability, the prospectus supplements are part of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§ 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed. Reg. 44,722-01, 44,768-69 (Aug. 3, 2005).

## A.    Offering Documents Misrepresented Weighted Average Loan-To-Value Ratios

311.   The Offering Documents included detailed representations regarding the weighted average LTV for the pools underlying the RMBS.

312.   The LTV ratio is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  For instance, if a borrower borrows $130,000 to purchase a house estimated to be worth $150,000, the LTV ratio is $130,000/$150,000 or 87%.

313.   A "weighted average" is an average in which each value to be averaged is assigned a weight that determines the relative importance of each value to the average.  A weighted average can be contrasted with a straight arithmetic mean in which each of the values to be averaged contributes equally to the average.  In the context of LTVs, the higher the balance of the loan(s) secured by the property, the more "weight" it is given in relation to the average.  To calculate the weighted average LTV ratio for a pool of loans, each loan's LTV ratio is multiplied by the loan balance, and the sum of

---

[3]   The dates provided for the Offering Documents in Appendix B are the dates on the Offering Documents themselves.  However, where the Offering Documents are undated, the dates referenced are the dates such documents were filed with the SEC.

**111**

those numbers is divided by the total loan balance of the pool.  The weighted average LTV ratio is a factor in describing the risk of a particular RMBS.

314.    The NCUA Board commissioned a forensic review that calculated LTV ratios for the loans underlying the RALI Series of offerings.  The forensic review used a retrospective automated valuation model ("AVM").  A retrospective AVM calculates the value of a property at a point in time in the past using data that was available at that time, such as comparable property values, comparable sales, and home price indices at the time of loan origination.  That is, a retrospective AVM is able to calculate the value of a property in 2006 using the data that was available in 2006.

315.    The forensic review commissioned by the NCUA Board calculated the value of the mortgaged properties underlying the RMBS at the time the mortgage loans were originated.  In total, 9,957 loans were analyzed.

316.    The forensic review demonstrated that the Offering Documents materially understated the LTV ratios, and thus the risks, of the mortgage pools.  The appraised values given to the mortgaged properties were significantly higher than what the properties were actually worth at the time of origination.

317.    For the six RMBS tested, the Offering Documents contained representations about the purported weighted average LTV ratio for the loan pools.  The forensic review found that on average, the actual weighted average LTV ratio was 21.88% higher than the weighted average LTV ratio reported in the Offering Documents.  *See infra* Table 7.

**Table 7**

| RMBS | Represented Weighted Average LTV Ratio | Actual Weighted Average LTV Ratio | Actual Weighted Average LTV ___% Higher than Represented |
|---|---|---|---|
| RALI Series 2006-QO6 Trust | 74.66% | 86.87% | 16.35% |
| RALI Series 2006-QO10 Trust | 74.76% | 91.20% | 21.99% |

112

**SECOND AMENDED COMPLAINT**

| RALI Series 2007-QH2 Trust | 73.54% | 90.91% | 23.62% |
| RALI Series 2007-QH3 Trust | 72.85% | 89.25% | 22.51% |
| RALI Series 2007-QH5 Trust | 73.93% | 90.83% | 22.86% |
| RALI Series 2007-QH6 Trust | 73.89% | 91.58% | 23.93% |

318.   The discrepancy between the reported weighted average LTV ratio and the ratio calculated using the retroactive AVM provides additional evidence that the Originators systematically disregarded underwriting standards contrary to representations in the Offering Documents.  Where the weighted average LTV is close to or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted on the mortgaged properties.  The actual weighted LTV ratio shows that the RMBS were significantly riskier than represented in the Offering Documents.

**B.    Untrue Statements in the Offering Documents About Owner-Occupancy Ratios**

319.   The Offering Documents represented the percentage of properties that would be occupied by the borrower for the loans underlying each RMBS.  Goldman Sachs performed due diligence regarding the occupancy status of the underlying properties.

320.   Representations regarding the occupancy type of a mortgaged property are material because borrowers are less likely to default on mortgages on their primary residences.  Barclays Capital explained:

Most home owners become anchored to their communities through the schools their children attend and the friends they make.  As a result, defaulting on the mortgage backing one's primary residence can be a jarring experience, one that most people would choose to avoid.  By

**113**

**SECOND AMENDED COMPLAINT**

contrast, an investment property primarily represents a stream of income or speculative opportunity, making the decision to default more one of dollars and cents than of a major life change.  As a result, all else being equal, borrowers are less likely to default on a mortgage backed by their primary residence than on one backed by an investment property.

Barclays Capital, Barclays Loan Transition Model, at 9 (Nov. 30, 2010).

321.   The forensic review used borrower- and property-specific public records to test loan-level occupancy data for each of the RALI Series offerings.

322.   First, the forensic review analyzed contemporaneous property tax records to determine whether: (1) borrowers received their property tax bill for the mortgaged property at the address of the mortgaged property; and (2) borrowers took a property tax exemption on the mortgaged property that is only available for owner-occupied properties.  Borrowers are likely to have a tax bill sent to their primary residence to ensure their ability to make timely payment.  However, if borrowers have tax records sent to a different address, then they probably do not actually reside at the mortgaged property.  And if borrowers decline to take certain tax exemptions dependent on the borrowers residing at their mortgaged properties, then the borrowers probably do not reside at those properties.

323.   Second, the forensic review analyzed public records to determine whether borrowers owned any other properties during the same time period in which they owned the securitized property.  The forensic review then examined whether the borrowers consistently identified the securitized property as their mailing address for property tax bills on each concurrently owned property.  Inconsistencies in tax bill mailing addresses for concurrently-owned properties strongly suggest that the securitized property was not, in fact, owner-occupied.

324.   Third, the forensic review conducted a review of lien records on concurrently-owned properties to determine whether borrowers indicated that any

property other than the securitized property was owner-occupied. This test examines all liens originated after the securitized mortgage and compares owner-occupancy representations with those in the loan tapes. If liens on concurrently-owned properties indicate that those properties are owner-occupied, then the borrower probably does not reside at the mortgaged property.

325.   Fourth, the forensic review examined the mailing addresses identified for liens on concurrently-owned properties to determine whether the address of the securitized property was listed as the mailing address for bills and other correspondence between borrowers and the lienholders. If the securitized property address is not identified, then the securitized property is probably not owner-occupied.

326.   Finally, the forensic review reviewed credit records to help determine whether a given borrower occupied the mortgaged property. Specifically, the forensic review investigated whether creditors were reporting the securitized property's address as the borrower's mailing address six months after the origination of the loan. Within six months of closing on a mortgage, one would expect borrowers to have changed their billing address with each of their creditors. If a borrower was telling creditors to send bills to another address even six months after buying the property, it is likely the borrower was living at a different location.

327.   In assessing the accuracy of the Offering Documents' representations about owner-occupancy, the forensic review considered mortgages that failed multiple owner-occupancy tests to not have actually have been backed by owner-occupied properties. Even with this high threshold, the forensic review revealed systemic overstatements of owner-occupancy rates within each of the RMBS at issue.

328.   The forensic review's analysis demonstrates that, for the six RMBS tested, the Offering Documents drastically overstated the percentage of owner-occupied properties in the collateral pools. *See infra* Table 8. Overall, the Offering Documents overstated the number of owner-occupied properties in each RMBS by

17.3% to 26.2%, with an average overstatement of 21.81%.

**Table 8**

| RMBS | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Percentage Overstatement |
|---|---|---|---|
| RALI Series 2006-QO6 Trust | 85.6% | 73% | 17.3% |
| RALI Series 2006-QO10 Trust | 82.9% | 70.3% | 17.9% |
| RALI Series 2007-QH2 Trust | 85.5% | 69.0% | 23.9% |
| RALI Series 2007-QH3 Trust | 81.8% | 68.2% | 19.9% |
| RALI Series 2007-QH5 Trust | 85.3% | 70.0% | 21.9% |
| RALI Series 2007-QH6 Trust | 82.8% | 65.6% | 26.2% |

### C.      Other Untrue Statements in the Offering Statements

329.    Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made: (1) the Originators' evaluation of the borrower's likelihood and capacity to repay the loan through application of the stated underwriting standards, including the calculation and use of an accurate "debt-to-income" ratio and the frequency and use of exceptions to those standards; (2) adherence to stated underwriting standards for reduced documentation programs; (3) the accurate calculation of the "loan-to-value" ratio for the mortgaged property and the accuracy of appraisals; and (4) the existence of credit enhancement to minimize the risk of loss.

330.    The following chart, Table 9, lists the originators that contributed loans to each RMBS, as identified in the Offering Documents or through an independent analysis of these RMBS commissioned by the NCUA.  With the exception of the RALI Series offerings, the Offering Documents disclosed the underwriting guidelines for the Originators that contributed more than 20% of the loan collateral.  For the RALI Series offerings, the Offering Documents disclosed only RFC's underwriting guidelines, stating that "[a]ll of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding."  *See*,

**SECOND AMENDED COMPLAINT**

*e.g.*, RALI Series 2006-QO6 Trust Prospectus Supplement at S-47. RFC acted as the sponsor for all of the RALI Series offerings.

**Table 9**

| CUSIP(S) | RMBS | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | A3 | Countrywide Home Loans and affiliated entities (100%) |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | A3 | First Franklin Financial Corporation (100%) |
| 35729VAE7 35729VAF4 | Fremont Home Loan Trust 2006-D | 2A4 M1 | Fremont Investment & Loan (100%) |
| 362631AD59 | GSR Mortgage Loan Trust 2006-OA1 | 2A3 | American Home Mortgage Corp., Countrywide Home Loans, Inc., IndyMac, F.S.B., SunTrust Mortgage, Inc. |
| 3622NAAB6 3622NAAG5 | GSR Mortgage Loan Trust 2007-OAl | 1A2 2AM | Countrywide Home Loans, Inc., Residential Funding Company, LLC, Quicken Loans Inc. |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | II-A4 | Long Beach Mortgage (100%) |
| 751153AC1 | RALI Series 2006-QO10 Trust | A3 | Homecomings Financial, LLC (35%), First Magnus Financial Corp. (11%), FNB Arizona (7%), SCME (4%) |
| 74922JAC2 | RALI Series 2007-QH2 Trust | A3 | Homecomings Financial, LLC (20%), First Magnus Financial Corp. (21%), FNB Arizona (11%), SCME (9%) |
| 74922WAB5 74922WAC3 | RALI Series 2007-QH3 Trust | A2 A3 | Homecomings Financial, LLC (30%), First Magnus Financial Corp. (13%), FNB Arizona (10%), SCME (12%) |
| 75116EAA0 75116EAB8 75116EAC6 | RALI Series 2007-QH5 Trust | AI1 AI2 AI3 | Homecomings Financial, LLC (33%), First Magnus Financial Corp. (10%), FNB Arizona (4%), SCME (21%) |
| 74922AAB3 74922AAC1 | RALI Series 2007-QH6 Trust | A2 A3 | Homecomings Financial, LLC (43%), First Magnus Financial Corp. (16%), FNB Arizona (4%), SCME (10%) |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | A3 | GreenPoint Mortgage Funding, Inc. |
| 75114NAC8 | RALI Series 2006-QO6 Trust | A3 | Homecomings Financial Network, LLC, (41%), First Magnus Financial Corp. (3%), FNB Arizona (8%), SCME (10%) |

331. For certain RMBS, Table 9 reflects the percentage of loans that was

**SECOND AMENDED COMPLAINT**

contributed by certain originators, rounded to the nearest whole number, as reflected in the Offering Documents or determined by forensic analysis.  Such information was not available for every RMBS.  An originator responsible for 10% or more of the loans in a particular mortgage pool should have been disclosed in the Offering Documents.  *See* 17 C.F.R. § 229.1110.  While certain such originators were not disclosed, NCUA alleges that they did in fact contribute the percentage of the loans in the mortgage pool listed herein based upon a forensic review commissioned by NCUA to determine the originators for the loans in the RALI Series of offerings.  NCUA's investigation could not conclude whether, and NCUA does not allege that, any Defendant knowingly or intentionally excluded any originators in violation of any applicable regulation.

332.   Examples of material untrue statements and/or omissions of fact from the RMBS listed above follow.

### D.   Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood To Repay the Mortgage Loan

333.   The Alternative Loan Trust 2007-OA4 Prospectus Supplement stated:

All of the Mortgage Loans will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards.  Countrywide Home Loans has been originating mortgage loans since 1969.  Countrywide Home Loans' underwriting process are applied in accordance with applicable federal and state laws and regulations.  Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Loan Program — Underwriting Standards" in the prospectus.

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-33; *see* Alternative Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at S-52.

**118**

334.   The Alternative Loan Trust 2007-OA4 Prospectus Supplement also stated:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-33-34; *see* Alternative Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at S-53.

335.   The Alternative Loan Trust 2007-OA4 Prospectus stated:

> Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral.

Alternative Loan Trust 2007-OA4 Prospectus, Nov. 14, 2006, at 25; *see* Alternative Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at 25; *see id.* ("Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property

119

**SECOND AMENDED COMPLAINT**

such as property taxes and hazard insurance[]. The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.").

336. The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

> The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement. S-31

> Since January 1, 2005, all of the mortgage loans of a type similar to mortgage loans that were acquired by the responsible party were required to meet the underwriting criteria described in this prospectus supplement. S-34

> The responsible party's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.

Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-31, S-34; *see* First Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-32, S-35.

337. The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus stated:

> The lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as collateral.

**120**

**SECOND AMENDED COMPLAINT**

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus, Nov. 17, 2005, at 26.

338. The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

> While each underwriting program is intended to assess the risk of default, the Direct Access Program makes use of credit bureau risk scores (the "Credit Bureau Risk Score").

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-35; *see* First Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-36.

339. The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement stated:

> All mortgage loans [_____] originates or acquires are generally underwritten by [_____] according to its credit, appraisal and underwriting standards. [_____], or its agents, apply such underwriting standards to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with applicable federal and state laws and regulations. [_____] permits exceptions to the underwriting standards where compensating factors are present.

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at S-10; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement, Nov. 2, 2005, at S-10.

340. The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement stated:

**121**

**SECOND AMENDED COMPLAINT**

The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement. See "The Underwriting Guidelines" below.

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at S-25.

341.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement stated:

In the case of single family loans, cooperative loans and manufactured housing contracts, once all applicable employment, credit and property information is received, the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance).

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at 27; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement, Nov. 2, 2005, at 27; *see* First Franklin Mortgage Loan Trust 2006-FF4 Prospectus, Nov. 17, 2005, at 27.

342.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement stated:

The [_____] mortgage loans were originated generally in accordance with one of the following income documentation types: "Full Documentation," "Limited Documentation" or "Stated Income." The Underwriting Guidelines are primarily intended to evaluate:  (1) the

**122**

**SECOND AMENDED COMPLAINT**

applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral.

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at S-28; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement, Nov. 2, 2005, at S-28.

343.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan.

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-37; *see* First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, August 17, 2005, at S-29.

344.   The Fremont Home Loan Trust 2006-D Prospectus stated:

Fremont Investment & Loan provides underwriters with specific underwriting guidelines and maintains strict control procedures to manage the quality of its originations at all locations.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 74; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 74.

345.   The Fremont Home Loan Trust 2006-D Prospectus stated:

Generally, Fremont Investment & Loan's guidelines require an analysis of the following

• a borrower's creditworthiness, as reflected in particular by the borrower's credit history and employment stability,

**123**

**SECOND AMENDED COMPLAINT**

1   •   a borrower's "debt-to-income ratio," which measures a borrower's
2   projected income relative to the proposed mortgage payment and to
3   other fixed obligations, and
4   •   the "loan-to-value ratio" of the proposed loan, which measures the
5   adequacy of the mortgaged property to serve as the collateral for a
6   mortgage loan.

7   Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 74; *see* Fremont
8   Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 74.

9   346.   The Fremont Home Loan Trust 2006-D Prospectus stated:

10   A borrower's lack of credit payment history and/or relatively low Credit
11   Score, however, will not necessarily preclude Fremont Investment &
12   Loan from making a loan if other favorable borrower characteristics
13   exist, including an adequate debt-to-income ratio or sufficient equity in
14   the property.

15   Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 75; *see* Fremont
16   Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 75.

17   347.   The Fremont Home Loan Trust 2006-D Prospectus stated:

18   Fremont Investment & Loan's underwriting standards are primarily
19   intended to assess the ability and willingness of the borrower to repay the
20   debt and to evaluate the adequacy of the mortgaged property as collateral
21   for the mortgage loan.  All of the mortgage loans in the mortgage pool
22   were underwritten with a view toward the resale of the mortgage loans in
23   the secondary mortgage market.  Fremont Investment & Loan considers,
24   among other things, a mortgagor's Credit Score, past payment history,
25   repayment ability and debt service-to-income ratio, as well as the value,
26   type and use of the mortgaged property.

27

28

**124**

**SECOND AMENDED COMPLAINT**

The mortgage loans were underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("Scored Programs").  Fremont Investment & Loan began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004.  Within the Scored Programs, there are three documentation types, Full Documentation, Easy Documentation, and Stated Income. All of the mortgage loans were originated in accordance with Fremont Investment & Loan's underwriting guidelines, subject to various exceptions as described in this section.  A Credit Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment.  Fremont Investment & Loan's underwriting staff fully reviews each loan to determine whether it's underwriting guidelines for income, assets, employment and collateral are met.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 76-77; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 76-77.

348.   The Fremont Home Loan Trust 2006-D Prospectus stated:

Fremont Investment & Loan conducts a number of quality control procedures, including a post-funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 78; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 78.

349.   The Fremont Home Loan Trust 2006-D Free Writing Prospectus stated:

All of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority.  Each underwriter is granted a

125

SECOND AMENDED COMPLAINT

level of authority commensurate with their proven judgment, experience and credit skills.  On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions.

Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 41; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at S-38.

350.   The Fremont Home Loan Trust 2006-D Free Writing Prospectus stated:

Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by Fremont's senior management.  Adverse findings are tracked monthly.  This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies,

**SECOND AMENDED COMPLAINT**

1    areas of risk to be reduced or eliminated and the need for additional staff

2    training.

3  Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 42; *see*

4  Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at S-38-39.

5        351.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

6    In general, each lender or loan seller will represent and warrant that all

7    mortgage loans originated and/or sold by it to us or one of our affiliates

8    will have been underwritten in accordance with standards consistent with

9    those used by mortgage lenders or manufactured home lenders during

10   the period of origination or such other standards as we have required of

11   such lender or loan seller, in any case, as specified in the applicable

12   prospectus supplement.

13  GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 28-29; *see*

14  GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29,

15  2006, at 28-29.

16       352.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus further

17  stated:

18   The lender or an agent acting on the lender's behalf applies the

19   underwriting standards to evaluate the borrower's credit standing and

20   repayment ability, and to evaluate the value and adequacy of the

21   mortgaged property as collateral.  In general, the lender may require that

22   a prospective borrower fill out a detailed application designed to provide

23   to the underwriting officer pertinent credit information.

24  GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 29;

25  *see* GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement,

26  Mar. 29, 2006, at 29; GreenPoint Mortgage Funding Trust 2006-OH1

27  Prospectus, Oct. 6, 2006, at 29 ("As a part of the description of the borrower's

28

**127**

**SECOND AMENDED COMPLAINT**

financial condition, the lender may require the borrower to provide a current list of assets and liabilities and a statement of income and expense as well as an authorization to apply for a credit report, which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The lender may obtain employment verification from an independent source (typically the borrower's employer). The employment verification reports the length of employment with that organization, the current salary and whether it is expected that the borrower will continue such employment in the future. If a prospective borrower is self employed, the lender may require the borrower to submit copies of signed tax returns. The lender may require the borrower to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. In determining the adequacy of the mortgaged property as collateral, the lender will generally obtain an appraisal to determine the fair market value of each property considered for financing.").

353.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

> In the case of single family loans, cooperative loans and manufactured housing contracts, once all applicable employment, credit and property information is received, the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance). The underwriting standards applied by lenders may be varied in appropriate cases where factors such as low Loan-to-Value Ratios or other favorable credit factors exist.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 29; *see* GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006, at 29.

**128**

**SECOND AMENDED COMPLAINT**

354.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated: "All of the mortgage loans that GSMC may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section." GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 30.

355.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:
Generally, each borrower applying for a mortgage loan must complete a credit application.   The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information.   In addition, prospective borrowers generally must provide an authorization to apply for a credit report.   A credit report summarizes the borrower's past credit experience with lenders and other debtors, including any record of bankruptcy. Sometimes, the borrower is required to authorize the originating lender to verify deposits at financial institutions identified by the borrower as institutions at which the borrower maintains demand or savings accounts. The originating lender may also consider certain non-wage income of the borrower in the underwriting process, including income derived from mortgaged properties that are investment properties or two- to four-unit dwellings.   Generally, the originating lender will not consider income derived from vacation or second homes in the underwriting process. Certain borrowers with acceptable payment histories are not required to state their income on their loan application and, as a result, the originating lender does not verify their income.

**129**

Based on the data referred to above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed and revolving obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first twelve months of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months may equal no more than a specified percentage of the prospective borrower's gross income. The permitted percentage is determined on the basis of various underwriting criteria, including the LTV ratio of the mortgage loan and, in certain instances, the amount of liquid assets available to the borrower after origination.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 30; *see* GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006, at 30.

356. The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement provided:

*Underwriting Methodology.* The methodology used in underwriting the extension of credit for each Mortgage Loan does not rely solely on the extent of the Mortgagor's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria, such as the Mortgagor's income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's originator made a

130

**SECOND AMENDED COMPLAINT**

reasonable determination that at the time of origination the Mortgagor had the ability to make timely payments on the Mortgage Loan. Such underwriting methodology confirmed that at the time of origination (application/approval) the Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan[.]

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-58.

357.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement provided:

*Acceptable Investment.* There are no circumstances or conditions with respect to the mortgage, the Mortgaged Property, the Mortgagor, the mortgage file or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan, or cause the Mortgage Loans to prepay during any period materially faster or slower than the mortgage loans originated by the Seller generally[.]

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-56.

358.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

The lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as collateral.

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 29; *see* GSR Mortgage Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 29.

**131**

**SECOND AMENDED COMPLAINT**

359.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

> In the case of single family loans, cooperative loans and manufactured housing contracts, once all applicable employment, credit and property information is received, the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance).

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 29; *see also* GSR Mortgage Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 29.

360.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

> All of the mortgage loans that GSMC may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section.
>
> …
>
> Generally, each borrower applying for a mortgage loan must complete a credit application.   The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information.   In addition, prospective borrowers generally must provide an authorization to apply for a credit report.  . . . Certain borrowers with acceptable payment histories are not required to state their income on their loan application and, as a result, the originating lender does not verify their income.

**SECOND AMENDED COMPLAINT**

Based on the data referred to above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed and revolving obligations other than housing expenses. . . .  The permitted percentage is determined on the basis of various underwriting criteria. . . .

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29-30; GSR Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 30; *see* GSR Mortgage Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 30; GSR Mortgage Loan Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 30.

361.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses . . . are within acceptable limits. . . . In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.  Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

**133**

**SECOND AMENDED COMPLAINT**

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-60; GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-51-52; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-50.

362. The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

> Quicken Loans' underwriting standards for the Secure Advantage program follow prudent and generally accepted mortgage industry underwriting standards and are intended to evaluate the borrower's credit standing, repayment ability, and the value and adequacy of the proposed mortgaged property as collateral.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-65; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-55.

363. The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement represented:

> Although borrowers are assessed against Quicken Loans' underwriting standards, prudent exceptions may be made on a case by case basis. Exceptions may be allowed if the application reflects strong compensating factors, such as, a lower debt-to-income ratio, higher credit scores, low loan-to-value ratio, significant asset reserves, stable employment or ownership at current residence.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-67; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-57.

364. The Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement stated: "The sponsor's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral." Long

**134**

**SECOND AMENDED COMPLAINT**

Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at S-38.

365.   The Amendment No. 1 to Registration Statement also stated:

The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related mortgaged property as collateral.

Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at 26; *see id.* at 2 ("Each mortgage loan to be transferred to a trust will have been originated in accordance with the underwriting guidelines applied by the originator of that mortgage loan."); Long Beach Mortgage Loan Trust 2006-11 Prospectus, July 21, 2006, at 28 ("The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related mortgaged property as collateral.").

366.   The Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to Registration Statement stated:

During the underwriting or re-underwriting process, the sponsor reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with the sponsor's underwriting guidelines.

135

SECOND AMENDED COMPLAINT

Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at S-38; *see* Long Beach Mortgage Loan Trust 2006-11 Prospectus, July 21, 2006, at 29:

> Initially, a prospective borrower is required to complete an application with respect to the applicant's liabilities, income and credit history and personal information, as well as an authorization to apply for a credit report that summarizes the borrower's reported credit history with local merchants and lenders and any record of bankruptcy.  In addition, an employment verification is obtained that reports the borrower's current salary and may contain information regarding length of employment.  If a prospective borrower is self-employed, the borrower is required to submit copies of signed tax returns or other proof of business income. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.  In the case of a multifamily loan, commercial loan or mixed-use loan, the mortgagor will also be required to provide certain information regarding the related mortgaged property, including a current rent roll and operating income statements which may be pro forma and unaudited.  In addition, the originator will generally also consider the location of the mortgaged property, the availability of competitive lease space and rental income of comparable properties in the relevant market area, the overall economy and demographic features of the geographic area and the mortgagor's prior experience in owning and operating properties similar to the multifamily properties or commercial properties, as the case may be.

367.   The Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to

**SECOND AMENDED COMPLAINT**

Registration Statement stated:

> While the underwriting guidelines of each originator will have been
> approved by an affiliate of the depositor, the underwriting guidelines,
> including documentation requirements, of some originators may be less
> restrictive than those of other originators.  Moreover, some underwriting
> guidelines may result in a less accurate assessment of the borrower's
> credit standing and repayment ability and/or the value and adequacy of
> the related mortgaged property as collateral.

Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at 2; *see* Long Beach Mortgage Loan Trust 2006-11 Prospectus, July 21, 2006, at 3.

368.   The RALI Series offerings represented the following underwriting guidelines set by RFC would apply to every originator contributing loans to the offering:

> The depositor expects that the originator of each of the mortgage loans
> will have applied, consistent with applicable federal and state laws and
> regulations, underwriting procedures intended to evaluate the borrower's
> credit standing and repayment ability and/or the value and adequacy of
> the related property as collateral.

RALI Series 2007-QH6 Trust Prospectus, Apr. 9, 2007, at 17; RALI Series 2006-QO10 Trust Prospectus, Dec. 6, 2006, at 12; RALI Series 2007-QH2 Trust Prospectus, Dec/ 6, 2006, at 12; RALI Series 2007-QH3 Trust Prospectus, Dec. 6, 2006, at 12; RALI Series 2007-QH5 Trust Prospectus, Apr. 9, 2007, at 17; RALI Series 2006-QO6 Trust Prospectus, Mar. 3, 2006, at 12; *see also* RALI Series 2007-QH6 Trust Registration Statement, Feb. 12, 2007, at 17; RALI Series 2006-QO10 Trust Registration Statement, Jan. 23, 2006, at 13; RALI Series 2007-QH2 Trust Registration Statement, Jan. 23, 2006, at 13; RALI Series 2007-QH3 Trust Registration Statement,

**SECOND AMENDED COMPLAINT**

Jan. 23, 2006, at 13; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12, 2007, at 17; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at 13.

369. The RALI Series offerings represented the following underwriting guidelines set by RFC would apply to every originator contributing loans to the offering:

> Program Underwriting Standards.  In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.

RALI Series 2007-QH6 Trust Prospectus Supplement at S-47; RALI Series 2006-QO10 Trust Prospectus Supplement at S-48; RALI Series 2007-QH2 Trust Prospectus Supplement at S-44; RALI Series 2007-QH3 Trust Prospectus Supplement at S-47; RALI Series 2007-QH5 Trust Prospectus Supplement at S-53; RALI Series 2006-QO6 Trust Prospectus Supplement at S-45;  *see* RALI Series 2007-QH6 Trust Registration Statement, Feb.12, 2007, at S-42; RALI Series 2006-QO10 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH2 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH3 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at S-43.

**SECOND AMENDED COMPLAINT**

370.   The RALI Series offerings represented the following underwriting guidelines set by RFC would apply to every originator contributing loans to the offering:

> Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.

RALI Series 2007-QH6 Trust Prospectus Supplement at S-48; RALI Series 2006-QO10 Trust Prospectus Supplement at S-48; RALI Series 2007-QH2 Trust Prospectus Supplement at S-44; RALI Series 2007-QH3 Trust Prospectus Supplement, at S-47-48; RALI Series 2007-QH5 Trust Prospectus Supplement at S-54; RALI Series 2006-QO6 Trust Prospectus Supplement at S-45;  *see* RALI Series 2007-QH6 Trust Registration Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO10 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH2 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH3 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at S-43.

371.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed. The preceding statements were untrue at the time they were made because, as alleged herein, the Originators did not adhere to the stated underwriting guidelines, did not effectively evaluate the borrowers' ability or likelihood to repay the loans, did not

139

properly evaluate whether the borrower's debt-to-income ratio supported a conclusion that the borrower had the means to meet his/her monthly obligations, and did not ensure that adequate compensating factors justified the granting of exceptions to guidelines. Rather, as alleged herein, the Originators systematically disregarded the stated underwriting guidelines in order to increase the volume of mortgages originated (*see supra* Section VII.D). Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the rate at which actual losses outpaced expected losses within the first year after the offerings (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

**E.    Untrue Statements Concerning Reduced Documentation Programs**

372.    The Alternative Loan Trust 2007-OA4 Prospectus Supplement represented:

> In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.
>
> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.
>
> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is

140

waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Generally, cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment

**SECOND AMENDED COMPLAINT**

during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-35-36; *see* Alternative Loan Trust 2007-OA4 Registration Statement, February 7, 2006, at S-55.

373. The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement stated:

The no income/no asset verification program, emphasizes the value and adequacy of the mortgaged property as collateral and credit history rather than the borrower's verified income and assets. *Only borrowers with excellent credit histories may obtain mortgage loans underwritten under no income/no asset verification*.

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at S-12; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement, Nov. 2, 2005, at S-12. (Emphasis added.)

374. The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

. . . under the [No Income Verification] Program, applicants are qualified based on monthly income as stated on the mortgage application and the

**142**

underwriter will determine that the stated income is reasonable and realistic when compared to borrower's employment type, assets and credit history.

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-36; *see* First Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-37.

375.   The Fremont Home Loan Trust 2006-D Prospectus Supplement represented:

There are three documentation types, Full Documentation ("**Full Documentation**"), Easy Documentation ("**Easy Documentation**") and Stated Income ("**Stated Income**"). Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work.

Fremont Home Loan Trust 2006-D Prospectus Supplement at 41; *see* Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 78.

376.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement stated:

GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited

**143**

**SECOND AMENDED COMPLAINT**

documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived. Mortgage loans originated and acquired with limited documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties. Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements. Under no documentation programs, income ratios for the prospective borrower are not calculated. Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and assets of the borrower. Documentation concerning income, employment verification and asset verification is not required and income ratios are not calculated. Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-47.

377. With respect to Countrywide's documentation programs, the GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

**SECOND AMENDED COMPLAINT**

> Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-64-65; GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-56; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-54.

378. The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement continued:

> Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-65; GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-56; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-55.

379. With respect to Quicken Loan's documentation programs, the GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

**145**

**SECOND AMENDED COMPLAINT**

Quicken Loans originates the Secure Advantage product under two documentation programs: full and stated income/verified asset. Quicken Loans' full documentation program requires the verification of liabilities, income and assets. Acceptable documentation for income verification may include, but is not limited to, the borrower's most recent pay stubs, previous two years of W2 forms and a verbal verification of employment.

The borrower's assets are generally verified by obtaining two consecutive months of bank account statements and such statements are reviewed to ensure that sufficient funds are available to meet the asset reserve requirements of the program.

Generally, under the stated income/verified assets program, the borrower states his/her income and provides Quicken Loans with two years of employment history. Quicken Loans verbally verifies the borrower's employment history without confirmation of income. In determining the borrower's ability to meet their monthly obligations, the stated income amount is assessed relative to the borrower's current employment status and tenure. Quicken Loans may also use various online sources to ensure the borrower's stated income is reasonable relative to their employment position. To verify a borrower's assets, Quicken Loans obtains bank statements from the two most recent months and verifies that sufficient funds are available to meet the asset reserve requirements of the program.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-68; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-58.

380.   The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

**146**

**SECOND AMENDED COMPLAINT**

stated:

> The mortgage loans have been, or will be, originated or re-underwritten upon acquisition, generally in accordance with the Long Beach guidelines under the Long Beach full documentation, limited documentation or stated income documentation residential loan programs.

> Under the full documentation residential loan program, salaried prospective borrowers are generally required to submit their most recent W-2s and pay stubs and self-employed prospective borrowers are generally required to submit their most recent federal income tax return. Under the stated income documentation residential loan program, prospective borrowers are required to state their income on the application but are not required to submit any documents in support. Under the limited documentation residential loan program, salaried prospective borrowers or self-employed prospective borrowers are generally required to submit their most recent six months of personal bank statements or business bank statements. Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application. The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion. However, the prospective borrower's income as stated on the application is not independently verified. Verification of employment is required for salaried prospective borrowers. Maximum loan-to-value ratios under the stated income documentation residential loan programs are generally lower than those

147

1    permitted under the full documentation and limited documentation
2    residential loan programs. Generally, the same underwriting guidelines
3    that apply to the full documentation and limited documentation
4    residential loan programs, except as noted in this section, apply to the
5    stated income documentation residential loan programs.

6    Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-38.

7    381. The RALI Series offerings represented the following underwriting
8    guidelines set by RFC would apply to every originator contributing loans to the
9    offering:

10    General Standards

11

12    In most cases, under a traditional "full documentation" program, each
13    mortgagor will have been required to complete an application designed to
14    provide to the original lender pertinent credit information concerning the
15    mortgagor.   As part of the description of the mortgagor's financial
16    condition, the mortgagor will have furnished information, which may be
17    supplied solely in the application, with respect to its assets, liabilities,
18    income (except as described below), credit history, employment history
19    and personal information, and furnished an authorization to apply for a
20    credit report that summarizes the borrower's credit history with local
21    merchants and lenders and any record of bankruptcy.  The mortgagor
22    may also have been required to authorize verifications of deposits at
23    financial institutions where the mortgagor had demand [f]or savings
24    accounts.  In the case of investment properties and two- to four-unit
25    dwellings, income derived from the mortgaged property may have been
26    considered for underwriting purposes, in addition to the income of the
27    mortgagor from other sources.  With respect to mortgaged property

28

148

consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated, or verified, in connection with the loan application.

If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program. Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated. For example, a new appraisal of a mortgaged property may not be required if the related original mortgage loan was originated up to 24 months prior to the refinancing. In addition, a mortgagor's income may not be verified, although continued employment is required to be verified. In certain circumstances, a mortgagor may be permitted to borrow up to 100% of the outstanding principal amount of the original mortgage loan. Each mortgage loan underwritten pursuant to this program will be treated as having been underwritten pursuant to the same underwriting documentation program as the mortgage loan that it refinanced, including for purposes of the disclosure in the accompanying prospectus supplement.

If specified in the accompanying prospectus supplement, some mortgage loans may have been originated under "limited documentation," "stated documentation" or "no documentation" programs that require less

**149**

**SECOND AMENDED COMPLAINT**

documentation and verification than do traditional "full documentation" programs.  Under a limited documentation, stated documentation or no documentation program, minimal investigation into the mortgagor's credit history and income profile is undertaken by the originator and the underwriting may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

RALI Series 2007-QH6 Trust Prospectus, April 9, 2007 at 18; RALI Series 2006-QO10 Trust Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH2 Trust Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH3 Trust Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH5 Trust Prospectus, April 9, 2007, at 18; RALI Series 2006-QO6 Trust Prospectus, Mar. 3, 2006, at 12-13; *see also* RALI Series 2007-QH6 Trust Registration Statement, Feb. 12, 2007, at 18; RALI Series 2006-QO10 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH2 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH3 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12, 2007, at 18; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at 13-14.

382.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed. The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages originated, emphasizing quantity of loans rather than the quality of those loans (*see supra* Section VII.D).  Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the

**150**

huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### F.    Untrue Statements Concerning Loan-to-Value Ratios

383.    The Alternative Loan Trust 2007-OA4 Prospectus Supplement stated: Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan, or $2,000.

**151**

**SECOND AMENDED COMPLAINT**

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-35.   At S-36, the Prospectus Supplement also included similar descriptions of the maximum loan-to-value ratios permitted under Countrywide's "Expanded Underwriting Guidelines."

384.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement represented:

**SECOND AMENDED COMPLAINT**

Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio. In general, higher credit risk mortgage loans are graded in categories which permit higher Debt Ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however these loan programs establish lower maximum loan-to-value ratios and lower maximum loan amounts for loans graded in such categories.

Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-37; see Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-38.

385.   The Fremont Home Loan Trust 2006-D Prospectus Supplement stated: "A+." Under the "A+" category, an applicant must have no 30-day late mortgage payments within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 100% with a minimum Credit Score of 600. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores below 600.

"A." Under the "A" category, an applicant must have not more than one 30-day late mortgage payment within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is

153

SECOND AMENDED COMPLAINT

100% with a minimum Credit Score of 600. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores below 600.

"A-." Under the "A-" category, an applicant must have not more than three 30-day late mortgage payments within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a minimum Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores below 550.

"B." Under the "B" category, an applicant must have not more than one 60-day late mortgage payment within the last 12 months and it must be at least 18 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores under 550.

"C." Under the "C" category, an applicant must not be more than 90 days delinquent with respect to its current mortgage payment and it must be at least 12 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value

154

**SECOND AMENDED COMPLAINT**

ratio is 85% with a minimum Credit Score of 580. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C-." Under the "C-" category, an applicant must not be more than 150 days delinquent with respect to its current mortgage payment and it must not be subject of a Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 70% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"D." Under the "D" category, an applicant must not be more than 180 days delinquent with respect to its current mortgage payment. Any Chapter 7 or Chapter 13 bankruptcy proceedings and/or foreclosure actions must be paid in connection with closing. The maximum permitted loan-to-value ratio is 65% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced to 60% if the property is currently subject to foreclosure proceedings.

Fremont Home Loan Trust 2006-D Prospectus Supplement at 43-44; *see* Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 43-44.

386. The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement represented:

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally

155

**SECOND AMENDED COMPLAINT**

allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-62; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, Apr. 26, 2007, at S-51.

387.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement continued:

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-63; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, Apr. 26, 2007, at S-53.

388.   The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

156

1  stated:

2      The Long Beach underwriting guidelines permit first lien mortgage loans

3      with loan-to-value ratios at origination of up to 100%, or 80% if at the

4      time of origination of the first lien mortgage loan, the sponsor also

5      originated a second lien mortgage loan. The Long Beach second lien

6      mortgage loan underwriting guidelines permit second lien mortgage loans

7      with a combined loan-to-value ratios at origination of up to 100%. The

8      maximum allowable loan-to-value ratio varies based upon the residential

9      loan program, income documentation, property type, creditworthiness

10     and debt service-to-income ratio of the prospective borrower and the

11     overall risks associated with the loan decision. The maximum combined

12     loan-to-value ratio, including any second lien mortgage subordinate to the

13     sponsor's first lien mortgage, is generally 100% under the "Premium A,"

14     "A," "A-," "B+" and "B" risk categories, and 95% under the "C" risk

15     category. Noninstitutional (private party) second lien loans are not

16     permitted.

17 Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-37.

18     389.  UNTRUE STATEMENTS AND OMITTED INFORMATION:  The

19 preceding statements were material at the time they were made because the riskiness of

20 the RMBS investment is directly dependent on the quality of the underwriting process

21 and adequate assessment and limits on loan-to-value ratios (in addition to accurate

22 appraisals) is key to that process.  The preceding statements were untrue at the time

23 they were made because the Originators did not adhere to the maximum loan-to-value

24 ratios as represented in the Offering Documents, encouraged inflated appraisals and

25 frequently granted loans with high loan-to-value ratios with no meaningful assessment

26 of the borrower's ability to repay the loan based on the borrower's credit profile (*see*

27 *supra* Section VII.D).  Further evidence of this fact is found in, among other things, the

28

**SECOND AMENDED COMPLAINT**

surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### G.  Untrue Statements Concerning Credit Enhancement

390.  The Alternative Loan Trust 2007-OA4 Prospectus Supplement represented:

> Credit enhancement provides limited protection to holders of certain certificates against shortfalls in payments received on the mortgage loans.
>
> This transaction employs the following forms of credit enhancement . . . .

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-12; *see* Alternative Loan Trust 2007-OA4 Amended Registration Statement, Mar. 6, 2006, at S-14-15.

391.  The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement represented:

> The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Class A certificates, and to a limited extent, the holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 certificates and, to a lesser degree, the holders of the Class B-1 and Class B-2 certificates, will receive regular payments of interest and principal.

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-19; *see* First Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-20.

392.  The Fremont Home Loan Trust 2006-D Prospectus stated:

**SECOND AMENDED COMPLAINT**

> The amount of any applicable credit enhancement supporting one or more classes of offered securities, including the subordination of one or more classes of securities, will be determined on the basis of criteria established by each rating agency rating such classes of securities based on an assumed level of defaults, delinquencies, other losses or other factors.  We cannot assure you, however, that the loss experience on the related assets will not exceed these assumed levels.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 17; *see also* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 17.

393.    The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement stated:

> The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the class A certificates, and to a limited extent, the holders of the class M-1, class M-2, class M-3, class M-4, class M-5, class M-6, class M-7 and class M-8 certificates, will receive regular payments of interest and principal.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-26-27.

394.    The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

> The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the senior certificates, and to a limited extent, the holders of the subordinate certificates, will receive regular payments of interest and principal.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-32; *see* GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-28; GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, Apr. 27, 2007, at S-25.

395.    The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

**SECOND AMENDED COMPLAINT**

stated:

> The credit enhancement features described in the summary of this prospectus supplement are intended to enhance the likelihood that holders of the Class A Certificates, and to a limited extent, the holders of the Mezzanine Certificates and the Class B Certificates, will receive regular payments of interest and principal.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-19; *see* Long Beach Mortgage Loan Trust 2006-11 Registration Statement, Jan. 24, 2006, at the "Risk Factors" section.

396.   The RALI Series offerings represented the following underwriting guidelines set by RFC would apply to every originator contributing loans to the offering:

> The credit enhancement for the benefit of the offered certificates consists of:
>
> Excess Cash Flow.  Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the Class A, Class M and Class B Certificates each month and related expenses, there may be excess cash flow.  Some of this excess cash flow may be used to protect the offered certificates against some realized losses by making an additional payment of principal up to the amount of the realized losses.

RALI Series 2007-QH6 Trust Prospectus Supplement at S-15; *see* RALI Series 2006-QO10 Trust Prospectus Supplement at S-14; RALI Series 2007-QH2 Trust Prospectus Supplement at S-13; RALI Series 2007-QH3 Trust Prospectus Supplement at S-13; RALI Series 2007-QH5 Trust Prospectus Supplement at S-15; RALI Series 2006-QO6 Trust Prospectus Supplement at S-13.

**SECOND AMENDED COMPLAINT**

397.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because U.S. Central and WesCorp nearly always purchased the highest rated tranches of the RMBS, and those highly rated tranches relied on the credit enhancement, which purportedly afforded protection against financial loss.  The preceding statements were untrue at the time they were made, because, due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail (*see supra* Section VII.D).  This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory.  Further evidence of the Originators' pervasive disregard of underwriting standards is found in the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5); the huge discrepancy between expected and actual losses (*see supra* Figure 2); the collapse of the credit ratings (*see supra* Table 4); and the Originators' high OTD lending (*see supra* Table 6).

## IX.   THE CLAIMS ARE TIMELY

398.   For actions brought by the NCUA Board as Liquidating Agent, the FCU Act extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.  *See* 12 U.S.C. § 1787(b)(14)(B)(i).

399.   The NCUA Board placed U.S. Central and WesCorp under conservatorship and appointed itself as conservator on March 20, 2009.  On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into liquidation and appointed itself as Liquidating Agent.

400.   Actions brought under Sections 11 and 12(a)(2) of the Securities Act must be:

brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the

**161**

1           exercise of reasonable diligence. . . .  In no event shall any such action be

2           brought to enforce a liability created under section 77k or 77*l*(a)(1) of this

3           title more than three years after the security was bona fide offered to the

4           public, or under section 77*l*(a)(2) of this title more than three years after

5           the sale.

6   15 U.S.C. § 77m.

7        401.   Actions brought under section 17-12a509 of the Kansas Uniform

8   Securities Act must be brought within "within the earlier of two years after discovery

9   of the facts constituting the violation or five years after the violation." Kan. Stat. Ann.

10  § 17-12a509(j).

11       402.   Actions brought under section 25501 of the California Corporate

12  Securities Law must be brought within "five years after the act or transaction

13  constituting the violation or the expiration of two years after the discovery by the

14  plaintiff of the facts constituting the violation, whichever shall first expire." Cal. Corp.

15  Code § 25506(b).

16       403.   As the Federal Reserve Board noted in November 2008, the

17  "[d]eteriorating lending standards" and "the surge in early payment defaults suggests

18  that underwriting . . . deteriorated on dimensions that were less readily apparent to

19  investors."  Mayer, *The Rise in Mortgage Defaults* at 15-16; *see also* FSOC Risk Retention

20  Report at 9.

21       404.   The FSOC explained that the origination and securitization process

22  contains inherent "information asymmetries" that put investors at a disadvantage

23  regarding critical information concerning the quality and performance of RMBS.  The

24  FSOC Risk Retention Report described the information disadvantage for investors of

25  RMBS:

26          One important informational friction highlighted during the recent

27          financial crisis has aspects of a "lemons" problem that exists between the

28  **162**

issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

405.    Accordingly, U.S. Central and WesCorp did not discover and could not have discovered the untrue statements and/or misleading omissions in the Offering Documents more than one year prior to March 20, 2009, the date on which the NCUA Board placed U.S. Central and WesCorp into conservatorship.

406.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 11 of the Securities Act (Claims One through Six), the earliest date they were bona fide offered to the public was March 27, 2006, or not more than three years prior to March 20, 2009.   Accordingly, the NCUA Board's Section 11 claims are not time-barred.

407.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 12(a)(2) (Claim Seven), the earliest sale was December 14, 2006, or not more than three years prior to March 20, 2009.  Accordingly, the NCUA Board's Section 12(a)(2) claims are not time-barred.

408.    With respect to those RMBS purchases for which the NCUA Board asserts claims under state law (Claims Eight and Nine), the earliest purchase date/offering date with respect to those claims was  March 3, 2006, or not more than five years prior to March 20, 2009. Accordingly, the NCUA Board's state law claims are not time-barred.

**SECOND AMENDED COMPLAINT**

409.   In addition, NCUA entered into a tolling agreement with Goldman Sachs for the period between August 19, 2010 until May 31, 2011.

## X.   NUMEROUS CLAIMS ARE INDEPENDENTLY TIMELY BY VIRTUE OF *AMERICAN PIPE*

410.   U.S. Central, WesCorp, and/or the NCUA Board as their Liquidating Agent are or were members of putative classes asserting claims on their behalf for certificates in the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO6, RALI Series 2006-QO10, RALI Series 2007-QH2, RALI Series 2007-QH3, RALI Series 2007-QH5, and RALI Series 2007-QH6 Offerings.   Accordingly, the NCUA Board's claims relating to those offerings are subject to legal tolling of the statute of limitations and statute of repose under the doctrine announced in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("American Pipe") and its progeny.   *See* Tables 10, 11 (attached as Appendix A to Complaint).

411.   <u>GSR Mortgage Loan Trust 2007-OA1 offering</u>:   *American Pipe* tolling applies to this offering from December 11, 2008 through January 28, 2010.   The Prospectus and Prospectus Supplement for this offering issued on February 13, 2007 and May 7, 2007, respectively.   On May 4, 2007, WesCorp purchased the 1A2 and 2AM tranches of this offering from Goldman Sachs.   The case which supplies this tolling is Complaint, *NECA-IBEW v. Goldman*, No. 08-10783 (S.D.N.Y filed Dec. 11, 2008).   The named plaintiff, NECA-IBEW, asserted Section 11 claims against Goldman Sachs in its role as RMBS underwriter for misstatements and omissions in RMBS offering documents, such as the supposed compliance with stated underwriting guidelines.   NECA-IBEW purported to represent a class of all individuals who purchased RMBS certificates in 2007 and 2008 for which GS Mortgage Securities Corporation served as the depositor.   That purported class included purchasers of the GSR Mortgage Loan Trust 2007-OA1 offering.   *See id.* ¶¶ 1, 13.   NECA-IBEW did not

**164**

disclose which certificates it had purchased until February 9, 2009, when it disclosed that it had purchased certificates in the GSAA Home Equity Trust 2007-5 and GSAA Home Equity Trust 2007-10 offerings.  *See id.* ¶ 10; *NECA-IBEW*, Doc. 5-2 at 4, No. 08-10783 (S.D.N.Y. Feb. 9, 2009).

412.  <u>RALI Series 2006-QO6 offering</u>:  *American Pipe* tolling applies to the RALI Series 2006-QO6 offering from September 22, 2008 until January 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on March 3, 2006 and June 28, 2006, respectively.  On October 11, 2006, WesCorp purchased the A3 tranche of this offering from Credit Suisse First Boston.  The case which supplies this tolling is Complaint, *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781 (S.D.N.Y. filed Sept. 22, 2008) ("N.J. Carpenters Compl.").  The named plaintiff, New Jersey Carpenters Health Fund, asserted Section 11 and Section 12 claims against Goldman Sachs in its role as RMBS underwriter for misstatements and omissions in RMBS offering documents, such as the supposed compliance with stated underwriting guidelines.  The Health Fund purported to represent a class of all individuals who purchased certificates from several RALI Series offerings, including RALI Series 2006-QO6 and RALI Series-QO10.  *See id.* ¶ 1.  The Health Fund did not disclose which certificates it had purchased until January 12, 2009, when it disclosed that it had purchased certificates in the RALI Series 2006-QO7 offering.  *See id.* ¶ 7; *N.J. Carpenters*, Doc. 10-2 at 4 (S.D.N.Y. Jan. 12, 2009); *see also* Consol. First Am. Compl., *N.J. Carpenters*, ¶¶ 19-20 (S.D.N.Y. filed May 18, 2009) ("N.J. Carpenters Am. Compl.") (adding new named plaintiffs and disclosing that the named plaintiffs group had purchased the following certificates: RALI Series 2006-QO7, Class M1; RALI Series 2007-QS1, Class 1A1; RALI Series 2007-QS1, Class 2A10; RALI Series 2007-QH4, Class A1; and RALI Series 2007-QO4, Class A1A).  On July 30, 2010, the Orange County Employees' Retirement System ("OCERS") and the Iowa Public Employees' Retirement System ("IPERS") moved to intervene and disclosed that they

165

had purchased certificates in the RALI Series 2006-QO6 and RALI Series 2006-QO10 offerings.  *See N.J. Carpenters*, Doc. 100-1 at 3 and Doc. 100-2 at 3 (S.D.N.Y. July 30, 2010); *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2010 WL 5222127 (S.D.N.Y. Dec. 22, 2010) (granting motion to intervene).

413.  <u>RALI Series 2006-QO10 offering</u>:  *American Pipe* tolling applies to the RALI Series 2006-QO10 offering from September 22, 2008 until January 18, 2011. The Prospectus and Prospectus Supplement for this offering issued on December 6, 2006 and December 27, 2006.  On December 14, 2006, WesCorp purchased the A3 tranche of this offering from Goldman Sachs.  The case which supplies this tolling is Complaint, *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781 (S.D.N.Y. filed Sept. 22, 2008).  The facts regarding this case from paragraph 412 are incorporated here.

414.  <u>RALI Series 2007-QH2 offering</u>:  *American Pipe* tolling applies to the RALI Series 2007-QH2 offering from May 18, 2009 until March 31, 2010.  The Prospectus and Prospectus Supplement for this offering issued on December 6, 2006 and February 23, 2007, respectively.  On February 16, 2007, WesCorp purchased the A3 tranche of this offering from Goldman Sachs.  The case which supplies this tolling is Consolidated First Amended Complaint, *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781 (S.D.N.Y. filed May 18, 2009).  The named plaintiffs asserted Section 11 and Section 12 claims against Goldman Sachs in its role as RMBS underwriter for misstatements and omissions in RMBS offering documents, such as the supposed compliance with stated underwriting guidelines.  The named plaintiffs purported to represent a class of all individuals who purchased certificates from RMBS traceable to two shelf registration statements.  *See id.* ¶ 1.  That class included purchasers of certificates from the RALI Series 2007-QH2, 2007-QH3, 2007-QH5, and 2007-QH6 offerings.  *See id.* ¶¶ 27-28.  The named plaintiffs had purchased the following certificates: RALI Series 2006-QO7, Class M1; RALI Series 2007-QS1,

166

Class 1A1; RALI Series 2007-QS1, Class 2A10; RALI Series 2007-QH4, Class A1; and RALI Series 2007-QO4, Class A1A.  *See id.* ¶¶ 19-20.

415.  <u>RALI Series 2007-QH3 offering</u>: *American Pipe* tolling applies to the RALI Series 2007-QH3 offering from May 18, 2009 until March 31, 2010.  The Prospectus and Prospectus Supplement for this offering issued on December 6, 2006 and March 28, 2007, respectively.  On March 28, 2007, WesCorp purchased the A2 and A3 tranches of this offering from Goldman Sachs.  The case which supplies this tolling is *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Consolidated First Amended Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009).  The facts regarding this case from paragraph 414 are incorporated here.

416.  <u>RALI Series 2007-QH5 offering</u>: *American Pipe* tolling applies to the RALI Series 2007-QH5 offering from May 18, 2009 until March 31, 2010.  The Prospectus and Prospectus Supplement for this offering issued on April 9, 2007 and May 29, 2007.  On May 24, 2007 and May 30, 2007, WesCorp purchased the AI1, AI2, and AI3 tranches of this offering from Goldman Sachs.  The case which supplies this tolling is *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Consolidated First Amended Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009).  The facts regarding this case from paragraph 414 are incorporated here.

417.  <u>RALI Series 2007-QH6 offering</u>: *American Pipe* tolling applies to the RALI Series 2007-QH6 offering from May 18, 2009 until March 31, 2010.  The Prospectus and Prospectus Supplement for this offering issued on April 9, 2007 and June 27, 2007.  On June 21, 2007, WesCorp purchased the A2 and A3 tranches of this offering from Goldman Sachs.  The case which supplies this tolling is *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Consolidated First Amended Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009).  The facts regarding this case from paragraph 414 are incorporated here.

**167**

**SECOND AMENDED COMPLAINT**

418.  <u>Alternative Loan Trust 2007-OA4 offering</u>:  *American Pipe* tolling applies to this offering from November 14, 2007 through January 6, 2010.  The Prospectus and Prospectus Supplement for this offering issued on November 14, 2006 and March 28, 2007.  On March 20, 2007, WesCorp purchased the A3 tranche of this offering from Goldman Sachs.  The cases which supply this tolling are Complaint, *Wash. State Plumbing & Pipefitting Pension Trust v. Countrywide Fin. Corp.*, No. BC392571 (CA Sup. Ct., L.A. Cnty. filed June 12, 2008) ("WSPPPT Compl."), and Complaint, *Luther v. Countrywide Home Loans Servicing LP*, No. BC380698 (CA Sup. Ct., L.A. Cnty. filed Nov. 14, 2007) ("Luther Compl.").  In both of those suits, the named plaintiff asserted Section 11 and Section 12 claims against Goldman Sachs in its role as RMBS underwriter for misstatements and omissions in RMBS offering documents, such as the supposed compliance with stated underwriting guidelines.  The named plaintiffs purported to represent purchasers of RMBS certificates traceable to certain shelf registration statements issued by CWALT, a subsidiary of Countrywide.  That class included purchasers of certificates from the Alternative Loan Trust 2007-OA4 offering.  In their initial complaints, the named plaintiffs did not disclose which certificates they had purchased.  *See* WSPPPT Compl. ¶¶ 1, 13, 37; *Luther* Compl. ¶¶ 1, 12, 14.

419.  *American Pipe* and the tolling agreement between the NCUA Board and Goldman Sachs independently make timely all of the NCUA Board's Section 11 and Section 12 claims.  *See* Tables 10, 11 (attached as Appendix A to Complaint).

## XI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Section 11 of the Securities Act of 1933

### (Alternative Loan Trust 2007-OA4)

420.  The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than

168

the Alternative Loan Trust 2007-OA4 Offering.

421. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the Alternative Loan Trust 2007-OA4 certificates against Defendant Goldman Sachs as the underwriter.

422. The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

423. At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

424. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

425. WesCorp purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

426. At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

427. Defendant Goldman Sachs's conduct as alleged above violated Section 11.

428. WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## SECOND CLAIM FOR RELIEF

169

## Section 11 of the Securities Act of 1933

## (Fremont Home Loan Trust 2006-D)

429.  The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific specific to offerings other than the Fremont Home Loan Trust 2006-D Offering.

430.  The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the Fremont Home Loan Trust 2006-D certificates against Defendant Goldman Sachs as the underwriter.

431.  The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

432.  At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

433.  The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

434.  U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

435.  At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

436.  Defendant Goldman Sachs's conduct as alleged above violated Section 11.

437.  U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its

170

**SECOND AMENDED COMPLAINT**

favor against Defendant Goldman Sachs, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## THIRD CLAIM FOR RELIEF

### Section 11 of the Securities Act of 1933

### (GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, GreenPoint Mortgage Funding Trust 2006-OH1)

438.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than GS Mortgage Securities Corp., or specific to offerings other than the GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, and GreenPoint Mortgage Funding Trust 2006-OH1 Offerings.

439.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, and GreenPoint Mortgage Funding Trust 2006-OH1 certificates against Defendant Goldman Sachs, as the underwriter, and against Defendant GS Mortgage Securities Corp., as the issuer.

440.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

441.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

442.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

443.   WesCorp purchased the certificates pursuant to and traceable to a

171

defective registration statement, as alleged above.

444.   At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

445.   Defendant Goldman Sachs's and Defendant GS Mortgage Securities Corp.'s conduct as alleged above violated Section 11.

446.   WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's and Defendant GS Mortgage Securities Corp.'s violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs and Defendant GS Mortgage Securities Corp., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## FOURTH CLAIM FOR RELIEF

### Section 11 of the Securities Act of 1933

### (First Franklin Mortgage Loan Trust 2006-FF4)

447.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than GS Mortgage Securities Corp., or specific to offerings other than the First Franklin Mortgage Loan Trust 2006-FF4 Offering.

448.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchase of the First Franklin Mortgage Loan Trust 2006-FF4 certificate against Defendant Goldman Sachs, as the underwriter, and against Defendant GS Mortgage Securities Corp., as the issuer.

449.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

450.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted

172

facts that were necessary to make the statements made not misleading, as alleged above.

451.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

452.   U.S. Central purchased the certificate pursuant to and traceable to a defective registration statement, as alleged above.

453.   At the time U.S. Central purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

454.   Defendant Goldman Sachs's and Defendant GS Mortgage Securities Corp.'s conduct as alleged above violated Section 11.

455.   U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's and Defendant GS Mortgage Securities Corp.'s violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs and Defendant GS Mortgage Securities Corp., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## FIFTH CLAIM FOR RELIEF

### Section 11 of the Securities Act of 1933

### (Long Beach Mortgage Loan Trust 2006-11)

456.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Long Beach Mortgage Loan Trust 2006-11 Offering.

457.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the Long Beach

Mortgage Loan Trust 2006-11 certificates against Defendant Goldman Sachs as the underwriter.

458. The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

459. At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

460. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

461. U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

462. At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

463. Defendant Goldman Sachs's conduct as alleged above violated Section 11.

464. U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## SIXTH CLAIM FOR RELIEF

### Section 11 of the Securities Act of 1933

### (RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-

174

**QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)**

465.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Residential Accredit Loans, Inc., or specific to offerings other than the RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust Offerings.

466.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust certificates against Defendant Goldman Sachs, as the underwriter, and against Defendant Residential Accredit Loans, Inc., as the issuer.

467.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

468.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

469.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

470.   WesCorp purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

471.   At the time WesCorp purchased the certificates, it did not know of the

175

untrue statements and omissions contained in the registration statement.

472.   Defendant Goldman Sachs's and Defendant Residential Accredit Loans, Inc.'s conduct as alleged above violated Section 11.

473.   WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's and Defendant Residential Accredit Loans, Inc.'s violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs and Defendant Residential Accredit Loans, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## SEVENTH CLAIM FOR RELIEF

### Section 12(a)(2) of the Securities Act of 1933

**(Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)**

474.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust offerings.

475.   The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust certificates against Defendant Goldman Sachs, as the underwriter and seller of those certificates.

476.   The NCUA Board expressly disclaims and disavows any allegation that

could be construed as alleging fraud.

477.  Defendant Goldman Sachs offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

478.  Defendant Goldman Sachs offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectuses and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

479.  The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

480.  The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

481.  WesCorp purchased the certificates on the initial offering pursuant to the prospectuses and/or prospectus supplements.

482.  At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

483.  Defendant Goldman Sachs's conduct as alleged above violated Section 12(a)(2).

484.  WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Section 12(a)(2).

485.  Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration WesCorp paid for the certificates, minus principal and interest received.

**SECOND AMENDED COMPLAINT**

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## EIGHTH CLAIM FOR RELIEF

### Violation of the California Corporate Securities Law of 1968

### Cal. Corp. Code §§ 25401 and 25501

### (Alternative Loan Trust 2007-OA4, GreenPoint Mortgage Funding Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)

486.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Alternative Loan Trust 2007-OA4, GreenPoint Mortgage Funding Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust offerings.

487.   The NCUA Board brings this cause of action pursuant to Sections 25401 and 25501 of the California Corporate Securities Law, with respect to WesCorp's purchases of the Alternative Loan Trust 2007-OA4, GreenPoint Mortgage Funding Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust certificates against Defendant Goldman Sachs, as the seller of those certificates.

488.   Defendant Goldman Sachs offered to sell and sold the securities to WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to

178

make the statements made not misleading, as alleged above.

489.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

490.   At the time WesCorp purchased the certificates, it did not know of these untruths or omissions.

491.   Defendant Goldman Sachs sold the certificates to WesCorp in California.

492.   Defendant Goldman Sachs's sales of the certificates violated Cal. Corp. Code § 25401.

493.   WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Cal. Corp. Code § 25401, and WesCorp and the NCUA Board are entitled to the remedies provided by Cal. Corp. Code § 25501.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## NINTH CLAIM FOR RELIEF

### Violation of the Kansas Uniform Securities Act

### Kan. Stat. Ann. § 17-12a509

### (First Franklin Mortgage Loan Trust 2006-FF4)

494.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the First Franklin Mortgage Loan Trust 2006-FF4 offering.

495.   The NCUA Board brings this cause of action pursuant to Section 17-12a509 of the Kansas Uniform Securities Act, with respect to U.S. Central's purchases of the First Franklin Mortgage Loan Trust 2006-FF4 certificates against Defendant Goldman Sachs, as the seller of those certificates.

**SECOND AMENDED COMPLAINT**

496.    Defendant Goldman Sachs offered to sell and sold the securities to WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

497.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

498.    Defendant Goldman Sachs sold the certificates to U.S. Central in Kansas.

499.    U.S. Central did not know of these untruths and omissions.

500.    If U.S. Central had known about these untruths and omissions, it would not have purchased the securities from Defendant Goldman Sachs.

501.    Defendant Goldman Sachs's sales of the certificates violated Kan. Stat. Ann. § 17-12a509(b).

502.    U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Kan. Stat. Ann. § 17-12a509(b).

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

**A.**     For judgment against the Defendants in accordance with the prayers for relief set forth in each of the foregoing Claims for Relief;

**B.**     For Plaintiff's costs of suit; and

**C.**     For any other relief the Court deems just and proper.

**180**

**SECOND AMENDED COMPLAINT**

1

## JURY DEMAND

2        Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury

3    of all of the claims asserted in this Complaint so triable.

4

5    Dated:  November 14, 2014                TERRY W. BIRD
                                              BIRD, MARELLA, BOXER,
6    GEORGE A. ZELCS                             WOLPERT, NESSIM, DROOKS,
     KOREIN TILLERY LLC                          LINCENBERG & RHOW, P.C.
7

8    STEPHEN M. TILLERY                       MARK C. HANSEN
     DOUGLAS R. SPRONG                        DAVID C. FREDERICK
9    ROBERT L. KING                           dfrederick@khhte.com
     DIANE E. MOORE                           WAN J. KIM
10   KOREIN TILLERY LLC                       DANIEL V. DORRIS
     505 North Seventh Street, Suite 3600     KELLOGG, HUBER, HANSEN,
11   St. Louis, Missouri 63101-1625              TODD, EVANS & FIGEL, P.L.L.C.
     Telephone: (314) 241-4844               Sumner Square
12   Fax: (314) 241-3525                      1615 M Street, N.W., Suite 400
                                              Washington, D.C. 20036
13   MICHAEL J. MCKENNA, General              Telephone: (202) 326-7900
     Counsel                                  Fax: (202) 326-7999
14   JOHN K. IANNO, Associate General
     Counsel
15   NATIONAL CREDIT UNION
       ADMINISTRATION                         By:   /s/ Terry W. Bird
16   1775 Duke Street                         _____
     Alexandria, Virginia 22314-3428                  Terry W. Bird
17   Telephone: (703) 518-6350                Attorneys for Plaintiff
     Fax: (703) 518-6569                      National Credit Union Administration
18                                            Board

19

20

21

22

23

24

25

26

27

28

**181**

**SECOND AMENDED COMPLAINT**

## APPENDIX A

## Table 10

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | Case That Supplies American Pipe Tolling | American Pipe tolling start date | American Pipe Tolling End Date |
|---|---|---|---|---|---|---|
| 02150DAC9 | ALT Loan Trust 2007-OA4 | 3/28/2007 | 3/20/2007 | *Luther v. Countrywide,* Complaint, BC380698 (Cal. Super. Ct., L.A. Cnty. Nov. 14, 2007) | 11/14/2007 | 1/6/2010 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/2007 | *NECA-IBEW v. Goldman Sachs,* No. 08-10783 (S.D.N.Y. Dec. 11, 2008) | 12/11/2008 | 1/28/2010 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/2007 | *NECA-IBEW, supra* | 12/11/2008 | 1/28/2010 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | 6/28/2006 | 10/11/2006 | *New Jersey Carpenters v. RALI,* Complaint, No. 08-602727 (N.Y. Sup. Ct. Sept. 22, 2008), *removed to* No. 08-8781 (S.D.N.Y.) | 9/22/2008 | 1/18/2011 |
| 751153AC1 | RALI Series 2006-QO10 Trust | 12/27/2006 | 12/14/2006 | *New Jersey Carpenters v. RALI, supra* | 9/22/2008 | 1/18/2011 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | 2/23/2007 | 2/16/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 75116EAB8 | RALI Series 2007-QH5 | 5/29/2007 | 5/24/2007 | *New Jersey Carpenters v.* | 5/18/2009 | 3/31/2010 |

A-1

| | Trust | | | *RALI, supra* | | |
|---|---|---|---|---|---|---|
| 75116EAC6 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/24/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/30/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |

**A-2**

**SECOND AMENDED COMPLAINT – APPENDIX**

## Table 11

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | American Pipe tolling start date | Case That Supplies American Pipe Tolling | American Pipe Tolling End Date | Federal Claims Timely with American Pipe Tolling? | Additional Tolling Based on Tolling Agreement – Aug.19, 2010 to May 31, 2011 | Federal Claims Timely with American Pipe + Tolling Agreement? |
|---|---|---|---|---|---|---|---|---|---|
| 02150DAC9 | ALT Loan Trust 2007-OA4 | 3/28/2007 | 3/20/07 | 11/14/07 | *Luther v Countrywide*, Complaint, BC380698 (Cal. Super. Ct., L.A. Cnty. Nov. 14, 2007) | 1/6/10 | Yes | | |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/07 | 12/11/08 | *NECA-IBEW v. Goldman Sachs*, Complaint, No. 08-10783 (S.D.N.Y. Dec. 11, 2008) | 1/28/10 | N/A | Yes | Yes |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/07 | 12/11/08 | *NECA-IBEW*, Complaint, *supra* | 1/28/10 | N/A | Yes | Yes |
| 75114NAC8 | RALI Series 2006-QO6 Trust | 6/28/2006 | 10/11/06 | 9/22/08 | *New Jersey Carpenters v. RALI*, Complaint, No. 08-602727 (N.Y. Sup. Ct. Sept. 22, 2008), *removed to* No. 08-8781 (S.D.N.Y.) | 1/18/11 | Yes | | |
| 751153AC1 | RALI Series 2006-QO10 Trust | 12/27/2006 | 12/14/06 | 9/22/08 | *New Jersey Carpenters v. RALI*, Complaint, *supra* | 1/18/11 | Yes | | |

**A-3**

| 74922JAC2 | RALI Series 2007-QH2 Trust | 2/23/2007 | 2/16/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009) | 3/31/10 | N/A | Yes | Yes |
|---|---|---|---|---|---|---|---|---|---|
| 74922WAB5 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 74922WAC3 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 75116EAB8 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/24/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 75116EAC6 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/24/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 75116EAA0 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/30/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 74922AAB3 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |

A-4

| 74922AAC1 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/07 | 5/18/09 | *New Jersey Carpenters v. RALI,* Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |

**A-5**

## APPENDIX B – Examples of False and Misleading Statements

### I.   RALI 2006-QO6 (Registration Statement No. 333-131213)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-47 (June 28, 2006); *see also id.* at S-45 to S-47; Prospectus at 6, 12-17, 19 ("Qualifications of Sellers") (Mar. 3, 2006); Free Writing Prospectus, Term Sheet Supplement at "The Program" and "Underwriting Standards" (June 1, 2006); Amendment No. 1 to Form S-3, at 4, 12-17, 20-21 ("Qualification of Sellers"), S-44 to S-46 (Mar. 3, 2006).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at I-1 to I-11 (June 28, 2006); *see also* Free Writing Prospectus, Structural and Collateral Term Sheet at "Collateral Stipulations – Mortgage Pool Characteristics" (June 28, 2006).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See, e.g.,* Free Writing Prospectus (June 20, 2006); *see also* Prospectus at 19 (Mar. 3, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

- "Under the depositor's underwriting standards, a mortgage collateral seller is usually permitted to provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, provided that the combined LTV ratio is not greater than 100%."  Prospectus at 12 (Mar. 3, 2006); Amendment No. 1 to Form S-3, at 12 (Mar. 3, 2006).

- "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, . . . [e]ach mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws."  Prospectus Supplement at S-38 (June 28, 2006); *see also* Prospectus at 19 (Mar. 3, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

## II.    RALI 2006-QO10 (Registration Statement No. 333-131213)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-50 (Dec. 27, 2006); *see also id.* at S-48 to S-50; Prospectus at 6, 12-17, 19 ("Qualifications of Sellers") (Dec. 6, 2006); Free Writing Prospectus, Term Sheet Supplement at "The Program" and "Underwriting Standards" (Dec. 5, 2006); Amendment No. 1 to Form S-3, at 4, 12-17, 20-21 ("Qualification of Sellers"), S-44 to S-46 (Mar. 3, 2006).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at I-1 to I-11 (Dec. 27, 2006); Free Writing Prospectus, Term Sheet at "Collateral Stipulations – Mortgage Pool Characteristics" (Dec. 5, 2006); Free Writing Prospectus, Structural and Collateral Term Sheet at "Mortgage Pool Stipulated Characteristics" and "Mortgage Pool Description – 68% of the Expected Final Mortgage Pool" (Dec. 11, 2006).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See, e.g.,* Free Writing Prospectus (Dec. 11, 2006); Free Writing Prospectus (Jan. 12, 2007); *see also* Prospectus at 19 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

- "Under the depositor's underwriting standards, a mortgage collateral seller is usually permitted to provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, provided that the combined LTV ratio is not greater than 100%."  Prospectus at 12 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 12 (Mar. 3, 2006).

- "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, . . . [e]ach mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-41 (Dec. 27, 2006); *see also* Prospectus at 19 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

A-7

### III.   RALI 2007-QH2 (Registration Statement No. 333-131213)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-46 (Feb. 23, 2006); *see also id.* at S-44 to S-45; Prospectus at 6, 12-17, 19 ("Qualifications of Sellers") (Dec. 6, 2006); Free Writing Prospectus, Term Sheet Supplement at "The Program" and "Underwriting Standards" (Feb. 7, 2007); Free Writing Prospectus, Term Sheet Supplement at "The Program" and "Underwriting Standards" (Feb. 8, 2007); Amendment No. 1 to Form S-3, at 4, 12-17, 20-21 ("Qualification of Sellers"), S-44 to S-46 (Mar. 3, 2006).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at I-1 to I-10 (Feb. 23, 2007); Free Writing Prospectus, Term Sheet at "Collateral Stipulations – Mortgage Pool Characteristics" (Feb. 7, 2007); Free Writing Prospectus, Term Sheet at "Collateral Stipulations – Mortgage Pool Characteristics" (Feb. 8, 2007); Free Writing Prospectus, Structural and Collateral Term Sheet at "Mortgage Pool Description" and "Final Mortgage Pool" (Feb. 27, 2007).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See*, *e.g.*, Free Writing Prospectuses, Preliminary Pool Information (Feb. 7, 2007); Free Writing Prospectus, Preliminary Pool Information (Feb. 14, 2007); *see also* Prospectus at 19 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

- "Under the depositor's underwriting standards, a mortgage collateral seller is usually permitted to provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, provided that the combined LTV ratio is not greater than 100%."  Prospectus at 12 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 12 (Mar. 3, 2006).

- "Residential Funding Company, LLC, as seller, will represent and warrant, as of the date of issuance of the certificates, . . . [e]ach mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws."  Prospectus Supplement at S-38 (Feb. 23, 2007); *see also* Prospectus at 19 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

## IV.    RALI 2007-QH3 (Registration Statement No. 333-131213)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-49 (Mar. 28, 2007); *see also id.* at S-47 to S-48; Prospectus at 6, 12-17, 19 ("Qualifications of Sellers") (Dec. 6, 2006); Free Writing Prospectus, Term Sheet Supplement at "The Program" and "Underwriting Standards" (Mar. 16, 2007); Amendment No. 1 to Form S-3, at 4, 12-17, 20-21 ("Qualification of Sellers"), S-44 to S-46 (Mar. 3, 2006).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at I-1 to I-10 (Mar. 28, 2007); Free Writing Prospectus, Term Sheet at "Collateral Stipulations – Mortgage Pool Characteristics" (Mar. 16, 2007); Free Writing Prospectus, Term Sheet at "Mortgage Pool Description" and "Appendix A – Stats" (Mar. 27, 2007); Free Writing Prospectus, Term Sheet at "Mortgage Pool Description" and "Appendix A – Stats" (Mar. 29, 2007).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See, e.g.,* Free Writing Prospectus, Preliminary Pool Information (Mar. 8, 2007); Free Writing Prospectus, Preliminary Pool Information (Mar. 16, 2007); Free Writing Prospectus, Preliminary Pool Information (Mar. 21, 2007); *see also* Prospectus at 19 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

- "Under the depositor's underwriting standards, a mortgage collateral seller is usually permitted to provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, provided that the combined LTV ratio is not greater than 100%."  Prospectus at 12 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 12 (Mar. 3, 2006).

- "Residential Funding Company, LLC, as seller, will represent and warrant, as of the date of issuance of the certificates, . . . [e]ach  mortgage loan at the time it was made complied in all material respects with applicable local,  state and federal laws, including, but not limited to, all applicable anti predatory lending laws."  Prospectus Supplement at S-40 (Mar. 28, 2007); *see also* Prospectus at 19 (Dec. 6, 2006); Amendment No. 1 to Form S-3, at 21 (Mar. 3, 2006).

A-9

## V.     RALI 2007-QH5 (Registration Statement No. 333-140610)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-55 (May, 28, 2007); *see also id.* at S-53 to S-55; Prospectus at 9, 17-24, 26-27 ("Qualifications of Sellers") (Apr. 9, 2007); Free Writing Prospectus, Term Sheet Supplement at "The Program" and "Underwriting Standards" (May 15, 2007); Amendment No. 1 to Form S-3, at S-42 to S-44, 9, 17-24, 26-27 ("Qualification of Sellers") (Apr. 3, 2007).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at I-1 to I-9 (May 28, 2007); Free Writing Prospectus, Term Sheet at "Collateral Stipulations – Mortgage Pool Characteristics" (May 15, 2007).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See, e.g.,* Free Writing Prospectus, Preliminary Pool Information (May 16, 2007); Free Writing Prospectus, Preliminary Pool Information (May 18, 2007); *see also* Prospectus at 27 (Apr. 9, 2007); Amendment No. 1 to Form S-3, at 27 (Apr. 3, 2007).

- "Under the depositor's underwriting standards, a mortgage collateral seller is usually permitted to provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, provided that the combined LTV ratio is not greater than 100%."  Prospectus at 17 (Apr. 9, 2007); Amendment No. 1 to Form S-3, at 17 (Apr. 3, 2007).

- "Residential Funding Company, LLC, as seller, will represent and warrant, as of the date of issuance of the certificates, . . . [e]ach mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws."  Prospectus Supplement at S-43 (May 29, 2007); *see also* Prospectus at 28 (Apr. 9, 2007); Amendment No. 1 to Form S-3, at 27-28 (Apr. 3, 2007).

## VI.   RALI 2007-QH6 (Registration Statement No. 333-140610)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-49 (June 27, 2007); *see also id.* at S-47 to S-49; Prospectus at 9, 17-24, 26-27 ("Qualifications of Sellers") (Apr. 9, 2007); Free Writing Prospectus, Term Sheet Supplement at "The Program" and "Underwriting Standards" (June 6, 2007); Amendment No. 1 to Form S-3, at S-42 to S-44, 9, 17-24, 26-27 ("Qualification of Sellers") (Apr. 3, 2007).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at I-1 to I-11 (June 29, 2007); Free Writing Prospectus, Term Sheet at "Collateral Stipulations – Mortgage Pool Characteristics" (June 6, 2007); Free Writing Prospectus, Term Sheet at "Mortgage Pool Characteristics" and "Appendix A – Stats" (June 28, 2007).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See* Free Writing Prospectus, Preliminary Pool Information (June 7, 2007); Free Writing Prospectus, Preliminary Pool Information (June 25, 2007); *see also* Prospectus at 27 (Apr. 9, 2007).

- "Under the depositor's underwriting standards, a mortgage collateral seller is usually permitted to provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, provided that the combined LTV ratio is not greater than 100%."  Prospectus at 17 (Apr. 9, 2007); Amendment No. 1 to Form S-3, at 17 (Apr. 3, 2007).

- "Residential Funding Company, LLC, as seller, will represent and warrant, as of the date of issuance of the certificates, . . . [e]ach mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws."  Prospectus Supplement at S-40 (June 27, 2007); *see also* Prospectus at 28 (Apr. 9, 2007); Amendment No. 1 to Form S-3, at 27-28 (Apr. 3, 2007).

## VII.   ALT 2007-OA4 (Registration Statement No. 333-131630)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-33 to S-38 (Mar. 28, 2007); *see also* Prospectus at 12, 25, 26 ("Qualifications of Sellers") (Nov. 14, 2006); Post-Effective Amendment No. 2 to Form S-3, at S-29, S-52 to S-57, 12, 25, 26 ("Qualification of Sellers") (Oct. 24, 2006).

SECOND AMENDED COMPLAINT – APPENDIX

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at A-1 to A-9 (Mar. 28, 2007); Free Writing Prospectus, Final Term Sheet at 3, A-1 to A-9 (Mar. 28, 2007).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See, e,g.,* Free Writing Prospectus (Mar. 8, 2007); Free Writing Prospectus (Mar. 9, 2007); Free Writing Prospectus (Mar. 21, 2007);

- "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%."  Prospectus Supplement at S-29 (Mar. 28, 2007).

## VIII.   LBMLT 2006-11 (Registration Statement No. 333-131252)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-12, S-34, S-36 to S-41, S-63 (Dec. 11, 2006); *see also* Prospectus at 2-3, 12, 28-30 (July 21, 2006); Preliminary Prospectus Supplement at S-34, S-36 to S-41, S-63 (Dec. 8, 2006); Amendment No. 1 to Registration Statement, at 2, 10, 26-28, S-12, S-35, S-36, S-38 to S-42, S-62 (Mar. 21, 2006) ("Version 2").

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading. *See* Prospectus Supplement at S-136 to S-158 (Dec. 11, 2006); Preliminary Prospectus Supplement at S-136 to S-158 (Dec. 8, 2006); Free Writing Prospectus, Preliminary Term Sheet at A-1 to A-27 (Dec. 6, 2006).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios. *See, e,g.,* Free Writing Prospectus (Dec. 12, 2006).

- "No mortgage loan had a loan-to-value ratio at origination in excess of 100%." Prospectus Supplement at S-64 (Dec. 11, 2006); *see also id.* at S-68; Preliminary Prospectus Supplement at S-64, S-68 (Dec. 8, 2006); Amendment No. 1 to Registration Statement, at S-63, S-68 (Mar. 21, 2006) ("Version 2").

- "[T]he sponsor will make representations and warranties in respect of the mortgage loans," including "[e]ach mortgage loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, predatory and abusive lending usury, equal credit opportunity, real estate settlement procedures, truth-in-lending and disclosure laws." Prospectus Supplement at S-68 (Dec. 11, 2006); *see also* Prospectus at 38 (July 21, 2006); Preliminary Prospectus Supplement at S-68 (Dec. 8, 2006); Amendment No. 1 to Registration Statement, at 36, S-67 (Mar. 21, 2006) ("Version 2").

## IX.   FHLT 2006-D (Registration Statement No. 333-132540)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at 32, 40-44 (Nov. 1, 2006); Prospectus at 73-80 (July 11, 2006); Free Writing Prospectus Supplement at 32, 40-44 (Oct. 24, 2006); Pre-Effective Amendment No. 2 to Form S-3, at S-30, S-39 to S-43, 73-80 (June 23, 2006).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading. *See* Prospectus Supplement at 33, 35-36, Schedule A (Nov. 1, 2006); Free Writing Prospectus Supplement at 33, 35-36, Schedule A (Oct. 24, 2006).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.

- "None of the mortgage loans has an original loan-to-value ratio (or combined loan-to-value ratio in the case of second lien mortgage loans) in excess of 100.00%."   Prospectus Supplement at 34 (Nov. 1, 2006); Free Writing Prospectus Supplement at 34 (Oct. 24, 2006); Pre-Effective Amendment No. 2 to Form S-3, at S-32 (June 23, 2006).

- "The originator will represent that each mortgage loan is in compliance with applicable federal, state and local laws and regulations." Prospectus Supplement at 25 (Nov. 1, 2006); *see also* Prospectus at 68, 69-70 (July 11, 2006); Free Writing Prospectus Supplement at 25 (Oct. 24, 2006); Pre-Effective Amendment No. 2 to Form S-3, at 68, 69-70 (June 23, 2006).

- "An asset seller and the servicer will represent and warrant, among other things, as follows: . . . The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated in them or necessary to make the information and statements in the documents, instruments and agreements not misleading.  No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a mortgage loan has taken place on the part of any person, (including without limitation, the mortgagor, any appraiser, or any other party involved in the origination or servicing of the mortgage loan)."   Prospectus at 70-71 (July 11, 2006); Pre-Effective Amendment No. 2 to Form S-3, at 70-71 (June 23, 2006).

## X.     FFMLT 2006-FF4 (Registration Statement No. 333-127620)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-34 to S-38 (Mar. 27, 2006); *see also id.* at S-31; Prospectus at 26-27 (Nov. 17, 2005); Free Writing Prospectus at S-32, S-35 to S-39 (Mar. 3, 2006); Post-Effective Amendment No. 1 to Form S-3, at S-10 to S-12 ("Version 1"), S-25, S-28 to S-30 ("Version 2"), 26-27 (Nov. 2, 2005).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at A-1 to A-17 (Mar. 27, 2006); Free Writing Prospectus (Feb. 22, 2006); Free Writing Prospectus, Structural and Collateral Term Sheet at A-25 to A-42 (Mar. 2, 2006); Free Writing Prospectus at "All Records" (Mar. 2, 2006); Free Writing Prospectus, Structural and Collateral Term Sheet at A-23 to A-38 (Mar. 3, 2006); Free Writing Prospectus at A-23 to A-39 (Mar. 3, 2006); Free Writing Prospectus (Mar. 8, 2006); Free Writing Prospectus (Mar. 9, 2006); Free Writing Prospectus (Mar. 23, 2006).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See, e.g.,* Free Writing Prospectus (Aug. 28, 2006); Free Writing Prospectus (Mar. 8, 2006); Free Writing Prospectus (Mar. 9, 2006); *see also* Post-Effective Amendment No. 1 to Form S-3, at S-35 ("Version 1") (Nov. 2, 2005).

A-14

---

**SECOND AMENDED COMPLAINT – APPENDIX**

- "The responsible party will represent that each mortgage loan originated or acquired by it is in compliance with applicable federal, state and local laws and regulations. In addition, the responsible party will also represent that none of the mortgage loans (i) are "high cost loans," (ii) are covered by the Home Ownership and Equity Protection Act of 1994, (iii) are in violation of, or classified as "high cost," "threshold," "predatory" or "covered" loans under, any other applicable state, federal or local law. No predatory or deceptive lending practices, as defined by applicable laws, including, without limitation, the extension of credit without regard to the ability of the mortgagor to repay and the extension of credit which has no apparent benefit to the mortgagor, were employed in the origination of the mortgage loan or (iv) is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then current Standard & Poor's LEVELS® Glossary)." Prospectus Supplement at S-15 (Mar. 27, 2006); *see also id.* at S-53, S-55 to S-58; Free Writing Prospectus at S-16, S-54, S-56 to S-59 (Mar. 3, 2006); Post-Effective Amendment No. 1 to Form S-3, at S-20, S-42 to S-43 ("Version 2") (Nov. 2, 2005).

- "Pursuant to the First Franklin Agreements, the responsible party will make certain representations and warranties as of the applicable Original Sale Date (or such other date as set forth below).  These representations and warranties include, but are not limited to . . . [t]he documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated in them or necessary to make the information and statements in them not misleading.  No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a mortgage loan has taken place on the part of the responsible party and, to the best of the responsible party's knowledge, any other person, (including without limitation, the mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the mortgage loan)." Prospectus Supplement at S-54 (Mar. 27, 2006); *see also* Free Writing Prospectus at S-55 (Mar. 3, 2006).

## XI.   GPMF 2006-OH1 (Registration Statement No. 333-132809)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-45 to S-48 (Dec. 21, 2006); Preliminary Prospectus Supplement at S-46 to S-49 (Dec. 20, 2006); *see also* Prospectus Supplement at S-54, S-55 ("Predatory Lending Generally"), S-58 ("Underwriting Methodology") (Dec. 21, 2006); Prospectus at 28-29 (Oct. 6, 2006); Form S-3 at S-25, S-28 to S-29 ("Version 1"), S-43 to S-46, S-53 ("Version 2"), 28-33 (Mar. 29, 2006).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading. *See* Prospectus Supplement at S-B-1 to S-B-6 (Dec. 21, 2006); Preliminary Prospectus Supplement at S-B-1 to S-B-6 (Dec. 20, 2006); Free Writing Prospectus, Structural and Collateral Term Sheet at 3, "GPMF 2006-OH1 Strats" (Dec. 18, 2006); Free Writing Prospectus, Structural and Collateral Term Sheet at 3, "GPMF 2006-OH1 Strats" (Dec. 29, 2006).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios. *See, e.g.*, Free Writing Prospectus (Dec. 7, 2006); Free Writing Prospectus (Dec. 19, 2016); Free Writing Prospectus (Dec. 28, 2006); Free Writing Prospectus (Jan. 4, 2006); *see also* Prospectus Supplement at S-51 (Dec. 21, 2006); Preliminary Prospectus Supplement at S-52 (Dec. 20, 2006); Form S-3, at S-49 ("Version 2") (Mar. 29, 2006).

- "The following is a general summary of the[] representations and warranties . . . . *Loan-to-Value Ratio.* The loan-to-value ratio of each Mortgage Loan is less than 100%." Prospectus Supplement at S-54 (Dec. 21, 2006); Preliminary Prospectus Supplement at S-55 (Dec. 20, 2006).

- "The following is a general summary of the[] representations and warranties . . . . *Compliance with Applicable Laws.* Any and all requirements of any federal, state or local law applicable to the origination and servicing of the Mortgage Loan have been complied with . . . and all inspections, licenses and certificates required for the occupied portion of each Mortgaged Property have been obtained." Prospectus Supplement at S-52 (Dec. 21, 2006); Preliminary Prospectus Supplement at S-53 (Dec. 20, 2006); Form S-3 at S-12, S-39, S-41 ("Version 1"), S-50, S-52, S-54, S-56 ("Version 2") (Mar. 29, 2006).

- "The following is a general summary of the[] representations and warranties . . . . *Origination/Doing Business. . . .* The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statements of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading." Prospectus Supplement at S-53. Any and all requirements of any federal, state or local law applicable to the origination and servicing of the Mortgage Loan have been complied with . . . and all inspections, licenses and certificates required for the occupied portion of each Mortgaged Property have been obtained." Prospectus Supplement at S-52 to S-53 (Dec. 21, 2006); Preliminary Prospectus Supplement at S-54 (Dec. 20, 2006); Form S-3 at S-39 to S-40 ("Version 1"), S-50 ("Version 2") (Mar. 29, 2006).

**A-16**

---

**SECOND AMENDED COMPLAINT – APPENDIX**

**XII.   GSR 2006-OA1 (Registration Statement No. 333-132809)**

- The statements regarding the underwriting standards used to originate the loans were false and misleading. *See* Prospectus Supplement at S-49 to S-60 (Aug. 23, 2006); *see also id.* at S-67; Prospectus at 28-33 (Aug. 3, 2006); Free Writing Prospectus, Term Sheet Supplement at "The Goldman Sachs Mortgage Conduit Program," "Countrywide Underwriting Guidelines," "IndyMac Bank F.S.B. Underwriting Guidelines," and "Representations and Warranties Regarding the Mortgage Loans – Underwriting Guidelines" (Aug. 11, 2006); Form S-3 at S-25, S-28 to S-29 ("Version 1"), S-43 to S-46, S-53 ("Version 2"), 28-33 (Mar. 29, 2006).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading. *See* Prospectus Supplement at S-B-1 to S-B-31 (Aug. 23, 2006); Free Writing Prospectus, Structural and Collateral Term Sheet at "Mortgage Pool Description" (Aug. 8, 2006); Free Writing Prospectus, Structural and Collateral Term Sheet at "Mortgage Pool Description" (Aug. 16, 2006); Free Writing Prospectus (Aug. 24, 2006).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios. *See, e.g.,* Free Writing Prospectus (Aug. 24, 2006); Free Writing Prospectus (Aug. 25, 2006); *see also* Prospectus Supplement at S-64 (Aug. 23, 2006); Free Writing Prospectus, Term Sheet Supplement at "Representations and Warranties Regarding the Mortgage Loans – Mortgage Loan Schedule" (Aug. 11, 2006); Form S-3, at S-49 ("Version 2") (Mar. 29, 2006.

- "The following is a general summary of the[] representations and warranties . . . . *Compliance with Applicable Laws.* Any and all requirements of any federal, state or local law applicable to the origination and servicing of the Mortgage Loan have been complied with . . . and all inspections, licenses and certificates required for the occupied portion of each Mortgaged Property have been obtained" Prospectus Supplement at S-65 (Aug. 23, 2006); Free Writing Prospectus, Term Sheet Supplement at "Representations and Warranties Regarding the Mortgage Loans – Compliance with Applicable Laws" (Aug. 11, 2006); Form S-3 at S-12, S-39, S-41 ("Version 1"), S-50, S-52, S-54, S-56 ("Version 2") (Mar. 29, 2006).

### XIII.  GSR 2007-OA1 (Registration Statement No. 333-139817)

- The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-58 to S-76 (May 7, 2007); *see also id.* at S-83; Prospectus at 28-32 (Feb. 13, 2007); Free Writing Prospectus, Term Sheet Supplement at S-48 to S-65 (Apr. 26, 2007); Free Writing Prospectus, Term Sheet Supplement at S-48 to S-66 (May 3, 2007); Pre-Effective Amendment No. 1 to Registration Statement, at S-26, S-29 to S-30 ("Version 1"), S-44 to S-47, S-54 ("Version 2"), 28-32 (Jan. 31, 2007).

- The summary statistical information for the loans, such as LTV, CLTV, and owner-occupancy ratios, was false and misleading. *See* Prospectus Supplement at S-58, S-B-1 to S-B-41 (May 7, 2007); Free Writing Prospectus (May 10, 2007); Free Writing Prospectus, Structural and Collateral Term Sheet at 3 (Apr. 26, 2007); Free Writing Prospectus, Structural and Collateral Term Sheet at 4 (May 1, 2007); Free Writing Prospectus, Structural and Collateral Term Sheet at 4 (May 3, 2007); Free Writing Prospectus, Structural and Collateral Term Sheet at 4 (May 7, 2007).

- The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios.  *See, e.g.,* Free Writing Prospectus (May 10, 2007); Free Writing Prospectus (May 15, 2007); *see also* Prospectus Supplement at S-80 (May 7, 2007); Free Writing Prospectus, Term Sheet Supplement at S-69 (Apr. 26, 2007); Free Writing Prospectus, Term Sheet Supplement at S-70 (May 3, 2007); Pre-Effective Amendment No. 1 to Registration Statement, at S-50 ("Version 2") (Jan. 31, 2007).

- "The following is a general summary of the[] representations and warranties . . . . *Compliance with Applicable Laws.*  Any and all requirements of any federal, state or local law applicable to the origination and servicing of the Mortgage Loan have been complied with . . . and all inspections, licenses and certificates required for the occupied portion of each Mortgaged Property have been obtained."  Prospectus Supplement at S-81 (May 7, 2007); Free Writing Prospectus, Term Sheet Supplement at S-70 (Apr. 26, 2007); Free Writing Prospectus, Term Sheet Supplement at S-71 (May 3, 2007); Pre-Effective Amendment No. 1 to Registration Statement, at S-12, S-40, S-42 ("Version 1"), S-51, S-55, S-57 ("Version 2") (Jan. 31, 2007).